**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ANDREW PAUL LEONARD,

      Plaintiff,

  v.

STEMTECH HEATH SCIENCES, INC., et al.

      Defendants.

CASE  NO.: 01-08-CV-67 (LPS)

## PRELIMINARY EXPERT REPORT AND DISCLOSURE OF PROFESSOR JEFF SEDLIK

SUBMITTED September 19, 2011

CONFIDENTIAL

TO BE FILED UNDER SEAL

I have been engaged by Plaintiff Andrew Paul Leonard ("Leonard") in the above captioned matter brought by Leonard against Defendant Stemtech Health Sciences, INC., et al. ("Stemtech") to serve as a consulting expert, and possibly as a testifying expert witness.

I expect to provide an expert opinion and possibly to give expert testimony on industry practices, standards and procedures in the photography and advertising industries, both in general and with respect to business transactions, actions and other occurrences involving or related to the parties to this matter.  In addition, I expect to opine on licensing issues, contractual issues, applicable damages and other issues that might arise in this matter.

Specific topics on which I expect to testify are discussed in more detail below.  My opinions are based in part on more than fifteen years of service in high-level positions in trade associations and standard-setting bodies in the photography, advertising and design industries. In addition, I have owned and operated a publishing company for more than a decade, and I have been a nationally recognized advertising photographer for more than 25 years, working with many clients, observing and interacting with large numbers of professional photographers, advertising agencies, design firms, corporate clients and others in the United States and other countries.

This preliminary expert Report ("the Report") has been prepared in connection with the above referenced matter, and is submitted pursuant to Fed. R. Civ. P. 26(a) (2). Section V of the Report outlines my preliminary opinions. In addition to my personal knowledge, my opinions are based on an independent examination of documents produced, deposition testimony, interviews, third party documents as disclosed and research and market surveys conducted by my firm. Portions of the Report are based on information designated as confidential in this matter. The Report is confidential, intended for the specific purposes of the above captioned matter, and is to be filed under seal to prevent disclosure of any information

1

designated as confidential by the parties. This report may not be used for any other purpose without my advance express written consent.

 Should additional relevant information come to light, I may amend or supplement my opinions as necessary and permitted by the Court. In addition to supplemental expert reports, I may also offer rebuttal expert reports in response to reports filed at any time by Stemtech or by experts retained by Stemtech in this matter.  Any supplemental or rebuttal report that I file may address additional topics on which I would expect to testify.

If called upon as a witness in this case, I could and would make the following statements of my own personal knowledge and experience.

## I.   QUALIFICATIONS

I am currently the President and CEO of the PLUS Coalition. "PLUS" is an acronym for "Picture Licensing Universal System." The PLUS Coalition is a non-profit, international standards body and trade association representing the shared business interests of all industries involved in the creation, licensing and use of photography and illustration, including photographers, illustrators, advertisers, advertising agencies, graphic design studios, publishers, artists' representatives, museums, libraries, stock photo agencies and all other image licensees and licensors. The PLUS Coalition develops, propagates and maintains universal standards for use by licensees and licensors in transactions involving photography and illustration. I also serve as a founding member of the PLUS Board of Directors, and was personally responsible for the initial development of the core concept ultimately resulting in the formation of the PLUS Coalition and its standards.

I am the past National President of the Advertising Photographers of America (APA), the leading trade association for commercial photographers in the United

2

States, for which I currently hold the position of Chief National Advisor on Licensing and Copyright. In that position, I advise the APA on current issues related to copyright, photography, advertising and modeling business practices. I represent the organization in discussions with the US Copyright Office on matters related to photography and copyright, and also interact with trade organizations in photography and other industries, discussing industry standards and other matters related to the business of photography. I have also served on the Board of Directors and Legal Affairs Committee of the Los Angeles Chapter of the APA. I currently serve on the Photo Metadata Working Group for the International Press Telecommunications Council (IPTC) and on the Digital Image Submission Guidelines Working Group for Universal Digital Image Guidelines (UPDIG). In addition, I authored the "Photography Licensing" chapter of "Professional Business Practices in Photography," published by the American Society of Media Photographers (ASMP).

I currently serve on the Photography Industry Advisory Council for Adobe Systems, a leading software company. In that capacity, I am one of twelve photographers selected by Adobe to represent the interests of all photographers worldwide in advising Adobe on matters related to professional photography, copyright, image licensing and software. I have also served in a similar capacity for other organizations.

I sit on the Intellectual Property Committee of the Art Center College of Design, where I am an active faculty member, holding the title of Professor of Photography, and where I teach advanced courses on legal, business and technical issues related to photography and advertising, with an emphasis on licensing issues.

After twenty-five years as an award-winning commercial photographer and the President of Jeff Sedlik Photography, I continue to operate an advertising photography production company in, California, with a client list that includes such companies as Nike, Federal Express, Farmers Insurance, SBC, GTE, NBC, Sony,

3

AT&T, Blue Cross, Epson, IKEA, MCA, United Airlines, Warner Brothers, Toyota, Nestle', Disney, Bank of America and others.

I am the President of Mason Editions, a publishing company engaged in producing and distributing fine reproductions of photographs. In addition, I provide consulting services to organizations and individuals on issues related to copyright, licensing, negotiating and business practices and procedures related to photography, advertising and modeling.

In recognition of my expertise and my contributions to the photography and advertising industries, I have received the 2005 Industry Leadership Award from the International Photography Council of the United Nations, the 2006 PhotoMedia Photographer of the Year award and the 2007 APA Industry Advocacy Award.  In 2008, I was awarded an Honorary Masters Degree from the Brooks Institute of Photography, recognizing Lifetime Achievement in the craft and industry of photography.

I have occasionally testified as an expert witness in litigation involving photography. The cases in which I have testified at trial or by deposition in the last four years are:

Omar Hogben v. Travelocity.com, Inc.

