# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ANDREW PAUL LEONARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 08–067–LPS–CJB |
| | ) | |
| STEMTECH HEALTH SCIENCES, | ) | |
| INC. and JOHN DOES 1–100, Inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION REGARDING
## MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff Andrew Paul Leonard ("Leonard" or "Plaintiff") filed this action for copyright

infringement against defendants Stemtech Health Sciences, Inc. ("Stemtech" or "Defendant") and

John Does 1–100 for infringement of certain photographic images created by Plaintiff. Presently

pending before the Court is Defendant's motion for summary judgment ("Motion"). (D.I. 101)

For the reasons that follow, I recommend that Defendant's Motion be granted.

## I.     BACKGROUND

### A.     Procedural Background

Plaintiff filed his original complaint on February 1, 2008, asserting one count of

copyright infringement. (D.I. 1) On July 16, 2009, Plaintiff filed a motion for leave to file an

amended complaint ("Motion for Leave"), which Defendant opposed. (D.I. 49) On July 16,

2010, the District Court granted the Motion for Leave, and on that same date the first amended

---

[1]     With regard to a motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, absent unanimous consent of the parties to the jurisdiction of a United States Magistrate Judge, a Magistrate Judge's authority as to the resolution of the motion is limited to making a Report and Recommendation to the District Court. 28 U.S.C. § 636(b)(1)(B); D. Del. LR 72.1(a)(3).

complaint ("Amended Complaint") was filed. (D.I. 75, 76)

On December 30, 2010, Defendant filed this Motion. (D.I. 101) Briefing on the Motion was completed in January 2011. (D.I. 113) On August 31, 2011, the case was referred to me to hear and resolve all pretrial matters, including the resolution of case dispositive motions. (D.I. 131) Under the current schedule, fact discovery closed on May 25, 2011, and expert reports were due on September 29, 2011. (D.I. 127, 130) A trial date has not yet been set.

The Court heard oral argument regarding the Motion on October 4, 2011. (D.I. 137) During the oral argument, it was brought to the Court's attention that, between the time the Motion was filed and the date of oral argument, the parties obtained additional evidence in discovery that may have been relevant to the Motion but that was not then a part of the record before the Court. Accordingly, the Court allowed supplemental briefing on the Motion, which was completed on October 14, 2011. (D.I. 138, 139)

## B. Factual Background

### 1. Plaintiff and His Images

Plaintiff Andrew Leonard is a photographer who specializes in microscopic photographs. (D.I. 109 at ¶ 2) The images that are the subject of this action are photographs of stem cells, which Plaintiff created using an electron microscope. (*Id.* at ¶ 3 & ex. 1) Each of the images was first published between 1999 and 2002,[2] and all were registered with the United States Copyright Office on December 20, 2007. (D.I. 109 at ¶ 4; D.I. 101, ex. H) Images 2 and 3, titled

---

[2]     Image 2 was first published on January 11, 1999, in *Time* magazine and Image 3 was first published on January 1, 2000, in *Discovery* magazine. (D.I. 101, ex. H) Image 4 was first published on March 6, 2001, in *Der Spiegel* and Image 5 was first published on March 13, 2002, in *Helix* magazine. (*Id.*)

2

"Scanning Electron Microscopy of Human Bone Marrow Stem Cells" were registered together on Certificate of Registration No. VA–1–426–177 and Images 4 and 5 (collectively with Images 2 and 3, "the Images" or individually, "the Image"), with the same title, were registered together on Certificate of Registration No. VA–1–426–178. (*Id.*)[3]

## 2. Defendant

Defendant Stemtech, founded in 2005, is a company that manufactures nutrition supplements and sells them through a network of distributors. The company's primary product, StemEnhance, is marketed as "a breakthrough natural botanical extract that supports wellness by helping your body maintain healthy stem cell physiology" and "the first product on the market from the latest phytoceutical product category called 'stem cell enhancers.'" (D.I. 111, ex. 3 at 1395) StemTech sells its products through a network of over 1,000 independent distributors. (D.I. 78 at ¶¶ 12, 13)

Defendant develops marketing materials and internet sites for its own use and for the use of its distributors in promoting and selling Stemtech products. (*Id.* at ¶ 29) A company document entitled "Policies and Procedures" states that any Stemtech distributors who choose to use an internet website to sell Stemtech products must utilize Stemtech's official replicated templates, rather than create their own website. (*Id.*) In this way, Defendant can control the content of each of its many distributors' websites. Defendant's Business Development System Training Manual ("Training Manual") similarly encourages its distributors to use Stemtech-

---

[3]     Although all four of these Images are referenced in the Amended Complaint, Plaintiff has confirmed that he is not making any claim in this case that Defendant has infringed his copyright as to Image 5. (D.I. 137 at 28) Plaintiff does assert claims of copyright infringement as to Images 2, 3, and 4.

3

created websites for business development. (*Id.*)

### 3. License Negotiations

According to Plaintiff, sometime in May of 2006 he was contacted by a representative of Defendant named Al Crane. Mr. Crane inquired whether Defendant could obtain a license to use Image 4 in Defendant's printed publication, *HealthSpan*, and also, for a limited time, on Defendant's website. (D.I. 76 at ¶ 14; D.I. 78 at ¶ 14; D.I. 109 at ¶ 5) Plaintiff provided Image 4 to Defendant, and contends that, on or about June 11, 2006, he sent the first of several invoices regarding the proposed license to Defendant. (D.I. 137 at 36; D.I. 76 at ¶ 15) This first invoice listed the licensing fees Plaintiff sought for the use of Image 4 both in the *HealthSpan* publication and on Defendant's website. (D.I. 76 at ¶ 15; D.I. 78 at ¶ 15; D.I. 109 at ¶ 5) Plaintiff alleges that Defendant later advised him that it did not want to license Image 4 for its website, but only wished to use it in the *HealthSpan* publication. Thereafter, Plaintiff sent a revised invoice, in the amount of $950.00, for use of the Image in the printed publication only. (*Id.*) Defendant paid only $500.00 of the $950.00 invoice. (*Id.*) Plaintiff later sent another invoice for the $450.00 balance, but contends that the balance was never paid. (*Id.*) Plaintiff states that he eventually "forgot about" the unpaid balance and "wrote it off." (D.I. 109 at ¶ 5) The parties' next interaction was not until more than a year later, when Plaintiff contends he first discovered the alleged infringement of certain of the Images.

4

### 4. Discovery of Alleged Infringement of Images 3 and 4

Plaintiff alleges that he first discovered an infringing use of the Images by Defendant in October of 2007,[4] when he found Images 3 and 4 on a website at www.yourstems.com that he alleges was selling Defendant's StemEnhance product.[5] (*Id.* at ¶ 6) Plaintiff asserts that he contacted Defendant's corporate compliance officer, Donna Marie Serritella, about this discovery. (*Id.* at ¶ 7) Plaintiff was unsatisfied with the response he received from Ms. Serritella, which suggested that the company thought that the Images were available for public use because one had previously appeared on the cover of *Time* magazine. (*Id.*)

Shortly after this communication with Defendant, on December 20, 2007, Plaintiff registered all of the Images with the United States Copyright Office. He then sent a cease and desist letter to Defendant on January 18, 2008.[6] (D.I. 78 at ¶ 19) Plaintiff asserts that, in response, Defendant removed the Images from some of its websites, but failed to remove the Images from all of its websites. (D.I. 76 at ¶ 19) Accordingly, Plaintiff commenced this action by filing the original complaint on February 1, 2008. (D.I. 1)

---

[4] Defendant notes that Plaintiff's stated time line of his discovery of the alleged infringement of Images 3 and 4 has shifted throughout the course of this litigation, leaving some question as to whether Plaintiff actually first discovered evidence of infringement earlier than October of 2007. Defendant notes, for example, that in certain of Plaintiff's discovery responses, Plaintiff indicated that Defendant's alleged infringement of Images 3 and 4 began as early as May of 2006. (D.I. 101 at 2)

[5] As noted above, Plaintiff acknowledges that he provided Defendant with Image 4 during licensing negotiations in the Summer of 2006. However, Plaintiff has no explanation for how Defendant came to possess Image 3, as Plaintiff never provided Image 3 to the Defendant. (D.I. 137 at 78–79)

[6] Plaintiff asserts that he sent a cease and desist letter regarding "the images," (D.I. 76 at ¶ 19), but Defendant contends the letter only discussed Images 4 and 5 (D.I. 78 at ¶ 19).

5

After this lawsuit began, Plaintiff alleges that he continued to discover what he refers to as "new infringements" of Images 3 and 4—additional instances of the use of these Images by Stemtech and its distributors. (D.I. 109 at ¶¶ 10–15) For example, in May of 2008, Plaintiff asserts that he found a video entitled "The Stemtech Story" on Google Videos and that this video contained multiple uses of Image 3. (*Id.* at ¶ 10) In July of 2008, Plaintiff states that he found a "StemEnhance Free Report" on multiple websites that contained Image 4. (*Id.* at ¶ 12) According to Plaintiff, the Stemtech Story video, the StemEnhance Free Report, and other "new" infringing uses of his Images continued to be available online through 2011. (*Id.* at ¶¶ 10–15) In total, Plaintiff has uncovered more than 100 alleged unauthorized uses of Images 3 and 4 to date, which Plaintiff contends is just the "tip of the iceberg." (D.I. 140, ex. 1 at ex. C) The facts with respect to the alleged infringement of Image 2 are somewhat different.