U.S. District Court, Southern District of Florida

Case #06-20478-CIV-MARTINEZ

People v. Thomas Edward Sizemore

Superior Court of the State of California, for the County of Los Angeles, Airport Judicial District

Case #3WL01383

Omar Hogben v. Wyndham International, Inc.

U.S. District Court, Southern District of Florida

Case #05-CV-20944-Lenard/Klein


Andes Industries, Inc., PCT International, Inc. v. John Mezzalingua Associates, Inc.

U.S. District Court, District of Arizona

Case #CV-05-1850-PHX-DKD


Pete Livingston v. Keya Morgan, et al.

U.S. District Court, Northern District of California

Case #C06-2389 MMC


Robert Wagner v. New Balance Athletic Shoes, Inc.

Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County, Florida

Case #00-30438 CA 30


Paula Perez v. The Finish Line, Inc. a foreign corporation, et al

U.S. District Court, Southern District of Florida, Miami Division

Case #06-21360-CIV-COOKE/BROWN


United States v. Rebecca Junkins

U.S. District Court, Southern District of Alabama

Case# 07-00279-KD


Jennifer Leigh Miller v. Anheuser-Busch, Inc.

5

U.S. District Court, Southern District of Florida, Miami Division

Case #06-021770-ASG

Stereo Optical Co., Inc. v. Thomas J. Judy, Jacqueline K. Judy, Ralph E. Craig, Richard Unger and Vision Assessment Corporation

U.S. District Court, Northern District of Illinois, Eastern Division

Case #08 C 2512

Cathrin Lorentz v. Sunshine Health Products, Inc., a Florida Corporation and Cathie Rhames

U.S. District Court, Southern District of Florida

Case # 09-CIV-61529-Moreno/Torres

My publication list is included in my curriculum vitae, a copy of which is attached to this Report as Exhibit A.

## II.   COMPENSATION

My work on this matter is being billed at my standard rate of $650.00 per hour. If my client elects to pay my fees in advance or within ten days of my invoice date, I offer 5% net 10 payment terms, excluding deposition and courtroom testimony. Other than my current engagement as an expert in this matter, I have had no relationships with the parties to this matter. My compensation is not contingent upon, dependent upon or related in any way to the outcome of this matter.

## III.   MATERIALS CONSIDERED

In preparation for this Report and for the expert testimony that I may be called on to provide, I have considered the materials listed in Exhibit B.

## IV.   BACKGROUND

Plaintiff Andrew Paul Leonard ("Leonard") is a photographer specializing in creating images of microscopic subject matter, using scanning electron microscopes. Residing in New York, New York, Leonard owns and operates APL Microscopic as a sole proprietor.   Leonard and his artist's representative seek and accept photography assignments from clients who make use of Leonard's photographs for editorial, advertising, educational, scientific and other purposes.   Leonard also markets his "stock" photographs via stock photo agencies and on his web site, www.aplmicro.com[1] .

Defendant Stemtech HealthSciences, Inc. ("Stemtech") engages in the development, production, distribution, and sale of phytoceutical dietary supplements including StemEnhance, a botanical extract.  A multi-level marketing company, Stemtech sells its products through a global network of distributors, as well as online. Founded in 2005, Stemtech is based in San Clemente, California[2] and operates a number of web sites including www.stemtechbiz.com.

On or about May, 2006, Stemtech representative Al Crane ("Crane") contacted Leonard seeking a limited license to reproduce one of Leonard's photographs, picturing a stem cell.[3]  Leonard initially understood Crane to request limited usage of Leonard's photograph in a printed Stemtech brochure, and provided a quote for a

---

[1] Telephonic interview with Leonard, September 1, 2011
[2] http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=30950596
[3] Email from KelleyBurnett (Al Crane) to Bonnie Goldfein dated May 22, 2006, acknowledging telephone conversation with Leonard regarding license details. Bates # ST-0002

$500 license fee.[4]   Upon Leonard's request, Crane then provided additional information, allowing Leonard to understand that Stemtech was requesting the right to reproduce one photograph in "HealthSpan," a magazine published by Stemtech to promote and encourage participation by Stemtech distributors in sales of Stemtech products.  Stemtech also requested limited usage of the photograph on the web, only on the Stemtech web site. The period of the requested license was one year.[5]

Due to Stemtech's pressing deadlines, Leonard delivered the photograph during these negotiations.  Stemtech requested an alternative version in a different color. Leonard then delivered an alternative version and Stemtech accepted that photograph as delivered.[6]

Leonard then delivered an invoice for a licensing fee in the amount of $1,250, based on the revised, greater scope of the license requested by Stemtech, for usage only in the magazine and on a single web site.[7] After receipt of the invoice, Stemtech informed Leonard that Stemtech did not require the right to make use of Leonard's photograph on the web.  Stemtech requested that Leonard remove the license fee for web usage, and reduce the total invoiced amount.   Leonard confirmed Stemtech's request, deducting the $300 fee for web usage, and re-issuing the invoice in the amount of $950.[8]   Stemtech then delivered partial

---

[4] Email from Leonard to Al Crane dated May 23, 2006 quoting a "brochure" license fee $500 and offering to quote an additional web license fee in response to Crane's request for same. Bates # ST-0004

[5] Email from Al Crane to Leonard dated May 24, 2006, providing detailed description of rights required by Stemtech, including one year usage of one image in HealthSpan magazine, and one year usage on Stemtech web site. "They would like to request usage on their internet web site." Bates # ST-0005. Also see June 1, 2006 email from Leonard to Crane requesting confirmation of detailed usage requirements, Bates # ST-0009, and see June 1, 2006, Crane email to Leonard, confirming that Leonard's license description is correct ("That's correct for the usage...") and confirming the URL of the Stemtech web site as www.StemTechHealth.com at Leonard's request. Bates # ST-0009. Also see June 2/3, 2006 email exchange between Crane and Leonard in which Crane confirms size of image for the web site, Bates # ST-00010 and ST-00011.