### 5. Discovery of Alleged Infringement of Image 2

In contrast to the allegations of the prolific dispersion of Images 3 and 4, Plaintiff alleges that he has only discovered one instance of the infringing use of Image 2. Plaintiff claims that on February 6, 2008, he discovered Image 2 on a website located at www.stemcellfacts.net, which he contends was selling Defendant's product, StemEnhance. (D.I. 109 at ¶ 9) Plaintiff interprets the fact that the website was purportedly selling StemEnhance as evidence of Defendant's affiliation with the website's owner or operator, whom Plaintiff contends must be one of Stemtech's distributors. (D.I. 137 at 31–34) Defendant disputes Plaintiff's contention that Stemtech is affiliated with the website in question, and asserts that Stemtech does not "own, operate, or control" www.stemcellfacts.net. (D.I. 113, Noar Decl. at ¶ 2)

Image 2, unlike Images 3 and 4, does not appear in the videos or other marketing

6

materials referred to above, nor does it appear in Defendant's *HealthSpan* publication.

Moreover, there is no direct evidence in the record that Defendant ever had Image 2 in its

possession[7] or that Defendant ever provided Image 2 to any of its distributors.

## 6.    The Amended Complaint and the Instant Summary Judgment Motion

Following his continued discovery of alleged infringing uses of the Images by purported

Stemtech distributors well after he had commenced this action, Plaintiff moved to amend his

complaint on July 16, 2009, to add claims for contributory and vicarious liability, in addition to

his claims of direct infringement. (D.I. 49) The Amended Complaint itself lacks clarity

regarding exactly what claim(s) Plaintiff is asserting with respect to each Image.[8] At oral

argument on the Motion, counsel for Plaintiff appeared to indicate that Plaintiff is asserting

claims against Defendant for contributory and vicarious infringement of Images 2 and 3, and

claims for direct, contributory and vicarious infringement of Image 4. (D.I. 137 at 34–35 &

---

[7]      Plaintiff's counsel confirmed at oral argument that Plaintiff never provided Image 2 to Defendant. (D.I. 137 at 35–36)

[8]      The allegations of the Amended Complaint are organized by acts of alleged infringement, as opposed to being organized by Image. In other words, instead of listing a separate count for each Image and each type of alleged infringement, (i.e., Count I for direct infringement of Image 2, Count II for contributory infringement of Image 2, etc.) the Amended Complaint lumps together allegations of infringement by alleged infringing uses (i.e., each count, with the exception of Counts I and II, includes allegations of infringement of all Images, but alleges infringement based on the appearance of the Images on different websites). Counts I and II are the only counts that specify which Images are at issue with respect to those particular counts. However, the allegations there make reference to the Images not by name or image number, but by the particular Certificate of Registration that relates to the Images being referred to in that count (*i.e.*, Count I includes a claim of direct infringement of the Images registered on Certificate No. VA–1–426–177 (Images 4 & 5) and Count II includes a claim of direct infringement of the Images registered on Certificate No. VA–1–426–178 (Images 2 & 3)). As a result of this organizational structure, it is difficult to identify, from the face of the Amended Complaint itself, whether Plaintiff is asserting claims of direct, contributory and/or vicarious infringement for each Image.

7

60–61)

In its Motion, Defendant asks this Court to grant summary judgment in its favor on three

separate issues. First, Defendant seeks summary judgment on Plaintiff's claims of infringement

of Image 2, arguing that Plaintiff has no evidence to support such claims. (D.I. 101 at 2)

Second, Defendant moves for summary judgment as to the election of statutory damages and

attorney's fees as to all claims. Defendant argues that Plaintiff is prohibited from electing to

receive these remedies for any copyright infringement, pursuant to 17 U.S.C. § 412, because he

failed to register the Images with the United States government until after the alleged

infringement began. (D.I. 101 at 10–14) Third, Defendant argues that Plaintiff is not entitled to

Defendant's profits as a damage remedy for any infringement. Specifically, Defendant asserts

that summary judgment is appropriate on this issue because Plaintiff cannot establish the

necessary causal nexus between the generation of such profits and the infringement of Plaintiff's

images required under 17 U.S.C. § 504(b). (D.I. 101 at 14–15) Each of these issues is addressed

in turn below.

## II.    STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a

genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material', and disputes are

'genuine' if evidence exists from which a rational person could conclude that the position of the

person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life*

8

*Assurance Co.*, 57 F.3d 300, 302 (3d Cir. 1995) (internal citation omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the moving party has demonstrated the absence of a genuine dispute of material fact, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, to defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586–87; *see also Podobnik v. United States Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"; a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

9

(1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. Infringement of Image 2

Defendant first asserts it is entitled to summary judgment as to Plaintiff's claims for contributory and vicarious infringement of Image 2. As to this issue, which is only cursorily mentioned in the parties' briefs, Defendant asserts that Plaintiff has failed to make a sufficient factual showing on the essential elements of those two claims. (D.I. 101 at 2–3) For the reasons set forth below, the Court agrees with Defendant.

#### 1. Legal Standard

Under the Copyright Act, 17 U.S.C. § 101 *et seq.* ("the Act"), a claim for direct copyright infringement "is established if the plaintiff proves that he owned the copyrighted work and that the copyrighted work was copied by the defendant." *Kunkel v. Jasin*, 420 F. App'x. 198, 199 (3d Cir. 2011). Although the Copyright Act itself does not provide for the secondary liability of defendants—i.e., liability for the infringement of third-parties under a contributory or vicarious liability theory—such claims have emerged from the common law and are well established. *See MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). In *Grokster*, the United States Supreme Court described the different types of secondary liability claims, noting that: "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement and

10

infringes vicariously by profiting from direct infringement while declining to exercise a right to

stop or limit it." *Id.* (internal citations omitted).

The Third Circuit further discussed these standards in *Parker v. Google, Inc.*, 242 F.

App'x. 833, 837 (3d Cir. 2007), where it stated that a claim of contributory infringement requires

proof of:

> (1) [D]irect copyright infringement of a third-party; (2) knowledge
> by the defendant that the third-party was directly infringing; and
> (3) material contribution to the infringement.

*Id.* at 837. *Parker* also explained that a claim of vicarious infringement requires proof:

> [T]hat the defendant "has the right and ability to supervise the
> infringing activity and also has a direct financial interest in such
> activities."

*Id.* (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d

Cir. 1971)). Although the lines between these two types of secondary liability claims are not

always clear, "in general, contributory liability is based on the defendant's failure to stop its own

actions which facilitate third-party infringement, while vicarious liability is based on the

defendant's failure to cause a third-party to stop its directly infringing activities." *Perfect 10,*

*Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007).

## 2. Evidence in the Record Regarding Image 2 and the Parties' Contentions Regarding that Evidence

In order for the parties' contentions on this portion of the Motion to be fully understood,

it is necessary for the Court to first discuss the record evidence before it with respect to Image 2.

This evidence is very limited. It includes, most significantly, an undated printout of a website

located at www.stemcellfacts.net, which was produced in discovery by Plaintiff and was

11

submitted to the Court by Defendant ("the website printout").[9] Image 2 appears twice on this printout. The website appears to have the primary purpose of promoting Defendant's product, StemEnhance, though it is not clear that the website is actually offering StemEnhance for sale. The page has a banner at the top that states: "Stem Cell Facts: Your source for StemEnhance." (D.I. 113, ex. N) Below this banner, the page contains information about stem cells generally, without mention of what StemEnhance is or what it purports to do, though there are several links regarding StemEnhance, including: (1) a box that states: "Get more details in your 'StemEnhance Free Report' here"; (2) a box entitled "StemEnhance: Research & Patent" that states the reader can obtain a "20-page document [that] details StemEnhance's extensive research and US Patent"; and (3) a box that says: "Learn more about StemEnhance in a recorded message here." (*Id.*) There are also four additional links to the StemEnhance Free Report on the two-page website printout. (*Id.*) In addition, there is an "Order" button on the webpage, though it is unclear whether the "Order" button would allow one to place an order to purchase StemEnhance, or simply to order the StemEnhance Free Report. (*Id.*) The website does not mention Stemtech. (*Id.*)

In addition to the website printout, the parties have each submitted declarations that discuss Image 2. Plaintiff's declaration states that he discovered Image 2 on the

---

[9]     In its opening brief, Defendant initially argued that the only evidence uncovered in discovery that related to Image 2 were documents suggesting that the Image appeared on a website located at www.inplainsite.org, which was operated by a woman named Carol Brooks, with whom Defendant had no relationship. (D.I. 101 at 7–8 & ex. F) In its reply brief, Defendant made no further mention of Ms. Brooks or the www.inplainsite.org website. Instead, it highlighted the www.stemcellfacts.net website as the only location allegedly related to Defendant on which Image 2 appears. At oral argument, counsel for both parties confirmed that Plaintiff is no longer alleging that Defendant can be held liable for the use of Image 2 on the www.inplainsite.org website. (D.I. 137 at 9)

www.stemcellfacts.net website in February of 2008 and that the website was "selling" StemEnhance. (D.I. 109 at ¶ 9) Defendant submitted a declaration from its Director of North America Sales & Marketing, Bryan Noar, which states that Stemtech does not "own, operate or control" the website in question. (D.I. 113, Noar Decl. at ¶ 2) This is the entirety of the credible evidence before the Court regarding Image 2.[10]

In its Motion, Defendant asserts that it is entitled to summary judgment on Plaintiff's claims regarding Image 2 because the evidence in the record as to the alleged infringement of that Image—the website printout and competing declarations—is insufficient as a matter of law to impose liability on Defendant for contributory or vicarious infringement of that Image. Plaintiff does not dispute the state of the evidence. However, he suggests that this evidence is sufficient to create an issue of material fact as to whether Defendant was contributorily or vicariously liable for the infringement. Plaintiff's theory is that because www.stemcellfacts.net was promoting Defendant's product, a fact finder could infer from this and other facts in the record that Defendant had the level of involvement with the alleged infringement necessary to satisfy his evidentiary burden.