[6] Email exchanges between Leonard and Al Crane, referring to delivery of image files attached to the emails, and referring to an alternative version in a different color. Crane accepts the yellow version "I like the yellow." All dated May 24, 2006, Bates # ST-0006

[7] Leonard invoice #711 to Stemtech in the amount of $1250, as delivered to Bonnie Goldfein July 17, 2006. Bates # ST-00012. Also see associated email from Leonard to Crane,  Bates # ST-00013.

[8] Leonard's revised invoice #711, sans $300 license fee for web usage "1 year usage of stem cell image APL1335 on Stemtech HealthSpan website – Canceled."  Invoice total revised from $1250 to $950, $500 payment applied to total. $450 outstanding balance.  Bates #APL 00055. Note: date entered by Leonard on revised invoice, 6/11/2011

payment, in the amount of $500.[9]  Leonard repeatedly requested payment of the
$450 outstanding balance due on the invoice, but did not receive full payment from
Stemtech.[10]

Although Stemtech did not make full payment to Leonard and thus was never
granted the license offered by Leonard, Stemtech proceeded to reproduce and
distribute Leonard's photograph in HealthSpan magazine to recruit and train
distributors and to generate profits for Stemtech by promoting sales of Stemtech
products.  Stemtech then made additional unlicensed use of the photograph on
Stemtech's websites, in Stemtech's publications, sales aids, training materials and
marketing materials. Stemtech also made use of an additional photograph owned
by Leonard, without requesting or receiving a license from Leonard.[11] Stemtech
then resold and sublicensed Leonard's photographs to its distributors without
Leonard's knowledge or permission. Stemtech's distributors then made extensive
additional unlicensed usages of at least three Leonard photographs.[12]

On or about October, 2007, Leonard learned of Stemtech's unlicensed usage when
he discovered his photograph in use by a Stemtech distributor. This discovery
prompted Leonard to conduct further investigation, upon which Leonard discovered
a multitude of unlicensed usages by Stemtech and its distributors. Such usages
included reproduction of Leonard's photographs in videos, PowerPoint
presentations, downloadable electronic brochures, e-Books, DVD packaging, DVD
content, product advertising in numerous commercial web sites, and assorted other
advertising/marketing materials.

---

is the original invoice date, not the actual date of the revised invoice. See Deposition of Andrew Paul Leonard,
January 22, 2010 ("Leonard Depo"), 105:3.
[9] See Stemtech notations on Leonard's invoice #711, indicating "Approved for $500 only."  Bates # ST-000336
[10] See Leonard email to Goldfein and Meyer dated August 21, 2006 requesting payment of balance of invoice. Bates
# ST-00017. Also see Leonard email to Goldfein dated October 11, 2006 requesting payment status. Bates # ST-
00018. Also Leonard invoice To Goldfein dated August 4, 2006 invoice status. Bates # ST00014.
[11] See section G, "Known and Unknown Infringements by Defendant and Defendant's Distributors," regarding
usage of alternative photograph in HealthSpan magazine, Volume 1, Issue 3.
[12] See Exhibit C, "Known Infringements."

Leonard retained an attorney and made unsuccessful attempts to resolve Stemtech's unlicensed usages.[13]  After receiving a settlement offer from Leonard's attorney, Stemtech attempted to stop certain unlicensed usage of Leonard's photographs by Stemtech and its distributors,[14] but its efforts were insufficient, and the infringements continued.  Stemtech refused to compensate Leonard for the unlicensed usages,[15] instead sending Leonard a $750 payment against the outstanding amount owed Leonard on the invoice for the 2006 limited license.[16] Leonard rejected Stemtech's offer and payment, explaining that payment of the past invoice would not remedy Stemtech's extensive unlicensed exploitation of Leonard's photographs and copyrights.

Leonard then filed the complaint in the instant matter on February 1, 2008.[17] Leonard continued his investigations,[18] and has discovered a large number of additional unlicensed usages by Stemtech and its distributors since initiating his lawsuit, including an infringement discovered as recently as September 17, 2011, two days prior to the submission of this Report.[19]


## V.    DISCUSSION


### A.    Copyright Licensing in Photography


Consideration of the facts associated with this matter requires a basic familiarity with standards and practices in the photography licensing

---

[13] Letter dated January 18, 2008 from Leonard's attorney Sherry Flax to Ray Carter. Bates # ST-000499-500.
[14] "Compliance Update" from Donna Marie Serritella dated February 8, 2008 indicating "The main focus, since discovered, has been given to finding websites who either use the single picture(s) or who use the 45 minute video with the questionable pictures."
[15] Email from Ray Carter to Sherry Flax dated January 21, 2008 refusing to pay Leonard for infringing usages by Stemtech, offering to pay $300 license fee for web use as originally quoted by Leonard.  Bates # APL 00213
[16] Letter dated February 19, 2008 from Sherry Flax to Ray Carter, returning Stemtech check dated February 5, 2008 in the amount of $750 payable to Leonard. Bates # APL 00217
[17] Complaint dated February 1, 2008
[18] Leonard Depo, 156:14
[19] See section G, "Known and Unknown Infringements by Defendant and Defendant's Distributors," regarding usage of alternative photograph in HealthSpan magazine, Volume 1, Issue 3.

industry. This section provides a brief overview, addressing selected issues relevant to this matter.

In the photography industry, clients seeking photographs may either commission new photographs ("assignment photography"), or acquire rights to existing photographs ("stock photography").

1. Assignment Photography

In assignment photography, clients contract with photographers or their agents to commission photographers to create new images. Photographers typically retain copyright ownership in the images that they create, and grant limited licenses to their clients in exchange for a license fee based in great measure on the scope of the rights granted.

While a photographer might require that a client pay fees and production expenses associated with the creation and production of a photograph, such payment does not entitle the client to ownership in the photographs, and does not entitle the client to make use of the photographs, unless the photographer expressly assigns ownership to the client or grants such rights to the client.