### 3. Discussion

Both the contributory and vicarious infringement claims require Plaintiff to demonstrate, in several different ways, that Defendant's involvement with the alleged third-party infringer and

---

[10]     Defendant has also submitted a second set of printouts regarding the www.stemcellfacts.net website, which it asserts demonstrate what the website looked like on February 24, 2007. (D.I. 113, Noar Decl. at ¶ 3 & ex. M) These archived printouts are of limited utility, however, with regard to an analysis of the use or misuse of Image 2, because they have no images visible on them, only placeholders where images *would* be located, if those images were visible to the viewer. (D.I. 113, ex. M)

13

the alleged infringement of Image 2 was substantial enough to impose liability on Defendant for that infringement. The Court addresses each of these two claims in turn.

### a.   Contributory Infringement

In order to establish contributory infringement, one of the things that Plaintiff must prove is that Defendant made a "material contribution" to the infringement. *Parker*, 242 F. App'x. at 837. Courts have explained that a defendant can be said to have made a "material contribution" to a third-party's infringing conduct where the defendant engages in "(i) personal conduct that encourages or assists the infringement; [or] (ii) [the] provision of machinery or goods that facilitate the infringement." *See R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 72 (S.D.N.Y. 2009) (quoting *Matthew Bender & Co., Inc. v. W. Publ. Co.*, 158 F.3d 693, 706 (2d Cir. N.Y. 1998)). "Participation by the defendant must be substantial." *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997) (citing *Apple Computer, Inc. v. Microsoft Corp.*, 821 F. Supp. 616, 625 (N.D. Cal. 1993)). In this case, with respect to Image 2, Plaintiff cannot demonstrate the existence of a genuine issue of material fact as to Defendant's material contribution to the alleged infringement.

As an initial matter, at oral argument, Plaintiff's counsel acknowledged that there is no evidence in the record that Defendant ever had Image 2 in its possession, nor any evidence that Defendant provided the image to anyone, including any of its distributors. (D.I. 137 at 32 ("Well, Your Honor, I will have to admit there are no facts in the record of which I am aware that shows that Stemtech provided image No. 2 to any of its distributors. . . .")) Moreover, Plaintiff concedes that he never provided Image 2 to the Defendant, and offers no explanation for how Defendant allegedly obtained the Image. As Plaintiff has acknowledged, this makes his claims

14

relating to Defendant's alleged indirect infringement of Image 2 "more tenuous" and "more problematic" than his claims as to other Images. (*Id.* at 11, 35–36)

Facing this reality, Plaintiff asks the Court to assume a number of facts in order to conclude that Defendant materially contributed to the alleged infringing use of Image 2 on www.stemcellfacts.net. For example, Plaintiff first asks the Court to assume that the owner or operator of the website in question is one of Stemtech's distributors. Yet, although a lengthy period of discovery preceded the filing of this Motion, there is an insufficient factual record to support such an assumption. On the contrary, the record lacks any information whatsoever regarding: (1) who owns or operates the website in question; or (2) whether that person or entity has any contractual or other relationship with Defendant. Despite the lack of evidence on this point, Plaintiff nevertheless argues that the website's owner or operator *must have* been one of Defendant's distributors, because the website was "selling StemEnhance, a Stemtech product" and the only person or entity who would logically be selling Defendant's product is one of the Defendant's distributors. (*Id.* at 36) The record before the Court, however, does not support that conclusion.

As noted above, the website printout does not specifically state that www.stemcellsfacts.net is offering StemEnhance for sale. But even if it did, that still would not be enough information to support a finding that the owner or operator of the website was, in fact, a distributor of Defendant. In light of the limited information that can be divined from the website printout, and the dearth of information in the record about www.stemcellfacts.net in general, one is left simply to guess at whether the website's owner or operator is: (1) a Stemtech distributor; (2) an unauthorized re-seller of StemEnhance who is not a distributor; or (3)

15

something else entirely. Accordingly, a distributor relationship cannot be properly inferred.

In addition to asking the Court to assume facts about the ownership or operation of the website, Plaintiff also asks the Court to make additional assumptions about Defendant's involvement with the alleged infringement. He suggests, for example, that Defendant must have possessed Image 2 and then later provided it to the website's owner or operator for use on www.stemcellfacts.net, or that Defendant must in some other way have materially contributed to the misuse of the image. In support, Plaintiff points to a portion of Defendant's Training Manual that appears to require Defendant's distributors to use Defendant's own "self replicated . . . website" to publicize and sell Defendant's products. (D.I. 108, ex. B at ST–00092) He also cites deposition testimony of certain other Stemtech distributors that they utilized a "self-replicating website" maintained on Stemtech's server, which included allegedly infringing Images, in order to sell StemEnhance. (D.I. 140 at 3) Since Defendant's distributors appear to be required to use website content generated by Defendant, Plaintiff argues that the Court can infer that www.stemcellfacts.net's owner or operator "either got Image No. 2 from Stemtech or was permitted by Stemtech to use it." (D.I. 137 at 34)

Yet here again, the limited evidence in the record provides little support for the inferences urged by Plaintiff. There is no evidence in the record: (1) that Defendant ever possessed Image 2; (2) that Defendant had any contact of any kind with the website's owner or operator, let alone contact regarding Image 2; or (3) that Defendant or the website's owner or operator took any action regarding the construction of the website in question. Moreover, even if one assumes the website's owner or operator is a Stemtech distributor, with no real information in the record about the relationship between this person or entity and the Defendant, the Court is hard-pressed

16

to cite anything that would create a genuine issue of material fact as to whether the owner or operator of the website *in fact* had the type of distributor relationship with Defendant that is described in the Training Manual.

"While courts are required to draw every reasonable inference in favor of the party opposing summary judgment, they are not permitted to stack inference upon inference to preserve an issue for the jury." *Gregg v. Ohio Dep't of Youth Servs.*, 661 F. Supp. 2d 842, 859 (S.D. Ohio 2009) (citation omitted); *see also Sado v. Leland Mem. Hosp.*, 933 F. Supp. 490, 493 (D. Md. 1996) ("While all justifiable inferences must be drawn in favor of the nonmovant, the non-moving party cannot create a genuine issue of material fact through mere speculation or the building of inference upon inference.") (internal citation omitted). Instead, inferences must be supported by facts in the record, not by "speculation or conjecture." *Miles v. Jones*, Case No. 08–20612–CIV, 2010 WL 5574324, at *7 (S.D. Fla. Nov. 22, 2010) ("Although the Court is required to draw all *reasonable* inferences in favor of the party opposing summary judgment, those inferences must be based on facts in the record.") (emphasis in original). Indeed, where courts have found the evidence of record sufficient for a plaintiff to withstand summary judgment on a claim that a defendant materially contributed to copyright infringement, such that contributory liability might be established, that evidence was far more developed than it is in this case. *See, e.g., R.F.M.A.S.*, 619 F. Supp. 2d at 74 (denying defendant's motion for summary judgment regarding contributory liability in light of evidence in the record that defendants introduced the alleged infringer to plaintiff, that certain of defendants were engaged in a joint venture with infringer's company and that they assisted that company with marketing and sales and other support services); *Century Consultants, Ltd. v. Miller Group, Inc.*, No. 03–3105, 2008

17

WL 345541, at *7–8 (C.D. Ill. Feb. 7, 2008) (granting plaintiff's motion for summary judgment regarding contributory infringement where undisputed facts showed that defendant, among other things, paid the start-up costs for the creation of the infringing software system and installed a network connection that gave infringer direct access to source code of copyrighted program); *U2 Home Entm't, Inc. v. Gatechina.com, Inc.*, No. C 05–260 JF (PVT), 2007 WL 951291, at *5 (N.D. Cal. Mar. 27, 2007) (denying defendant's summary judgment motion as to contributory infringement where evidence of material contribution included defendant's "establishing merchant accounts such as Visa and Mastercard to process credit card payments to [third-party infringer], depositing customer checks made out to [third-party infringer], managing [third-party infringer's] accounts payable, and remitted monies to [third-party infringer] accounts on [its] behalf"); *Marobie-FL*, 983 F. Supp. at 1171, 1178–79 (denying defendant's motion for summary judgment regarding contributory liability in case where infringer posted allegedly infringing clip art on its web page and where facts in record suggested that defendant provided a host computer for that web page and the "access link or connection" that users of the web page utilized to access the web page).

In light of the nearly blank slate that is the record regarding the alleged misuse of Image 2, the Court finds that Plaintiff has provided no more than "assertions, conclusory allegations [and] suspicions" as to its claim that Defendant materially contributed to any alleged infringement of that Image. *Podobnik*, 409 F.3d at 594. Therefore, I recommend that the District Court find that Plaintiff's claim for contributory infringement fails as a matter of law and that

Defendant be granted summary judgment as to that claim.[11]

## b.    Vicarious Infringement

With regard to his claim of vicarious infringement, Plaintiff must show that Defendant "[1] has the right and ability to supervise the infringing activity and also [2] has a direct financial interest in such activities." *Parker,* 242 F. App'x. at 837 (internal quotations omitted). "Unlike contributory infringement, knowledge is not an element of vicarious liability." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1375 (N.D. Cal. 1995) (citing 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 12.04[A][1], at 12–70 (Matthew Bender, Rev. Ed.)).

In attempting to show that a genuine issue of fact exists as to Defendant's "right and ability to supervise the infringing activity," Plaintiff again focuses almost exclusively on one fact in the record: that www.stemcellfacts.net is a website that provides information about StemEnhance. Further, as with his contributory infringement claim, Plaintiff again relies on the same unsupported inferences discussed above: (1) the assumption that the owner or operator of the www.stemcellfacts.net website was, in fact, a distributor of Defendant; and (2) the assumption that the website's owner or operator was a party to a contract requiring the use of Defendant's website template. Additionally, however, in order to find in Plaintiff's favor on this claim, a fact finder would also need to assume that, as part of any such contractual relationship, Defendant also had the right and ability to supervise the infringing activity, including the ability to stop or limit the infringing conduct regarding Image 2.