Many photographers specify a "Usage Fee" or "Licensing Fee" in their estimates and invoices, while others use a single fee, applying to both the production of the photographs and a copyright license, granted by the photographer to the client. Notwithstanding a photographer's fee structure, if a license is not specified either in a photographer's estimate or invoice or in an associated agreement between the photographer and client, the client has no legal right to exploit the photographs or to otherwise make use of the photographs.

After creating a photograph and licensing rights for an initial use by a client, a photographer typically earns and relies upon residual revenue earned by licensing additional rights to that client. In the absence of an exclusive license arrangement, the photographer may also license use of the photograph to third parties, provided that such license does not infringe on the rights of any persons pictured in the photographs or violate the rights of the owners of any property pictured in the photographs. Photographers may offer such photographs directly to third parties, or may offer such photographs via "stock" photography agencies.

Photographers' often earn greater revenues from relicensing their images than from the initial licenses granted to commissioning clients. Photographers' livelihoods depend on the receipt of payment from their clients in exchange for the right to use their photographs and copyrights. The fee charged by a photographer can vary dramatically depending on the scope of rights licensed.  For most photographers, when determining an appropriate fee, the time and complexity involved in the creation of a photograph (although an important consideration) is secondary to consideration of the extent of the reproduction rights granted.

2. Stock Photography

In stock photography, photographers first create photographs, and then offer these existing images for licensed usage by clients. This offering is typically made on stock photography websites, either by the photographer or by a "stock agency" acting as an authorized licensor for the photographer's images.

Clients seeking stock photography typically visit stock photography websites, search for photographs meeting their requirements, and then purchase licenses and download the images for usage. Such purchases

may be made via an automated process, or by communicating with sales staff at the stock agencies or a photographer's office.

Clients may acquire rights to stock photographs under various "licensing models." While some vendors specialize in certain licensing models, many vendors offer photographs under several licensing models. Common licensing models include:

i.  Royalty Free ("RF"): this model allows a client to pay a single, one-time fee based on the size of the digital image file desired by the client. The client receives a license allowing usage of the photograph in unlimited media, for unlimited time, at any size, in any quantities, worldwide, promoting any products.   For example, such a license allows a client to use an image on any number of web sites in any and all countries, worldwide, forever.   There are numerous detailed restrictions on RF licenses but in general, the licenses allow broad usage.   Most RF images are professionally produced, and are less unique than many images offered under the Rights Managed model (see below).

ii. Microstock: A form of Royalty Free licensing, microstock is a less expensive alternative, providing broad rights for a low price, based on the size of the image file desired by the client. Like royalty free, microstock provides usage in unlimited media, unlimited quantities, unlimited sizes, unlimited countries, for unlimited time.   Images are provided by professional photographers, semi-pros, and amateurs.

iii. Rights Managed ("RM"):   A long-standing licensing model, rights managed licensing remains a common form of stock image licensing. In RM licensing, usage fees are based upon the scope of usage desired by the client.   In general, the greater the scope of usage desired, the greater the licensing fee paid by the client.   Scope is defined by the type of media, the size and quantity of reproductions, the regions in

13

which the reproductions will be distributed, the duration of use, exclusivity desired, exclusivity and other factors. RM images are primarily created by professional photographers. Fees associated with RM licenses are often (but not always) higher than fees for RF licenses.

In the instant matter, Stemtech did not commission the creation of new images, but instead sought a limited, non-exclusive rights managed license to exploit a single pre-existing "stock" image created and owned by Leonard.

### B.   Plaintiff's Photographs

The photographs at issue in this matter are pictured below.



Image #2
Bone Marrow Stem Cell
Copyright registration No. VA1426178[20]

---

[20] Leonard's copyright registration #VA 1-426-178, Bates # APL 00119



Image #3
Bone Marrow Stem Cells,
Copyright registration No. VA1426178[21]



Image #4
Bone Marrow Stem Cell
Copyright registration No. VA1426177[22]

### C.    Copyright Ownership in Plaintiff's Photographs

Working as an independent contractor/sole proprietor, Leonard authored each of the three photographs at issue in this matter.  As Leonard has neither assigned nor granted exclusive rights in the photographs to any party, Leonard is the sole and exclusive owner of the copyright in each photograph.[23]    Leonard registered his copyright ownership in the photographs with the U.S. Copyright Office.[24]

---

[21] Leonard's copyright registration #VA 1-426-178, Bates # APL 00119
[22] Leonard's copyright registration #VA 1-426-177, Bates # APL 00123
[23] Telephonic interview with Leonard, September 1, 2011
[24] Leonard's copyright registration #VA 1-426-178, Bates # APL 00119, and Leonard's copyright registration #VA 1-426-177, Bates # APL 00123

## D.    Plaintiff's Work Process

Creating a photograph using a scanning electron microscope is a complex, time consuming and painstaking process.  Leonard first spends many days or weeks seeking out samples to photograph. In identifying sources for samples, Leonard relies upon a network of associates with whom he has cultivated relationships for more than a decade.  A sample must be first be grown by a scientist, or otherwise obtained. Once a sample is obtained, it must be prepared for microscopy.  The nature of the sample determines the type of preparation involved. Samples typically must be rinsed in a succession of chemicals, then dehydrated and placed in a critical point drier. Once dry, the sample is mounted on a stub of metal, then coated in gold-palladium and stored in a moisture-free environment. After placing the sample in the scanning electron microscope, Leonard selects an angle by titling and rotating the microscope platform and composes the image. Leonard controls the quality of the image by varying the electric current to the microscope and by making other adjustments.  After spending many hours photographing a succession of samples, the images are processed, and Leonard begins post-processing the images in Adobe Photoshop.  Leonard typically dedicates a minimum of ten hours to post-processing each image, colorizing various areas of the image and adjusting contrast, tone and density to achieve the end results desired and designed by Leonard. Remarkably, scanning electron microscopes capture black and white images. All color is added by Leonard, exercising creative expression and original authorship.[25]

Even after all of this effort, there is no guarantee of success, most especially with bone marrow stem cells.  The effort required, combined with the high level of skill necessary to create a successful image, and the need to obtain viable and correct samples, make a successful bone marrow stem cell image difficult to achieve, and quite rare.