---

[11]      Because the Court finds that Plaintiff cannot establish one element of his contributory infringement claim, the Court need not consider the other elements of that claim.

There is simply no evidence in the record to support these assumptions. In addition to the total lack of evidence regarding who the website's owner or operator is and what, if any, relationship that person or entity had with Defendant, there is no evidence of record that such person or entity had the type of relationship with Defendant necessary for vicarious infringement. Plaintiff points to Defendant's Training Manual, which appears to show that Defendant's distributors must agree to use only web content provided by Defendant. However, in this case, there is no evidence that the owner or operator of www.stemcellfacts.net (whoever that is) *actually agreed* to the terms contained in the Training Manual—if, in fact, there was ever any agreement at all. Because Plaintiff's theory regarding Defendant's right and ability to supervise the content of the website is founded on speculation, the first element of Plaintiff's claim of vicarious infringement must fail. *See, e.g., Bridgeport Music, Inc. v. Rhyme Syndicate Music,* 376 F.3d 615, 622 (6th Cir. 2004) (affirming summary judgment for defendant on vicarious infringement claims where there was "no showing that [defendant] UPIP had control over a direct infringer" and there was "a complete absence of proof connecting UPIP either to the distribution and sale of the album [containing the allegedly infringing work] or to the performance of the allegedly infringing work within the limitations period."); *Morgan v. Hawthorne Homes, Inc.,* Civil Action No. 04–1809, 2009 WL 1010476, at *22 (W.D. Pa. Apr. 14, 2009) ("*Morgan I*") (granting summary judgment for defendant parent company on vicarious infringement claim where, although there was evidence that a subsidiary of the parent had used allegedly infringing drawings on its website, there was "no evidence that [parent company] could direct the use of the drawings on the website and the construction of homes from the drawings"); *Metzke v. May Dep't Stores Co.,* 878 F. Supp. 756, 760 (W.D. Pa. 1995) (granting defendant

department store's motion for summary judgment on vicarious infringement claim where, even if it could be assumed that store supplied prototype of infringing work to third-party company for copying, there was no record evidence that store had the "right and ability to supervise" the third-party company).

For similar reasons, the second element of Plaintiff's vicarious infringement claim—that Defendant had a "direct financial interest" in any infringing activities of the www.stemcellfacts.net website—also fails. With no evidence in the record about the website's owner or operator—or the existence of any actual contractual or other financial agreement between the owner or operator and the Defendant—any claim that Defendant had a "direct financial interest" in the infringing actions of www.stemcellfacts.net would be unduly speculative. Plaintiff cannot generate a genuine dispute of material fact out of such an evidentiary void. *See, e.g., Jalbert v. Grautski*, 554 F. Supp. 2d 57, 73 (D. Mass. 2008) (granting summary judgment for defendant on vicarious infringement claim, even though alleged infringer of copyrighted prints was an employee of defendant, where there was "no evidence that [defendant] received, or had any possibility of receiving, any financial benefit from [the employee's] infringing actions, or had any financial interest in the exploitation of the copyrighted print").

As Plaintiff cannot point to any record evidence demonstrating that Defendant had the right and ability supervise the alleged infringer or had a direct financial interest in the alleged infringement, his claim for vicarious infringement must fail. The Court therefore recommends that summary judgment also be granted with respect to this claim as to the alleged infringement of Image 2.

21

Having addressed the only aspect of Defendant's Motion that deals with liability, the

Court now turns to the two remaining issues on which Defendant seeks summary judgment, both

of which pertain to damages.

## B. The Availability of Statutory Damages and Attorney's Fees

The second issue on which Defendant seeks summary judgment relates to its contention

that Plaintiff may not collect statutory damages and attorney's fees pursuant to the Act.

Defendant argues that because the alleged infringement of Images 3 and 4 commenced prior to

the registration of those Images with the United States Copyright Office, Plaintiff cannot elect to

obtain these two remedies regarding any such infringement. For the reasons that follow, the

Court agrees.

### 1. Legal Standard

Section 504 of the Copyright Act sets forth the types of remedies that a plaintiff may

seek in a lawsuit for copyright infringement. That section gives plaintiffs the option of electing

one of two types of remedies in such a suit: "(1) the copyright owner's actual damages and any

additional profits of the infringer . . . or (2) statutory damages. . . ." 17 U.S.C. § 504(a)(1)–(2).

Additionally, pursuant to Section 505 of the Act, courts also have discretion to award attorney's

fees and costs to the prevailing party. 17 U.S.C. §§ 504, 505. However, the Act limits the

availability of statutory damages and attorney's fees to only those plaintiffs who registered their

copyright prior to the commencement of the infringement. Specifically, Section 412 of the Act

provides that:

> [N]o award of statutory damages or of attorney's fees, as provided
> by sections 504 and 505, shall be made for . . . *any infringement* of
> copyright *commenced* after first publication of the work and before

22

> the effective date of its registration, unless such registration is
> made within three months after the first publication of the work.

17 U.S.C. § 412(2) (emphasis added).

## 2. Discussion

With respect to the availability of statutory damages and attorney's fees under Section

412, Plaintiff concedes that the first publication of Images 3 and 4 occurred in 2000 and 2001,

respectively. Plaintiff also concedes that the first infringement of these images by an entity

allegedly associated with Defendant occurred pre-registration—in October of 2007—when he

found Images 3 and 4 on the www.yourstems.com website. Plaintiff contends that the operator

of this website is a distributor of Defendant and that when Plaintiff viewed the website in

October of 2007, the site was selling Defendant's StemEnhance product. (D.I. 109 at ¶ 6; D.I.

137 at 46) Lastly, Plaintiff acknowledges that he did not register Images 3 and 4 until December

20, 2007. (D.I. 137 at 46)

In light of Section 412 of the Act, the only alleged infringements for which Plaintiff is

seeking statutory damages and attorney's fees are those instances of infringement of Images 3

and 4 that occurred post-registration.[12] (D.I. 137 at 50–51) Plaintiff notes that after he registered

the Images in December of 2007, he continued to find evidence of many "new" infringing acts by

Defendant's distributors, including instances where distributors posted those Images on their

websites. (D.I. 108 at 11) He argues that under Section 412, these post-registration infringing

acts should not be considered infringements that "*commenced . . . before the effective date of* [the

---

[12]    As previously noted, Plaintiff also alleged contributory and vicarious infringement
of Image 2. In light of the Court's recommendation that Defendant's motion for summary
judgment be granted on the question of liability for infringement of Image 2, any claim for
damages or attorney's fees regarding that Image would be moot.

23

Image's] registration." According to Plaintiff, because these acts post-dated the Images'

registration, they can each be the basis for a separate claim of copyright infringement. He further

argues that he should be permitted to elect to obtain statutory damages and attorney's fees as a

remedy for any such post-registration infringements.

In its Motion, Defendant contends that none of the alleged infringing acts of its

distributors, even those that occurred after registration, may give rise to a claim for statutory

damages and attorney's fees. Defendant argues that (1) any of its distributors' acts of post-

registration infringement of Images 3 and 4 would be considered part of a single continuing

infringement for purposes of Section 412; and (2) this continuing infringement "commenced" at

least as early as October 2007—the date when Plaintiff first alleges he discovered Defendant's

contributory and vicarious liability for infringement of the Images on www.yourstems.com.

Since this continuing infringement "commenced" before the date of the registration, Defendant

claims that Plaintiff is barred from electing statutory damages and attorney's fees, even if

additional acts of infringement that were part of this pattern of continuing conduct occurred after

the registration date.

### a. Interpretation of Section 412

In order to resolve Defendant's claim for summary judgment on this issue, the Court must

first determine what is meant by Section 412's reference to an "infringement" having

"commenced." This question is one of first impression in this District and one that has not been

ruled upon by the United States Court of Appeals for the Third Circuit.

Statutory interpretation begins with the plain language of the statute. *See Jimenez v.*

*Quarterman,* 555 U.S. 113, 118 (2009) *("*As with any question of statutory interpretation, our

24

analysis begins with the plain language of the statute."). The plain language of Section 412, which refers to "any infringement of copyright *commenced . . . before the effective date of its registration*," tends to support Defendant's assertion that the statute allows for a "continuing infringement" that begins pre-registration and continues post-registration. 17 U.S.C. § 412(2) (emphasis added). As the United States District Court for the Eastern District of New York explained in *Singh v. Famous Overseas, Inc.*, 680 F. Supp. 533, 535 (E.D.N.Y. 1988):

> The word "infringement" can be used in two senses. [I]t can mean both a single act of infringement, and it can also mean several or continuous or repeated acts of infringement. However, it would be peculiar if not inaccurate to use the word "commenced" to describe a single act. That verb generally presupposes as a subject some kind of activity that begins at one time and continues or reoccurs thereafter.

The Court agrees that Section 412's reference to a copyright "infringement" that "commenced" on a certain date strongly suggests that the "infringement" being referenced in the statute can begin on one date (with one instance of infringement) and continue thereafter (with other, related infringements), including on dates after Plaintiff has registered his copyright. *Cf. Mason v. Montgomery Data, Inc.*, 741 F. Supp. 1282, 1286 (S.D. Tex. 1990) ("*Mason I*") ("The plain language of the statute does not reveal that Congress intended to distinguish between pre- and post-registration infringements."). This conclusion is drawn from the typical meaning attributed to the verb "commenced," which tends to be used to describe a type of activity that begins at one given moment, but that can thereafter continue over a longer period of time.

In light of the clear implication of Section 412's text, it is perhaps unsurprising that every court that has had the opportunity to consider this question has held that "infringement 'commences' for purposes of § 412 when the first act in a series of acts constituting continuing

25

infringement occurs." *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998).[13] Moreover,

although the Third Circuit has not yet had occasion to address the matter, all of the district courts

in this Circuit that have considered the issue agree with this statutory interpretation. *See Morgan

v. Hawthorne Homes, Inc.*, Civil Action Nos. 04–1809, 07–803, 2011 WL 2181385, at *3 (W.D.