---

[25] Telephonic interview with Leonard, September 1, 2011

16

### E.    Plaintiff's Licensing History

Plaintiff has a history of licensing his images for significant fees. A few examples include:

$9,000 for a 1 year license, 1 image in sales aids for Metrodin

$7,000 for a 1 year license, 1 image in sales aids for Plax

$7,000 for a 2 year license of 1 image, in visual aids for AstraZeneca

$25,000 for a 2 year license of 1 image in campaign for Lipitor

$9,000 for a 2 year license of 3 images for sales kit for Baxter Blood Products

$8,000 for a 1 year license of 1 image for sales aid for Zithromax

### F.    License Offered by Plaintiff to Defendant

In response to Stemtech's request to acquire a license to use one of Leonard's photographs, Leonard offered to grant Stemtech a limited, non-exclusive license to reproduce the photograph in the Stemtech "HealthSpan" magazine for a period of one year.   Leonard issued an invoice for the fee required by Leonard in order to grant the license to Stemtech.[26]   Stemtech failed to pay the invoice in full.   It is the custom and practice in the photography industry that rights are not granted to a licensee until the applicable license fee is paid in full. Due to Stemtech's decision to pay only a portion of Leonard's invoice, Leonard granted no license to Stemtech, and Stemtech had no legal right to make use any of Leonard's photographs. Thus, any and all usages of any Leonard photographs by Stemtech are infringements.

However, in the event that the Court finds that the unpaid invoice is a breach not voiding the license, Stemtech's only authorized usage would be Stemtech's reproduction of a single Leonard photograph in a single issue of the printed version of HealthSpan magazine, and any reproduction of the

---

[26] Leonard's revised invoice #711, sans $300 license fee for web usage "1 year usage of stem cell image APL1335 on Stemtech HealthSpan website – Canceled."  Invoice total revised from $1250 to $950, $500 payment applied to total. $450 outstanding balance. Bates #APL 00055. Note: date entered by Leonard on revised invoice, 6/11/2011 is the original invoice date, not the actual date of the revised invoice. See Leonard Depo, 105:3.

same version of that image in other issues within twelve months of the first usage. All other Stemtech usages of Leonard's photographs would remain infringements of Leonard's copyrights.

## G.   Known and Unknown Infringements by Defendant and Defendant's Distributors

Stemtech infringements currently known to Leonard are limited to those infringements discovered as the result of Leonard's ongoing investigations. Most of Leonard's discoveries have been made by a process of methodical, repeated searches, requiring tremendous effort and perseverance.

Despite years of diligent effort by Leonard, it is doubtful that the infringements uncovered by Leonard comprise the totality of the unauthorized usages of Leonard's photographs by Stemtech, its distributors and others. Stemtech has numerous websites,[27] extensive marketing materials, and has a total of approximately 100,000 distributors on its distributor list[28] (some active, some inactive). As a practical matter, Leonard is unable to monitor and police all Stemtech sites and all distributor sites throughout the world.   In addition, there is no doubt that other parties discovered Leonard's photographs on Stemtech sites without credit or copyright notice to Leonard, and proceeded to copy and make unlicensed usage of the photographs as the result of Stemtech's infringements.

It is likely that Leonard has discovered only the proverbial "tip of the iceberg" of Stemtech infringements. Any damages calculations in this report are based only upon known infringements, which likely represent only a fraction of the actual infringing usages relevant to this matter.

For example, as recently as Saturday, September 17, 2011 Leonard discovered that Stemtech's HealthSpan magazine, Volume 1, issue 3

---

[27] Deposition of Ray Carter dated January 18, 2011 "Carter Depo" 40:16
[28] Carter Depo, 131:20

(published Winter, 2006) features an alternative version of one of Leonard's photographs – a version for which Stemtech has never requested or obtained a license.   In fact, Stemtech expressly rejected the alternative version in favor of a different version accepted by Stemtech in 2006.   In the illustration below, the page on the left is from Volume 1, Issue 1 (published June, 2006), and pictures the version of the Leonard photograph for which Stemtech requested a license in 2006.   The page on the right is from Volume 1, Issue 3 and pictures a very different version, a derivative of the Leonard image, created by Leonard.   Even if Stemtech had been granted a license for the image pictured on the left, Stemtech would not have been legally entitled to use Leonard's derivative version of the photograph, pictured on the right.



The below list is an index to a montage appearing on the following page.   The list and montage provide a representative sampling of the wide variety of infringing usages of Leonard's photographs by Stemtech and its distributors. The numbers in the left column of the list correspond to numbers appearing overlaid on each infringement pictured in the montage.     This is not a comprehensive list of the known infringements. For a more complete and detailed list of infringements known to Leonard as of this date, see Exhibit C, attached to this Report.