Pa. June 2, 2011) (holding that "the first act of infringement in a series of ongoing infringements

of the same kind marks the commencement of one continuing infringement for purposes of §

412(2)"); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 609 F. Supp. 1325, 1331 (E.D. Pa.

1985) (interpreting "'commencement of infringement'" in Section 412 as "the time when the first

act of infringement in a series of ongoing discrete infringements occurs"); *Tannock v. Review

Trading Corp., Inc.,* 231 U.S.P.Q. 798, 800 (D.N.J. 1986) (rejecting plaintiff's argument that

Section 412 allows for statutory damages for infringements that occur after registration despite

the occurrence of pre-registration infringing acts because "Section 412 does not speak of 'acts of

infringement' which 'occur' at a particular point in time. Rather, Section 412 bars certain types

of damages for 'any infringement' which commenced prior to the effective date.").

This conclusion is also suggested by other aspects of Section 412's text. The wording of

that statutory section indicates that Congress wished to highlight the need for those who have

---

[13]     *See e.g., Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 701 (9th Cir.
2008) (holding that "the first act of infringement in a series of ongoing infringements of the same
kind marks the commencement of one continuing infringement under § 412"); *Ez-Tixz, Inc. v.
Hit-Tix, Inc.*, 919 F. Supp. 728, 736 (S.D.N.Y. 1996) ("Under section 412, infringement
'commences' when the first act of infringement in a series of on-going discrete infringements
occurs."); *Parfums Givenchy, Inc. v. C & C Beauty Sales, Inc.,* 832 F. Supp. 1378, 1393 (C.D.
Cal. 1993) ("[T]he first act of infringement in a series of ongoing separate infringements
'commence[s]' one continuing 'infringement' under Section 412(2).") (alteration in original);
*Johnson v. Univ. of Va.*, 606 F. Supp. 321, 325 (W.D. Va. 1985) (rejecting plaintiff's argument
that copyright infringement "commences" each time the defendant uses the infringing photos
because "ascribing such a meaning to the term 'commenced' would totally emasculate § 412.").

26

previously published a copyrighted work to register the copyright with the United States government. The statute's text suggests that, in order to provide an incentive for publishers to promptly register their copyright, Congress withheld the right for those persons to elect statutory damages or obtain attorney's fees if another person infringed that copyright "before the effective date of its registration." 17 U.S.C. § 412(2). If providing parties with an incentive to register their copyrighted material was not important to Congress, there would have been little reason for Congress to tie the act of registration to a party's ability to obtain these significant remedies in copyright infringement litigation. In light of the way Congress structured this portion of the statute, if a plaintiff were to be able to elect to obtain statutory damages and attorney's fees as to copyright infringement that could be said to have "commenced" before registration but have continued after registration via additional instances of infringement, the importance that Congress placed on timely registration would be diluted. For this additional reason, the statute's text augers in favor of the Defendant's suggested interpretation.

However, even were the Court to find the statutory language ambiguous as to this point[14] and therefore look to relevant extrinsic evidence, such the statute's legislative history,[15] that

---

[14]    At least one court to consider the issue has found Section 412's language ambiguous as to whether it allows for the concept of "continuing infringement." *See Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143 (5th Cir. 1992) ("*Mason II*") (finding that Section 412's use of the phrase "any infringement of copyright commenced . . . before the effective date of its registration" rendered the statute ambiguous, as the term "any infringement" could either refer to all of a defendant's infringing acts with respect to any one work or, alternatively, to each individual act of infringement linked to a defendant, regardless of whether that act occurred pre- or post-registration).

[15]    Where the plain language of the statute is unclear or ambiguous, the Court may look to the legislative history of the statute for guidance. *Ross v. Hotel Emps. and Rest. Emps. Int'l Union*, 266 F.3d 236, 245 (3d Cir. 2001).

27

evidence would only strengthen the Defendant's position. The legislative history relating to

Section 412 makes absolutely clear what its text suggests: that "by denying an award of statutory

damages and attorney's fees where infringement takes place before registration, Congress sought

to provide copyright owners with an incentive to register their copyrights promptly" and "to

encourage[] potential infringers to check the Copyright Office's database." *Derek Andrew, Inc.*,

528 F.3d at 700 (citing H.R. Rep. No. 94–1476, at 158 (1976), *as reprinted in* 1976

U.S.C.C.A.N. 5659, 5774 and *Jones*, 149 F.3d at 505). The reason for Congress' action is that

"[r]egistration promotes orderly resolution of copyright disputes because it creates a permanent

record of the protected work, putting the world on constructive notice of the copyright owner's

claim." *Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d 315, 329 (4th Cir. 2007). In the

legislative history of Section 412, Congress emphasized the link between the goal of prompt

registration and the availability of remedies as follows:

> Under the general scheme of the bill, a copyright owner whose
> work has been infringed before registration would be entitled to the
> remedies ordinarily available in infringement cases: an injunction
> on terms the court considers fair, and his actual damages plus any
> applicable profits not used as a measure of damages. However,
> section 412 would deny any award of the special or "extraordinary"
> remedies of statutory damages or attorney's fees where
> infringement of copyright in an unpublished work began before
> registration or where, in the case of a published work, infringement
> commenced after publication and before registration (unless
> registration has been made within a grace period of three months
> after publication). . . . . *With respect to published works, clause (2)*
> *[of Section 412] would generally deny an award of those two*
> *special remedies where infringement takes place before*
> *registration.*

H.R. Rep. No. 94–1476, at 158 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5774 (emphasis

added).

This window into Congress' purpose in enacting Section 412 supports the Defendant's argument that a party's copyright infringement can be said to have "commenced" as of the date when the first act in a continuing series of infringements takes place. If this were not the case, even if a plaintiff was tardy in registering his copyright (such that a potential defendant had infringed that copyright pre-registration), he would still be able to seek these special damage remedies against that same defendant, were the defendant responsible for any form of post-registration infringement of the same work. In such a scenario, copyright holders would have a diminished incentive to register their copyrights promptly, as it would be less likely that any such delay would negatively impact the breadth of the remedies available to them in a later copyright infringement lawsuit. And if fewer copyright holders were to timely register their copyrights as a result, then potential infringers would have less incentive to check the copyright database regularly. Such an outcome would frustrate the twin purposes of the statute as elucidated by its legislative history. *See generally Derek Andrew, Inc.*, 528 F.3d at 700 ("To allow statutory damages and attorney's fees where an infringing act occurs before registration and then reoccurs thereafter clearly would defeat the dual incentives of § 412"); *Arista Records LLS v. Lime Group LLC*, No. 06 Civ. 5936(KMW)(DF), 2010 WL 6230927, at *5 (S.D.N.Y. Dec. 28, 2010) ("There would be little motivation to register early in the face of massive induced infringement, if the copyright owner could obtain statutory damages against an inducer so long as the copyright was registered prior to any one act of direct infringement, regardless of how long the owner delayed in registration from the date when the inducer began distribution of an infringement-enabling product or service.").

In addition to considering the text and legislative history of Section 412, it is also

29

instructive to examine Section 504 of the Act, which is referenced in Section 412. *Mason II*, 967 F.2d at 143 ("We look to section 504 for assistance in understanding section 412 because section 412 bars an award of statutory damages 'as provided by section 504'"). Section 504 also discusses the types of remedies available to a plaintiff and provides that:

> [T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, *an* award of statutory damages for *all* infringements involved in the action, with respect to any *one one* work, for which any *one* infringer is liable individually, or for which any *two or more* infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just.

17 U.S.C. § 504(c)(1) (emphasis added). Under Section 504, the number of awards that a plaintiff can recover in any particular copyright infringement action is determined by the number of *works* that are infringed and the number of *infringers*, not the number of *infringements* of those works. This section thus gathers together "all infringements" of a particular copyrighted work attributable to one defendant or to multiple defendants on a joint and several liability basis, for purposes of determining the total amount of statutory damages that a plaintiff can claim regarding that work. The legislative history of Section 504 makes this even more explicit, noting that "[a] single infringer of a single work is liable for a single amount . . . , no matter how many acts of infringement are involved in the action and regardless of whether the acts were separate, isolated, or occurred in a related series." *Mason II*, 967 F.2d at 144 n.11 (quoting H.R. Rep. No. 94–1476 at 162, *as reprinted in* 1976 U.S.C.C.A.N. at 5659, 5778). In light of this, "[i]t would be inconsistent to read section 504 to include all of one defendant's infringements of one work within 'an award of statutory damages,' and then read section 412 to treat each infringement separately for purposes of barring that award." *Mason II*, 967 F.2d at 144.

The Court therefore agrees with the outcome of the line of well-reasoned decisions of other federal courts to have confronted this issue. I find that pursuant to Section 412 of the Act, a plaintiff is precluded from recovering statutory damages and attorney's fees for infringements that occurred after registration of a work, if those infringements can be said to be part of a continuing series of infringements of the same work that commenced prior to the work's registration.

Having determined what Section 412's provisions require, the Court will now consider whether, in light of those requirements, Plaintiff is precluded from electing statutory damages and attorney's fees regarding his allegations of Defendant's liability as to the use of Images 3 and 4.

### b. Review of Plaintiff's Claims Under the "Continuing Infringement" Standard

Plaintiff argues that even if Section 412's reference to an "infringement of copyright [that] commenced" before registration can take into account the concept of a "continuous infringement," Section 412 should not bar his ability to elect to recover statutory damages and attorney's fees under the circumstances of this case. Plaintiff asserts that Defendant was first liable for contributory and vicarious infringement of Images 3 and 4 due to the October 2007 pre-registration posting of those Images on www.yourstems.com, the website of an alleged distributor. However, Plaintiff argues that if another of Defendant's third-party distributors committed an act of post-registration infringement of those same images, that would be a "new" and distinct infringement, which should not be considered a part of Defendant's continuing infringement of Images 3 and 4. (D.I. 137 at 61) In light of the statutory structure of the Act, the

31

Court rejects Plaintiff's argument.