## Index to Montage of Infringements

| # | Photo# | Description |
|---|--------|-------------|
| 1 | 4 | Still Image HealthSpan Cover, Issue 1 |
| 2 | 4 | Still Image HealthSpan internal page, Issue 1 |
| 3 | 4 | Still Image HealthSpan internal page, Issue 3 |
| 4 | 4 | Still Image in The PowerLine Ebook |
| 5 | 4 | Still Image taken from Video "Mr. Stem Cell" with added face illustration |
| 6 | 4 | Still Image in PowerPoint – Spanish |
| 7 | 4 | Still Image in PowerPoint - Spanish Image silhouetted |
| 8 | 4 | Still Image in PowerPoint – English |
| 9 | 4 | Still Image in PowerPoint - English Image silhouetted |
| 10 | 4 | Still Image in video "An Introduction to Adult Stem Cells |
| 11 | 4 | Still Image in "Wellness" video |
| 12 | 4 | Still Image in "Product" video |
| 13 | 4 | Still Image in "Wellness" video |
| 14 | 4 | Still Image in "Product" video |
| 15 | 4 | Still image Flash Slide Presentation |
| 16 | 2 | Still Image silhouetted at stemcellfacts.net |
| 17 | 3 | Still Images appearing on YourStems website and downloadable PDF eBook |
| 18 | 4 | Still Image (different version - color) in video "An Introduction to Adult Stem Cells |
| 19 | 3 | Still Image #3 in video "An Introduction to Adult Stem Cells |
| 20 | 4 | Still Image with face illustrated for book entitled "The Open Secret" |
| 21 | 4 | Still Image with product bottle on LCR website |
| 22 | 4 | Still Image on "Kells Best of the Best" web page |
| 23 | 4 | Still Image YourStems.com website |
| 24 | 4 | Still Image capture with silhouetted cells from "Stem Cells and StemEnhance" Video |
| 25 | 4 | Still Image from Stem Cells and StemEnhance Video |
| 26 | 4 | Still Image on Web from stemcellupdateblog.com |
| 27 | 4 | Still Image on bac2health Website |
| 28 | 4 | Still Image from Video "Stem Cells and Stem Enhance with Christian Drapeau" |
| 29 | 4 | Still Image from Video "Stem Cells and Stem Enhance with Christian Drapeau" |
| 30 | 3 | Still Image from DVD back cover: "Stem Cells and Stem Enhance with Christian Drapeau" |
| 31 | 4 | Animated, face illustrated and replicated throughout "Mr. Stem Cell" video |
| 32 | 4 | An Introduction To Stem Cells Matt Canham video |
| 33 | 4 | Still Image (different version) on Adult-stem-cells.info |
| 34 | 3 | Still Image used in video "The Stemtech Story with Christian Drapeau" |
| 35 | 4 | Stem Cell on Free Ebook PDF "Stem Cell Science and Your Health" |
| 36 | 4 | Stem cell Image on with face illustrated used at www.missymoran.com |
| 37 | 4 | Still Image (replicated) on web |

Representative Sampling of Stemtech Infringements of Leonard Images



**H.    Unauthorized Sublicensing by Defendant**

The terms of the 2006 license offered by Leonard to Stemtech did not offer Stemtech the right to sublicense Leonard's copyrights to third parties. Without authorization from Leonard, Stemtech not only authorized its distributors to make use of Leonard's photographs, but Stemtech *repackaged, re-sold* and delivered Leonard's photographs to its distributors,[29] as reproduced on or within "marketing and training tools" (websites, DVDs, publications, etc.) developed by Stemtech for distributor training and as marketing vehicles supporting sales of Stemtech products, with the ultimate aim of increasing profits for Stemtech and its network of distributors.  In its efforts to recruit new distributors and maximize sales of Stemtech products, Stemtech states[30] (emphasis added):

> **"***You don't need any special skills or experience to succeed in Stemtech because we have a wide range of professional <u>marketing and training tools</u> available, as well as a fully-staffed Distributor Services department to support your efforts. Available tools include <u>CDs and DVDs, brochures and publications, a step-by-step Success Guide – and professional customized websites complete with videos</u> and an online shopping cart. You can easily share Stemtech information with contacts in other locations … whether it's next door or halfway around the world."*

**I.    Continuing Infringements by Defendant**

Leonard continues to discover new and ongoing infringements by Stemtech and its distributors. Below are five examples of ongoing infringements accessible on the web as of this writing:

---

[29] Carter Depo, 134:30
[30] http://www.stemtechbiz.com/OpportunityOverview.aspx



I personally made the above screenshots on September 18, 2011, by visiting the following websites:

http://www.thepowerlinesupport.com/documents/stemcellreport.pdf

http://improvebodyhealth.com/pdf/StemEnhanceReport.pdf

http://www.youtube.com/watch?v=_cp0FV4exkg

http://www.missymoran.com/AdultStemCell/ST_Rebirth.html

http://stemenhancebenefitshealth.improvebodyhealth.com/

## J.    Willful Infringement by Defendant

In offering a copyright license to Stemtech in 2006, Leonard made a good faith effort to determine the scope of usage required by Stemtech. Stemtech described its requirements, and Leonard then offered to grant Stemtech a license fulfilling the scope of usage described by Stemtech. After requesting a license for use of Leonard's photograph on Stemtech's web site,[31] Stemtech

---

[31] Email from Al Crane to Leonard requesting web usage, June 1, 2006. Bates # ST-0009

then informed Leonard that Stemtech had no intention to publish Leonard's photograph on the web, and instructed Leonard to revise Leonard's invoice to remove Leonard's fee applying to web usage.

In good faith reliance on Stemtech's representations, Leonard revised the invoice by removing the web usage license and the associated fee, and re-issued the invoice to Stemtech in a new, lesser amount.[32]   After instructing Leonard to remove the fee for web usage from Leonard's invoice, Stemtech then proceeded to publish Leonard's photograph to Stemtech's web sites and to web sites produced by Stemtech for use by its extensive network of distributors.[33]   This catalyzed viral distribution and infringement of Leonard's photographs throughout Stemtech's distribution network, worldwide.     At Deposition, Brian Noar, Stemtech's Manager of Sales and Marketing, commented on the nature of these web usages, and on Stemtech's viral distribution of Leonard's photograph: "once something's out there, it's out there."[34]

Stemtech is experienced in image licensing.[35]   As evidenced by Stemtech's initial license request in 2006, Stemtech clearly understood that Stemtech was required to obtain and pay for a license from Leonard in advance, in order to secure necessary rights to exploit Leonard's copyrights.   Stemtech then chose to pay only a portion of Leonard's invoice,[36] and proceeded with an egregious, expansive and willful campaign of infringement of Leonard's copyrights.