In this case, instead of alleging unrelated, separate acts of infringement by third-party infringers, Plaintiff alleges that Defendant is responsible for all of the infringing acts at issue: both its own acts of direct infringement regarding Image 4 and the alleged infringing acts of its distributors regarding Images 3 and 4. In seeking to hold Defendant indirectly liable for the acts of its distributors, Plaintiff has chosen to center his claims on the conduct of *Defendant*—asserting that (1) with regard to alleged contributory liability, *Defendant* had knowledge that its distributors were directly infringing Plaintiff's copyright as to these Images; and that *Defendant* made a material contribution to that infringement; and (2) with regard to alleged vicarious liability, *Defendant* had the right and ability to supervise the infringing activity of its distributors and that *Defendant* had a direct financial interest in such activities. Yet when putting forward his argument as to the availability of statutory damages and attorney's fees, Plaintiff takes the opposite tack. As to that issue, he attempts to separate the Defendant's acts from those of its distributors, arguing that each new act of infringement by a distributor regarding Image 3 or 4 is not part of a "continuous infringement" relating to the Defendant, but is instead a separate, unrelated activity. In light of the relevant law, Plaintiff cannot have it both ways.

Federal courts have rejected arguments similar to Plaintiff's argument here. For example, in *Bouchat v. Bon-Ton Dep't Stores, Inc.*, 506 F.3d 315, 324 (4th Cir. 2007) (*"Bouchat I"*), plaintiff Frederick Bouchat had, in a prior related matter, obtained a jury verdict for copyright infringement against defendants, the NFL football team the Baltimore Ravens, Inc. (the "Ravens") and National Football League Properties, Inc. ("NFLP"). The jury found that these defendants had infringed Bouchat's copyright in a drawing that the Ravens later chose to be the

team's logo. 506 F.3d at 324. In *Bouchat I*, the plaintiff was now suing several hundred licensees of the NFLP who had used the infringing logo in, among other things, the production and marketing of official Ravens merchandise. *Id.* While the NFLP first violated plaintiff Bouchat's copyright in June 1996, which was prior to the date of Bouchat's registration of that copyright, its licensees later used the logo with its permission at various times, including in many instances after the logo's registration. *Id.* at 324, 329–30. Prior to trial, the plaintiff argued that, with regard to whether he could elect to obtain statutory damages pursuant to Section 412, the district court should have treated "the date on which each individual licensee first violated Bouchat's copyright as the date that licensee's infringement commenced under § 412(1)." *Id.* at 330. The district court disagreed, holding that the date on which NFLP first infringed the Ravens' logo was the date on which the infringement of the logo should be said to have "commenced" for purposes of Section 412, because NFLP approved all of the licensees' infringing acts and any later infringement by the licensees were part of a continuing infringement. *Id.*

The Fourth Circuit upheld the district court's decision and rejected the plaintiff's proposed construction of Section 412. In doing so, it relied on Section 504's provision of a single award for "*all infringements* involved in the action . . . for which *any one infringer* is liable individually, *or* for which *any two or more infringers are liable jointly and severally.*" *Id.* at 331 (quoting 17 U.S.C. §504(c)(1)) (emphasis added). The *Bouchat I* Court held that "it is appropriate to treat the earliest date of infringement by *any* participant in a line of related copyright violations as the date of commencement." *Id.* (emphasis in original). In *Bouchat I*, that meant tracing the licensees' post-registration infringement back to the licensor's pre-

33

registration infringement, with the resulting effect that the plaintiff could not claim statutory

damages. *Id.* The Court explained that:

> NFLP gave each licensee permission to copy, so NFLP was also responsible for the licensee's acts of copying, making NFLP jointly and severally liable for the infringing acts of each licensee.

> Again, in an action against NFLP as "one infringer ... liable individually," we would trace post-registration infringing conduct back to pre-registration conduct in violation of the same copyright. When each licensee is paired with NFLP, the licensor-licensee pair constitutes "two ... infringers ... liable jointly and severally." Because the statute does not distinguish between "one infringer ... liable individually" and "two or more infringers ... liable jointly and severally," we must treat these two categories of infringers identically when assessing their statutory damages liability. The statute thus subjects a licensor-licensee pair to the same tracing rule that would apply to either one as an individually liable infringer. Here, then, we must trace the licensee's post-registration infringing conduct back to NFLP's pre-registration conduct and thereby deny statutory damages to Bouchat.

*Id.* at 330–31 (alterations in original) (quoting 17 U.S.C. § 504(c)(1)). This analysis is equally applicable here.

As in *Bouchat I*, at its core, the allegedly infringing acts of Defendant and its distributors are intertwined. Though Plaintiff here argues that it is illogical to treat each distributor's conduct as an extension of the Defendant's conduct, (D.I. 108 at 14), the Court agrees with the Fourth Circuit that "[f]ocusing on [the primary infringer's] conduct here is entirely logical," *Bouchat I*, 506 F.3d at 331. In this case, in each instance where Plaintiff has been able to determine that a third-party distributor has committed an allegedly "new" infringement of an Image, Plaintiff has pressed a separate claim against Defendant for third-party liability as to that infringement. Under Section 504, therefore, the Defendant and its distributors (were Plaintiff to have sued those distributors by name) would be treated as jointly and severally liable for the alleged infringement

34

at issue, were infringement proven at trial.

Moreover, the alleged post-registration conduct of the Defendant and its distributors is based on the same set of actions as the alleged pre-registration conduct: the unlicensed use of the same images on either (1) the same replicated Stemtech website, created by Stemtech and provided for use (with minimal customization) by its distributors; or (2) in the same Stemtech marketing materials. The only difference between the pre-registration conduct alleged and the post-registration conduct alleged is the identity of the distributor who is allegedly infringing. This difference alone is insufficient to escape the continuing infringement rule imposed by Section 412. *See also Love v. City of New York*, No. 88 CIV. 7562(MBM), 1989 WL 140578, at *2 (S.D.N.Y. Nov. 17, 1989) (finding that defendant City of New York's post-registration infringement regarding distribution of a manuscript was part of a continuing infringement, which "commenced" prior to registration when another defendant published the same manuscript, because "it was the same infringement—distribution of [the manuscript]—that commenced before registration, and is no different conceptually from sale of an infringing book by one book store before registration and sale of the same book by another after registration").

Further, the fact that Plaintiff's claims regarding the distributors' infringement are claims of secondary liability as to Defendant, as opposed to claims of direct infringement against Defendant, does not alter the Court's analysis. The opinion in *Morgan v. Hawthorne Homes, Inc.*, Civil Action Nos. 04–1809, 07–803, 2011 WL 2181385, at *3 (W.D. Pa. June 2, 2011) ("*Morgan II*"), is instructive in this regard. In *Morgan II*, the plaintiff alleged that the infringement of his drawings of certain homes began in 2001, prior to his registration of those drawings with the Copyright Office, when defendant Hanna Holdings acquired the drawings. *Id.*

at *1. However, Plaintiff claimed that later post-registration infringement of those drawings by Hanna Holdings' subsidiaries, for which Plaintiff sought to hold Hanna Holdings liable on contributory and vicarious liability claims, should not be considered part of a continuing infringement that "commenced" in 2001. *Id.* at *1–2. The United States District Court for the Western District of Pennsylvania disagreed. Citing *Bouchat I* and other cases, the *Morgan II* court explained that "[t]here is no legally significant difference between the pre-registration conduct and the post-registration conduct (if at all) that would suggest that the alleged infringement was anything but an ongoing series of infringements that commenced in 2001" as "[e]ach act of infringement stems from the initial acquisition and copying of Morgan's drawings . . . and their later use by the subsidiaries of Hanna Holdings." *Id.* at *3. The *Morgan II* Court explained that the "fact that the liability of the various subsidiaries of Hanna Holdings is grounded in contributory or vicarious infringement makes no difference" and held that Plaintiff could not recover statutory damages or attorney's fees regarding that conduct. *Id.* As in *Morgan II*, here each act of alleged infringement stems from Defendant's alleged initial use and publication of Images 3 and 4 on website templates or in marketing materials, rendering any later use of the Images by third-party distributors via the websites or marketing materials as all part of a continuing infringement. *See also Arista Records LLS*, 2010 WL 6230927 at *3 (holding that claims of direct infringement against defendant LimeGroup, LLC based on creating and distributing the product LimeWire, as well as secondary liability claims against the defendant that arose out of actions of third-party users who downloaded recordings using the LimeWire product, were "best understood as an ongoing series of infringing acts" as they were "of an

36

ongoing and substantially similar nature").[16]

For all of these reasons, the alleged infringing actions of Defendant and each of its distributors, both pre- and post-registration, would be treated as one continuing infringement for purposes of Section 412. The earliest date on which Plaintiff alleges that Defendant contributorily and vicariously infringed his copyright as to Images 3 and 4 was in October 2007, when the Images were posted by Defendant's alleged distributor on www.yourstems.com. Since October 2007 pre-dates the registration of those Images on December 20, 2007, and since Defendant's continuous infringement of the Images thus "commenced" prior to that registration date, Plaintiff cannot elect to obtain statutory damages or attorney's fees in this case for Defendant's later infringement of those same Images.

Accordingly, I recommend that the District Court grant summary judgment to Defendant on this issue, with the result that Plaintiff would not be permitted to elect to seek statutory damages and attorney's fees as a remedy for any claims of Defendant's infringement of Images 3 and 4.