---

[32] Leonard's revised invoice #711, sans $300 license fee for web usage "1 year usage of stem cell image APL1335 on Stemtech HealthSpan website – Canceled." Invoice total revised from $1250 to $950, $500 payment applied to total. $450 outstanding balance. Bates #APL 00055. Note: date entered by Leonard on revised invoice, 6/11/2011 is the original invoice date, not the actual date of the revised invoice. See Leonard Depo, 105:3.

[33] See Exhibit C, "Known Infringements"

[34] Deposition of Bryan Noar dated January 20, 2011 ("Noar Depo") 141:14

[35] Deposition of Christian Drapeau, dated January 19, 2011 ("Drapeau Depo") 96:17, 97:1,97:6.  Carter email to Sherry Flax dated January 21, 2008, Bates #APL 00212, "This image is just one of hundreds that we use, most of which are free or are one time payments for unlimited use."

[36] See Stemtech notations on Leonard's invoice #711, indicating "Approved for $500 only." Bates # ST-000336

Stemtech clearly failed to adequately control and manage its use of intellectual property. Stemtech also failed to adequately monitor and police the use of intellectual property on its distributors' websites and marketing materials. Stemtech could have easily prevented the distributor infringements of Leonard's images by monitoring all distributor websites. A well trained, two person team of Stemtech compliance officers could review the websites of all 30,000 active Stemtech distributors annually, ensuring that its distributors respect third party intellectual property rights. Unfortunately, Stemtech's compliance officer Donna Marie Serritella was poorly trained, and to Stemtech's detriment, believed that once a photograph appeared in public, anyone could make use of the image for free without the knowledge or permission of the copyright holder.[37]

Upon contact from Leonard's counsel, and after learning of the infringements, Stemtech failed to take adequate action to terminate all infringements by Stemtech and its distributors. Stemtech could have rapidly removed all infringements by conducting a review of all distributor websites, and by shutting down websites displaying or distributing unlicensed intellectual property. Even those web sites not under the control of Stemtech could have been controlled by issuing a DMCA takedown notice, thus immediately terminating any infringements. Instead, Stemtech made no substantive effort to identify and remedy infringing uses of Leonard's images by its network of more than 30,000 distributors. Infringements continue to this day.[38]

Based on my review of all information available to me in this matter, Stemtech willfully and recklessly infringed on Leonard's copyrights.

---

[37] Email from Donna Marie Serritella to Leonard dated December 14, 2007, in which Serritella states: "I think one of these was on the cover of a major publication and that made it public for usage." Exhibit 7 to Deposition of Donna Marie Serritella dated April 13, 2011 ("Serritella Depo").
[38] See section "I," "Continuing Infringements by Defendant.

25

### K.   Statutory Damages and Attorney's Fees

Leonard may be entitled to seek statutory damages and attorney's fees as remedies for infringements commencing after Leonard's effective date of registration, where those infringements give rise to new causes of action, such as where such infringements occur in new media, new versions of publications, or involve distributors not engaged in infringement prior to the effective date of registration.

### L.   Actual Damages

Actual damages are determined in part by the fee that a willing buyer would have been reasonably required to pay at the time of the infringement.[39] In the photography marketplace, each photographer sets his/her own fees, based upon criteria defining the scope of a license. These criteria include the type of media in which the photograph will be reproduced, the size of reproduction, the region of distribution, the duration of the license, exclusivity and other factors. Quality and scarcity of the photograph are also primary considerations. The unique circumstances of each transaction affect the fees offered by photographers.

To arrive at a reasonable estimate of licensing fees applicable to the infringing usages, I obtained comparative stock photography license fee quotes from several stock photography agencies.[40] I calculated total fees based on the information available to me, including some or all of these factors: the number of uses of each image, the media in which the photographs were reproduced, the reproduction quantity, size and placement of reproduction, and the period of use. Where one or more criteria were missing, I made the best approximation possible under the circumstances. I adjusted the fees to 2006 market rates by referencing pricing data obtained

---

[39] Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157 (9th Cir. 1977), later cited in Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505 (9th Cir. 1985)
[40] See stock agency license quotes in Exhibits G, H, I, J

by my firm in that time period.[41]   I did not apply any punitive multiplier contemplating the infringing use.

In addition to the actual damages computations performed by obtaining reference quotes matching Stemtech's usage to the greatest extent possible, I have relied on my personal knowledge and experience in image licensing.

I reserve the right to revise my damages calculations in the event that information comes to light that allows for a more precise calculation of damages.

Based upon the above criteria and on all of the information available to me at this time, it is my opinion that with respect to known infringements by Stemtech and its distributors, Leonard is at minimum entitled to actual damages in the amount of $215,767.65, as listed in the below chart, with details and supporting documentation provided in Exhibits C, D, E, F, G, H, I, J, K, L, M, N, O, P.  This amount represents only the approximated 2006 market value of licenses of generic images for usages known to Leonard, and does not contemplate the scarcity of the images, the exclusive nature of the usage, or the devaluation of the copyrights in the photographs, all of which are further discussed below.