## C. Actual Damages and Additional Profits

Defendant also seeks summary judgment on Plaintiff's claim for actual damages in the form of Defendant's indirect profits from the alleged infringement. Specifically, Defendant

---

[16]     Courts have emphasized that simply because a plaintiff may be barred from electing statutory damages and attorney's fees as a remedy, that does not mean that a defendant may infringe plaintiff's copyright with impunity if a related act of infringement began prior to registration of that copyright. In such a scenario, plaintiff may still seek actual damages under the Copyright Act for those post-registration infringements–the same remedy that existed for such claims under common law prior to the enactment of Section 412. *Arista Records LLS,* 2010 WL 6230927, at *5; *Teevee Toons, Inc. v. Overture Records,* 501 F. Supp. 2d 964, 967 (E.D. Mich. 2007) (rejecting copyright holder's argument that the refusal to recognize post-registration infringements as new infringements amounts to a "license to steal").

37

asserts that pursuant to the requirements set forth in 17 U.S.C. § 504(b), Plaintiff's claim to

indirect profits fails because Plaintiff cannot establish the requisite causal connection between

the alleged infringement and the profits he seeks. For the reasons that follow, the Court agrees

with Defendant.

## 1. Legal Standard

As previously noted, Section 504 of the Copyright Act provides copyright holders with

the option to elect to obtain one of two types of damage remedies:

> [A]n infringer of copyright is liable for either– (1) the copyright
> owner's actual damages and any additional profits of the infringer,
> . . . ; or (2) statutory damages. . . . .

17 U.S.C. § 504(a)(1)–(2). With respect to "additional profits," the Act allows for the recovery

of "any profits of the infringer that are attributable to the infringement . . . ." 17 U.S.C. § 504(b).

The Act explains that, in order to establish the infringer's profits:

> [T]he *copyright owner is required to present proof only of the*
> *infringer's gross revenue*, and the infringer is required to prove his
> or her deductible expenses and the elements of profit attributable to
> factors other than the copyrighted work.

*Id.* (emphasis added). "On its face, § 504(b) does not differentiate between 'direct

profits'—those that are generated by selling an infringing product—and 'indirect

profits'—revenue that has a more attenuated nexus to the infringement." *Mackie v. Rieser*, 296

F.3d 909, 914 (9th Cir. 2002). Courts have noted that, as a practical matter, "in an indirect

profits case the profits 'attributable' to the infringement are more difficult to quantify . . . [,]"

though "that difficulty does not change the burden of proof established by the statute." *Andreas*

*v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003).

38

In *William A. Graham Co. v. Haughey*, 568 F.3d 425, 442 (3d Cir. 2009), the Third Circuit applied a two-step framework with regard to the process for recovering an infringer's profits under Section 504. First, "the copyright claimant must [] show a causal nexus between the infringement and the [infringer's] gross revenue[.]" *Id.* (citing *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 710–11 (9th Cir. 2004)). Second, after the causal nexus is established, "the infringer bears the burden of apportioning the profits that were not the result of infringement." *Id.*

Many courts have examined what it means, under Section 504, for a plaintiff to meet its initial burden to establish the requisite causal nexus between the infringement and any profits flowing from it. Uniformly, courts have agreed that a plaintiff must do more than simply identify the allegedly infringing company's total yearly gross revenue for a year implicated by the infringement allegations; instead, the plaintiff must also put forward some evidence indicating that the revenues in question were, at least in part, caused by the alleged infringement. As the Seventh Circuit noted in *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983), "[i]f General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits."[17]

---

[17]     *See also Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005) ("[A] literal interpretation of 'gross revenue' in § 504(b) to include all profits produced by an infringer, no matter the source, would be incorrect. Rather, 'gross revenue' refers only to revenue reasonably related to the infringement. The copyright owner thus has the burden of demonstrating some causal link between the infringement and the particular profit stream.") (internal citations omitted); *University of Colorado Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1375 (Fed. Cir. 1999) (rejecting plaintiff's argument that proof of defendant's gross revenues from product sales shifted the burden, noting that "[t]he University's argument presumes that the sales of [defendant's product] were due to Cyanamid's copyright infringement. The University had the

39

In *Haughey*, the Third Circuit examined the scope of the required nexus in some detail and ultimately concluded that the plaintiff there had met his burden under Section 504(b). *Haughey* involved the alleged infringement of certain form language on which plaintiff had obtained a copyright. The defendants had inserted this language into proposals to purchase insurance, which were later sent to defendants' clients. *Id.* at 430. After a trial in which the jury found the plaintiff had proven copyright infringement as to certain defendants, one of those defendants, USI MidAtlantic ("USI"), filed for judgment as a matter of law on the ground that plaintiff had failed to prove the required causal nexus between the infringement and USI's resulting profits. *Id.* at 432. The district court denied that motion and USI appealed on this issue. *Id.* at 442. The Third Circuit upheld the district court's decision. In so doing, it noted that, "to satisfy its initial burden of proof, [plaintiff] was required to prove only that the profits it sought to recover were 'reasonably related to the infringement.'" *Id.* at 443. It held that plaintiff had done so by: (1) introducing expert testimony that calculated revenues received by defendant from those clients who received an infringing proposal; (2) eliciting testimony from USI's employees that the infringing language included in the proposals was a valuable part of the proposals; (3) eliciting testimony establishing that some clients were convinced to purchase insurance on the basis of the proposals and that it was USI's practice to review proposal contents "page by page" with clients; and (4) introducing other evidence that emphasized how valuable the language at issue was to USI. *Id.* at 442–43.

In evaluating the evidence submitted in the case before it, the *Haughey* Court found the opinion of the United States Court of Appeals for the Eighth Circuit in *Andreas v. Volkswagen of*

burden to show this connection.").

40

*Am., Inc.*, 336 F.3d 789, 796–97 (8th Cir. 2003), to be "instructive." *Id.* at 443. *Andreas* was a matter involving defendant Volkswagen (d/b/a Audi)'s infringing use of a portion of plaintiff's poem in a car commercial. In that case, the district court vacated a jury's award of additional profits on the grounds that the award was too speculative because plaintiff had failed to prove the requisite causal connection between the infringement and defendant's profits. *Andreas*, 336 F.3d at 795. Specifically, the district court concluded that the evidence failed to establish that defendant "profited from the infringing commercial at all—for which [plaintiff] carried the burden of proof[.]" *Andreas*, 336 F.3d at 796. The Eighth Circuit disagreed, finding that the plaintiff had proven the requisite causal connection by introducing evidence that: (1) the commercial was presented by defendant to its dealers as an integral part of the car's launch; (2) car sales exceeded projections while the commercial aired; (3) the commercial received high marks on surveys rating consumer recall of commercials; and (4) defendant paid a bonus to the advertising company that created the commercial, based on the commercial's success. *Id.* at 797. The *Andreas* Court found that this evidence amounted to "more than mere speculation that the . . . commercial contributed to sales of the TT coupe." *Id.* at 796. In so finding, the Court rejected defendant's argument that the award was based on speculation, noting that the circumstantial evidence presented was sufficient to meet plaintiff's burden under Section 504 and that plaintiff was not required "to put a TT buyer on the stand to testify that she bought the car because of the commercial in order to meet [the] burden of a causal connection." *Id.* at 797.

In contrast to *Haughey* and *Andreas*, where the plaintiffs had each set forth sufficient evidence to establish the requisite nexus, there are many cases in which plaintiffs have been unable to do so—either because there is no conceivable connection between the infringement and

41

the profits sought or because the only evidence of such a connection is unduly speculative. *See Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 520 (4th Cir. 2003) ("*Bouchat II*"). While the Court need not explore the first circumstance in any detail here, since, as discussed below, a conceivable connection exists in this case, the best example of the second type of case—one where the only evidence of a nexus is speculative—is found in *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002).

In *Mackie*, plaintiff Jack Mackie sued the Seattle Symphony Orchestra Public Benefit Corporation ("symphony") for copyright infringement. Mackie alleged that the symphony had infringed his copyright in certain artwork that was used in one page of the symphony's multi-page promotional brochure for a concert series. *Mackie*, 296 F.3d at 911–12. The Ninth Circuit affirmed the district court's order granting summary judgment in favor of defendant on the issue of indirect profits, finding that pursuant to Section 504(b), plaintiff's proffered evidence was too speculative to establish a causal link between the infringement and defendant's profits. *Id.* at 911. The Court found that the evidence before it, which consisted of only two contradictory reports from the plaintiff's single expert witness, was insufficient to establish the required causal link and, accordingly, the Court held that plaintiff "did not articulate a non-speculative correlation between the Symphony's infringement and subsequent [concert series] revenues." *Id.* at 916.

Important to the *Mackie* Court was the nature of the evidence submitted by the plaintiff in support of his claim for indirect profits damages. The Court highlighted the plaintiff's own expert's statement "that he could not 'understand' how it would be possible to establish a causal link between the Symphony's infringing use of [the artwork] and any [concert] series revenues

generated through the inclusion of the [artwork] in the direct-mail literature." *Id.* The

supplemental declaration submitted by the same expert in response to defendant's summary

judgment motion was likewise unpersuasive. The Court noted that the supplemental

declaration's "supposition that the Symphony's goal of generating a 1.5% response rate to its

direct-mail brochure was somehow directly correlated with revenue generated by individuals who

subscribed because of [plaintiff's] art [was] a virtual non-sequitur." *Id.* The Court found that

even if one could "determine how many people subscribed because of the brochure, such a

rudimentary analysis cannot determine how many of those individuals subscribed *because of* [the

artwork in the brochure]." *Id.* (emphasis in original). Elaborating on the speculative nature of

the evidence submitted, the Court noted that,

> [i]ntuitively, we can surmise virtually endless permutations to
> account for an individual's decision to subscribe to the [concert]
> series, reasons that have nothing to do with the artwork in question.
> For example, was it because of the Symphony's reputation, or the
> conductor, or a specific musician, or the dates of the concerts, or
> the new symphony hall, or the program, or the featured composers,
> or community boosterism, or simply a love of music, or ...? In the
> absence of concrete evidence, Mackie's theory is no less
> speculative than our effort in this paragraph to enumerate even a
> relatively short list of the myriad factors that could influence an
> individual's purchasing decisions.