---

[41] See Exhibits L, M, N

27

| | | | | Fees: known usages @2011 pricing | Fees: known usages @ 2006 pricing[43] | Fee to be applied per addl. year if discovered[44] |
|---|---|---|---|---|---|---|
| License Quantity | Media[42] | Size | Duration (Years)[44] | | | |
| 1 | Internal Business Collateral | 1/4 Page | 2 | $3,602.50 | $3,170.20 | $1,585.10 |
| 2 | Image on Video on DVD | Full Pg | 2-3 | $7,687.50 | $6,886.00 | $2,706.00 |
| 3 | Marketing Materials[45] | 1/2 Page | 2-3 | $17,285.38 | $15,211.13 | $6,476.99 |
| 5 | Marketing Materials[45] | 1/4 Page | 2-5 | $40,759.88 | $35,868.69 | $10,549.62 |
| 4 | Marketing Materials[45] | Full Pg | 2-3 | $26,622.63 | $35,972.43 | $10,277.84 |
| 1 | Product Packaging | 1/4 Page | 2 | $4,572.50 | $4,023.80 | $2,011.90 |
| 2 | Image on the Web | 1/2 Page | 2 | $6,290.00 | $5,535.20 | $2,767.60 |
| 11 | Image on the Web | 1/4 Page | 2-4 | $42,840.00 | $37,699.20 | $14,810.40 |
| 6 | Image on the Web | Full Pg | 2-3 | $24,600.00 | $21,648.00 | $8,659.20 |
| 6 | Image in Streaming Web Video | 1/2 Page | 2-3 | $18,947.50 | $16,673.80 | $7,695.60 |
| 2 | Image in Streaming Web Video | 1/4 Page | 3 | $8,707.50 | $7,662.60 | $2,554.20 |
| 7 | Image in Streaming Web Video | Full Pg | 2-3 | $28,882.50 | $25,416.60 | $9,632.70 |
| | | | | | | |
| | | | Totals | $230,797.89 | $215,767.65 | $79,727.15 |

**Summary of License Fees Applying To Known Unauthorized Usages**

## M.    Adjustments for Scarcity

The license fees estimated above do not contemplate the scarcity of Leonard's photographs in 2006. At that time, few if any other photographers had successfully captured a quality image of a bone marrow stem cell. This is evidenced by Time magazine's selection of Leonard's photograph for a prestigious cover photo,[46] and ironically by Stemtech's selection of the photograph for its usage. Scarce images typically demand much greater license fees than common images, often 3 to 5 times the fee for a common image.

---

[42] Regions:  pricing reflects use within the following regions: Canada, Germany, Malaysia, Mexico, the Netherlands, the Philippines, Taiwan, the UK and US.

[43] Adjustment made for estimation of 2006 pricing: 12 %. See Exhibits L, M, N for details.

[44] Duration vs. Fee: The relationship between duration and fees is not directly evident in this summary chart. See Exhibits C, D, E, F, G, H, I, J, K, L, M, N, O, P for detailed information supporting fee calculation based directly upon durations.

[45] Adjustment applied to printed brochure license fees to calculate fee for electronic brochure. Reduced by 44%. See Exhibit O for details.

[46] Time Magazine Cover, August 7, 2006.  Exhibit 11 to Leonard Depo.

Stephen Gerard, Leonard's previous stock agent at Photo Researchers, assessed the scarcity of Leonard's images at deposition:

> "...these are, in my opinion, you know, some of the most unique images and important images that have been out there in terms of stem cells." [47]

Stemtech's Christian Drapeau agrees that Leonard's photograph is "extremely valuable." At deposition, Drapeau commented on Leonard's photograph, acknowledging:

> "I understand its value totally.  I mean, it is a good representation. It's extremely valuable....it is one of the early depictions available..." [48]

I respectfully suggest that in determining damages applicable in this matter, the Court contemplate the scarcity of the photographs circa 2006, and apply a suitable scarcity multiplier to the total license fees calculated above.

## N.    Damage to the Value of Plaintiff's Photographs

Stemtech's widespread, global, pervasive exploitation of Leonard's photographs has destroyed the value of Leonard's images, and is the equivalent of an exclusive license. Few potential licensees would be interested in making use of photographs so closely associated with the Stemtech products and brand.

Leonard had every intention of fully monetizing the photographs.[49]  In the absence of Stemtech's infringements, Leonard and his heirs would have otherwise enjoyed licensing revenue over the lifetime of his copyrights in the photographs.  In granting exclusive licenses, licensors must consider the

---

[47] Deposition of Stephen Gerard, dated March 31, 2010, 56:2
[48] Drapeau Depo, 107:16, 106:6
[49] Telephonic interview of Andrew Leonard, September 1, 2011

29

revenue lost from all potential sales during the period of the license.   An exclusive license may demand a license fee of 3 to 10 times the fee applicable to a non-exclusive license.

In contemplating actual damages in this matter, I respectfully suggest that the Court consider that Stemtech's usage was comparable to an exclusive license, not only eliminating potential licensing revenue from other licenses during the period of Stemtech's usage, but permanently destroying the value of the images.

### O.    Disgorged Profits

Leonard is entitled to seek disgorgement of any Stemtech profits attributable to Stemtech's infringements on Leonard's copyrights.   A review of Stemtech's many usages of Leonard's photographs conclusively demonstrates that Stemtech exploited Leonard's photograph to promote its brand, to promote understanding of its company and products, to train and recruit distributors and to provide those distributors with tools which were used to maximize Stemtech's profits from sales of Stemtech products.

Stemtech has produced an accounting of its revenues during the period. Copies are attached as Exhibit Q.   It is Stemtech's burden to identify any revenues that are not in any way attributable to Stemtech's usage. Stemtech executive Bryan Noar has acknowledged that such a determination will be challenging.[50]

### VI.   Conclusion

Based on my personal knowledge and experience and on all information available to me as of this writing, I conclude with a reasonable degree of certainty that Stemtech willfully and recklessly infringed on Leonard's copyrights, that Stemtech's

---

[50] Noar Depo, 141:13

negligence resulted in widespread infringement by Stemtech distributors, and that Leonard is entitled to damages for copyright infringement as described hereinabove.

I understand that Stemtech may offer additional expert testimony to support Stemtech's claims in this matter, and that additional information and documents may come to light. If requested by Leonard, I may offer supplementary reports and/or rebuttal testimony to the opinions expressed by Stemtech and Stemtech's experts, in accordance with the Court's scheduling order.

Respectfully Submitted,

_____September 19, 2011

Professor Jeff Sedlik

31