*Id.* at 916. The Court concluded that "rank speculation ... will not allow a copyright holder to

survive a summary judgment motion on his claim for indirect profits[]" and affirmed the district

court's order on that issue. *Id.*

With these standards in mind, the Court will now address the parties arguments' as to this

issue.

43

## 2. Discussion

The parties agree that Plaintiff has the initial burden of establishing the existence of a link between the infringement and the profits at issue, but they disagree as to whether Plaintiff has met that burden.[18] In his briefing, Plaintiff first identified the relevant set of Defendant's "additional profits" at issue as Defendant's total gross revenues for the time periods implicated by the allegations in the Amended Complaint. (D.I. 140, ex. 1 at 30 & ex. Q)

Next, in attempting to demonstrate a causal link between the infringement alleged and those gross revenues, Plaintiff asserts that he has done so by demonstrating that Defendant regularly used his Images in its marketing and training materials, "essentially adopt[ing] Leonard's images as its corporate logo and brand." (D.I. 108 at 16) Plaintiff also again emphasizes that Defendant's distributors were required to use Defendant's website and marketing materials, which included the Images, and argues that there "can be no doubt that Leonard's images helped sell Stemtech's products." (*Id.* at 16)

In addition, Plaintiff submitted a Preliminary Expert Report authored by Professor Jeff Sedlik. The full extent of Professor Sedlik's discussion on the issue of causation is as follows:

> Leonard is entitled to seek disgorgement of any Stemtech profits
> attributable to Stemtech's infringements on Leonard's copyrights.

---

[18]     For its part, a plaintiff claiming damages in the form of indirect profits who is faced with a summary judgment motion "must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement." *Mackie*, 296 F.3d at 911. Should a plaintiff fail to adequately respond, "whether that failure is due to the absence of any conceivable connection between the infringement and the claimed revenues, or instead simply due to the plaintiff's inability to muster nonspeculative evidence in support of the alleged causal link—then summary judgment may properly be awarded to the infringer with respect to part or all of the contested revenues." *Bouchat II*, 346 F.3d at 522.

44

> A review of Stemtech's many usages of Leonard's photographs
> conclusively demonstrates that Stemtech exploited Leonard's
> photograph to promote its brand, to promote understanding of its
> company and products, to train and recruit distributors and to
> provide those distributors with tools which were used to maximize
> Stemtech's profits from sales of Stemtech products.

> Stemtech has produced an accounting of its revenues during the
> period. Copies are attached as Exhibit Q. It is Stemtech's burden
> to identify any revenues that are not in any way attributable to
> Stemtech's usage. Stemtech executive Bryan Noar has
> acknowledged that such a determination will be challenging.

(D.I. 140, ex. 1 at 30).

In his expert report, Professor Sedlik displays a "montage" of pictures purporting to show

the infringing use of Plaintiff's images on various webpages, videos and other marketing

materials of Defendant or its distributors. (*Id.*, ex. 1 at 20–21) It appears that the Images, though

not a large portion of each marketing item, were present to some degree in most, if not all, of

those items. Accordingly, it is conceivable that the presence of the Images in Defendant's

materials added an air of legitimacy to Defendant's product that might not have otherwise

existed, and that the Images could possibly have had some impact, whether consciously or

subconsciously, on consumer purchasing decisions. Mere conceivability, however, is not

enough. Instead, Plaintiff must identify evidence showing that the infringing use was

"reasonably related to the infringement" *Haughey*, 568 F.3d at 443. However, the Court finds

that, as in *Mackie*, the evidence submitted by Plaintiff in an attempt to demonstrate this causal

relationship amounts to nothing more than mere speculation.

In *Haughey* and *Andreas*, the plaintiffs were able to make the requisite causal link in part

by citing to robust record evidence demonstrating that: (1) the infringement had some tangible

impact on a purchaser's decision to buy a product; and/or (2) the infringer placed a significant

value on the infringing work. Here, Plaintiff highlights the fact that Defendant's Training

Manual requires its distributors to use the allegedly infringing materials (and the other content

Defendant provides) to market StemEnhance–suggesting that this is evidence that the company

thought that the infringing materials impacted its sales. (D.I. 108 at 16) Yet, in making this

claim, Plaintiff simply resorts to rhetorical questions, asking if "Stemtech did not profit from the

infringement of Leonard's images, why did it use them . . . so much [in its marketing

materials]?" (*Id.*)[19]

However, it is Plaintiff's burden to go beyond rhetorical argument and to identify some

evidence in the record that *actually explains why* Stemtech used those Images so much and that

they did so *because* the Images (or the media that contained them)[20] helped to sell StemEnhance.

*See, e.g., Del Amo v. Baccash*, No. CV 07–663 PSG (JWJx), 2008 WL 2780978, at *6 (C.D. Cal.

July 15, 2008) (granting defendant's motion for summary judgment in light of plaintiff's failure

to establish a nexus between defendants' infringing use of plaintiff's photos on their website,

where plaintiff "merely provided argument that Defendants' display of [plaintiff's] photographs

---

[19]     Moreover, it is worth noting that Plaintiff's conclusion appears to be refuted by the very same section of the Training Manual, which explains that the "rationale" for Defendant's requirement that distributors use the marketing materials it provides is "simple." That stated rationale is not that the materials are proven to increase sales, but rather that the requirement will help "ensure that [Stemtech] complies with . . . legal requirements of Federal, Provincial and State laws." (D.I. 108, ex. B at ST–00090).

[20]     One court has noted that some Circuits appear to require that a plaintiff must show that the use of the *specific work* was causally related to the revenue claimed under Section 504(b), while others appear to require a showing that the use of a *medium containing the work* was causally related to the revenue at issue. *See Thornton v. J. Jargon Co.*, 580 F.Supp.2d 1261, 1279-80 (M.D. Fla. 2008). The Court need not address that distinction here, as Plaintiff's claim to damages under Section 504(b) clearly falls short under either standard.

must have resulted in increased membership fees").

As did plaintiffs in *Haughey* and *Andreas*, Plaintiff might have sought to make this showing by obtaining statements in discovery from Defendant's employees, distributors, or customers, regarding whether, in their view, the Images contributed to sales or were otherwise valuable in generating revenues. Yet in response to Defendant's Motion, Plaintiff cites to no such evidence. In fact, far from establishing some connection between the alleged infringement and the revenues generated, the evidence submitted by Plaintiff in this regard demonstrates that Defendant never tracked the impact that its marketing or training materials had on its distributors' sales, or its own resulting revenues. (D.I. 140, ex. 2 at 111–12) (testimony of Stemtech's President and CEO that Stemtech has no way of knowing how its distributors get people to order Stemtech's products and that Stemtech had performed no analysis of what impact Plaintiff's images had on its revenues); (D.I. 138, ex. 4 at 175–76) (testimony of Stemtech's Vice President of Sales and Marketing that he "couldn't say with any certainty" what impact items that Stemtech provides to its distributors has on sales made by those distributors).

Finally, Plaintiff's submission of Professor Sedlik's expert report provides no additional evidence of a causal link. The report contains only one paragraph regarding the issue of causation, which simply opines that a "review of Stemtech's many usages of Leonard's photographs conclusively demonstrates that Stemtech exploited Leonard's photograph to promote its brand, to promote understanding of its company and products, to train and recruit distributors and to provide those distributors with tools *which were used to maximize Stemtech's profits*." (D.I. 140, ex. 1 at 30 (emphasis added)) The Court finds Professor Sedlik's expert's opinion on this issue to be entirely conclusory. Obviously lacking from this summary opinion is

47

any explanation of *why* Professor Sedlik believes that the Images "were used to maximize Stem[T]ech's profits" as well as any reference to any *underlying facts or data* in the record that would support this conclusion. The simple fact that an opinion is offered into evidence by way of expert report does not turn an opinion into a fact. *See Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011) ("Although juries are generally free to believe expert witnesses, a plaintiff cannot survive summary judgment with an expert's bare opinion on the ultimate issue.") (internal citation omitted).

Like the plaintiff in *Mackie*, Plaintiff here has not put forth any non-speculative evidence that would link customer decisions to purchase Defendant's product with the Defendant's use of his Images on its website, or in its videos, *HealthSpan* publication or other marketing materials, as opposed to any other reason why a customer might purchase those products. As in *Mackie*, here one could conjure an endless number of reasons why a person might purchase a supplement purporting to increase stem cell production, many of which have nothing to do with the presence of an image in the supplement's marketing materials. As the district court in the *Andreas* case noted, "While most people believe that advertising contributes somehow to [sales] . . . , it is not sufficient for a plaintiff to rely on such intuitive notions as proof of causation." *Andreas v. Volkswagen of Am., Inc.*, 210 F. Supp. 2d 1078, 1084 (N.D. Iowa 2002), *reversed in part on other grounds by* 336 F.3d 789 (8th Cir. 2003). Because the Court is unable to point to any non-speculative evidence in support of Plaintiff's claim to "additional profits" under Section 504(b), the Court recommends that summary judgment in favor of Defendant be granted on this issue as well.

48

## IV. CONCLUSION

For the reasons set forth above, I recommend that:

1. Defendant's Motion for Summary Judgment be GRANTED with respect to all claims by plaintiff of infringement regarding the use of Image 2.

2. Defendant's Motion for Summary Judgment be GRANTED with respect to all claims by plaintiff for statutory damages pursuant to 17 U.S.C. § 412.

3. Defendant's Motion for Summary Judgment be GRANTED with respect to all claims by plaintiff for "additional profits" damages under 17 U.S.C. § 504(b).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72(b), dated November 16, 2009, a copy of which is available on the Court's website, http://www.ded.uscourts.gov/StandingOrdersMain.htm.

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

49