IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANDREW PAUL LEONARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No: 08-067-LPS-CJB |
| STEMTECH HEALTH SCIENCES, | ) Consolidated |
| INC. and DOES 1-100, Inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE JEFF SEDLIK'S OPINIONS

1. **FACTUAL AND PROCEDURAL HISTORY**

    A. **Facts Regarding Leonard's Images**

    Leonard is a photographer that specializes in microscopic photography. In or about 1995, Leonard created four stem cell images entitled Scanning Electron Microscopy of Human Bone Marrow Stem Cells, Images 2 & 3, and Bone Marrow Stem Cells, Images 4 & 5.

    B. **Facts Regarding Stemtech's License for Leonard's Image 4**

    Stemtech was founded in 2005 and is a direct selling company that markets and sells nutritional supplements on its own and through its independent distributors. In May of 2006, Stemtech contacted Leonard to inquire about using Image 4 in its magazine "StemTech HealthSpan" and on its website for a one year period. Leonard agreed to this use and on June 11, 2006, he sent an invoice to Stemtech in the amount of $1,250.00, which included separate fees for using two different sizes of the image in HealthSpan, as well as an additional fee for use of the image on Stemtech's website for one year. (Ex. 1.) In particular, Leonard quoted Stemtech the following fees for the use of Image 4:

1

| Description | Amount |
|---|---|
| 1 year usage of stem cell image APL 1335 (size 2.5 x 3") in publication "StemTech HealthSpan" | $500.00 |
| 1 year usage of stem cell image APL 1335 (size < 1") in publication "StemTech HealthSpan" | $450.00 |
| 1 year usage of stem cell image APL 1335 on Stemtech HealthSpan web site | $300.00 |

(Ex. 1.) Stemtech paid the $500.00 required for use of the larger image in its magazine but decided against purchasing the other licenses included in the invoice.

In 2007, Stemtech began contacting Leonard to discuss using his images in additional publications. In response, Leonard represented that he would call Stemtech back with the applicable pricing. Leonard, however, never did so and, instead, began levying allegations that Stemtech was using his images without permission on its website and other products and/or publications and demanding that any and all images be removed from Stemtech's publications and website, along with a plethora of other websites not even owned, operated or controlled by Stemtech. Immediately after learning of Leonard's allegations that Stemtech was using his images without permission, Stemtech took all appropriate and reasonable steps to remove his image from its website and any other materials and, to Stemtech's knowledge, the images have all been removed for quite some time.

### C. Facts Regarding Leonard's First Lawsuit ("*Leonard I*")

On February 1, 2008, Leonard filed a lawsuit against Stemtech in which he asserted a single count for copyright infringement pertaining to Images 4 and 5. (D.I. 1.) Thereafter, on July 16, 2009, Leonard filed a Motion for Leave to File an Amended Complaint, which this Court granted on July 16, 2010. In his operative First Amended Complaint, Leonard added a new count for direct copyright infringement of Images 2 and 3 and 36 counts of vicarious and/or

contributory infringement for Stemtech's independent distributors' alleged infringement of Leonard's images. (D.I. 76.) In his First Amended Complaint, Leonard alleges that Stemtech directly and indirectly through its independent distributors infringed upon Images 2, 3, 4 and 5 by "using, copying, and displaying the images...on its Internet websites, in publications, and in video presentations without authorization."[2] (D.I. 76, pp. 4, 5, ¶¶ 17, 23.)

On December 30, 2010, Stemtech filed a Motion for Summary Judgment, in which it argued that Leonard was not entitled to recover statutory damages or attorney's fees on any of his claims because he failed to register his images before Stemtech's and its independent distributors' purported infringement of them commenced. Stemtech also argued that Leonard was not entitled to recover any of Stemtech's profits because he could not establish the necessary causal nexus. On December 5, 2011, Magistrate Judge Burke issued his Report and Recommendation on Stemtech's motion ("Report"). (D.I. 149.) In this Report, Magistrate Judge Burke recommended that Stemtech's Motion for Summary Judgment be granted, which had the effect of knocking out Leonard's claims for statutory damages, attorney's fees and profits, leaving only his nominal actual damages. (D.I. 149.) Judge Stark adopted Magistrate Judge Burke's Report on March 28, 2012. (D.I. 155.)

### D. Facts Regarding Leonard's Second Lawsuit ("*Leonard II*")

On January 27, 2012, less than two months after Magistrate Judge Burke issued his Report, Leonard filed a second lawsuit against Stemtech. (D.I. 1.) In *Leonard II*, Leonard alleges the identical claims against Stemtech that he alleges in *Leonard I*, namely that Stemtech infringed upon his Image 3 by improperly and without his permission posting it on its official website, stemtechbiz. (D.I. 1, pp. 2-3, ¶ 8; also D.I. 76, p. 5, ¶ 23.) At issue in *Leonard II* is the

---

[2] Images 2 and 5 are no longer at issue in this case as all claims relating to Image 2 were knocked out on summary judgment and Leonard admitted he is not alleging any infringement of Image 5.

3

use of Leonard's Image 3 by two of Stemtech's independent distributors, who used Image 3 as their "headshot" on their personalized websites. (D.I. 1; Ex. 2.)

### E. Facts Regarding Leonard's Expert, Jeff Sedlik's, Calculation of Leonard's Claimed "Actual Damages"

Leonard retained Jeff Sedlik as an expert to assist him in this matter. In both Sedlik's Preliminary Expert Report and Disclosure ("Preliminary Report") and his Supplemental Expert Report and Disclosure ("Supplemental Report"), and despite not being an accountant or other financial expert, Sedlik took the liberty of calculating Leonard's "actual damages" based upon licensing fees that Leonard purportedly lost. (Ex. 3, pp. 26-28; Ex. 4, pp. 13-14.) In making his calculations, despite expressly conceding that "each photographer sets his/her own fees," (Ex. 3, p. 26; Ex. 4, p. 13), Sedlik does not even consider the licensing fees Leonard actually charges for his images in calculating Leonard's "actual damages" and, instead, bases his severely inflated and unreliable calculations solely upon "comparative stock photography license fee quotes from several stock photography agencies." (Ex. 3, p. 26; Ex. 4, p. 13.) Based upon these other licensing fees, which are not even remotely similar to the fees regularly charged by Leonard or that at issue in this lawsuit, Sedlik opines that Leonard's "actual damages" in *Leonard I* total between $215,767.65 and $230,797.89, with an additional purported lost licensing fee of $79,727.15 for each additional year all of the same infringements occur. (Ex. 3, pp. 26-28.) As for Leonard's alleged lost licensing fees at issue in *Leonard II*, Sedlik opines that these total $33,660 based upon what he claims are 56 independent violations. (Ex. 4, pp. 13-14.) In calculating these "actual" damages, Sedlik averages a number of other individual's and/or agencies' licensing fees for photographs, the vast majority of which are thousands and thousands of dollars more than Leonard's own licensing fees, which are not even included in the average. (Ex. 3, pp. 26-28; Ex. 4, pp. 13-14.)

4

### F. Facts Regarding the Licensing Fees Leonard Actually Charges for Images 3 and 4

As already noted, Leonard's quote to Stemtech back in June 2006 for use of Image 4 was: (1) $300.00 for 1 year on Stemtech's website; and (2) $450.00-$500.00 for 1 year in Stemtech's magazine, depending upon the size of the image used. In addition, Leonard utilizes Photo Researchers to license his images, whose records from 1997 to the present were subpoenaed. (Declaration of Christine R. Arnold ["Arnold Decl."], ¶ 3.) The last batch of records produced in response to Stemtech's subpoenas was sent to Stemtech on March 12, 2013. (Arnold Decl. ¶ 3.) The parties stipulated to the following with respect to Photo Researchers' invoices: (1) that the photo numbers listed on Photo Researchers' invoices that correspond with Leonard's Image 3 are: 3G4557, 3H3364, 3L5663, 3L5664, 3L5665 and 3M0354; and (2) that the photo numbers listed on Photo Researchers' invoices that correspond with Leonard's Image 4 are: BE9950, 3U6689, 3D6755, 3U6686, 3U6687, 3U6688, 3U 6691, 3U7124, 3U7135, 3U7137, 3U7139, 3U7140, 3U7141, 3U7142, 3U7144, 3U9334, 3U9335, 3U9336 and 3U9337. (Ex. 5.)

Based upon this stipulation and Photo Researchers' subpoenaed records, Leonard's **annual** earnings from Photo Researchers' licensing of his Images 3 and 4 from 1997 through March 12, 2013 can be summarized as follows:

| Year | Image 3 | Image 4 |
|------|---------|---------|
| 1997 | $0.00 | $0.00 |
| 1998 | $0.00 | $0.00 |
| 1999 | $164.27 | $0.00 |
| 2000 | $150.00 | $0.00 |
| 2001 | $891.23 | $1,165.00 |
| 2002 | $485.02 | $2,282.50 |
| 2003 | $520.34 | $125.00 |
| 2004 | $1,204.88 | $0.00 |
| 2005 | $665.37 | $0.00 |
| 2006 | $1,048.91 | $0.00 |
| 2007 | $508.07 | $1,244.68 |
| 2008 | $106.91 | $592.63 |

5

| Year | Image 3 | Image 4 |
|---|---|---|
| 2009 | $103.38 | $699.85 |
| 2010 | $32.77 | $0.00 |
| 2011 | $33.04 | $0.00 |
| 2012 | $0.00 | $0.00 |
| 2013 | $0.00 | $0.00 |
| **TOTALS** | **$5,914.19** | **$6,109.66** |

(Exs. 6, 7.)

As the supporting invoices show, these amounts represent the licensing fees Leonard received each **year**, not each individual licensing fee. (Exs. 6, 7.) When one actually reviews the individual licensing fees that make up these annual earnings, one sees that the range of licensing fees Leonard has charged for Image 3 and 4 are $16.54-$425.00 and $10.77-$800.00, respectively. (Exs. 6, 7.) The average fee charged by Leonard for Image 3 from 1997 through March 12, 2013 is $125.83, (Ex. 6), while the average fee charged by Leonard for Image 4 during that same time period is $226.28. (Ex. 7.) With respect to Image 3, some of the more telling licensing fees are as follows:

| Date | Invoice No. | License Fee | Use |
|---|---|---|---|
| 7/2/01 | 096942 | $115.00 | U.S, English language, interior editorial in children's book "Sickel Cell Disease" |
| 12/14/01 | 099041 | $140.00 | U.S., English language, interior editorial in children's book "Cells" |
| 7/22/02 | 101733 | $215.00 | North America, English language, interior editorial in hardcover edition of "Science Year" |
| 10/31/06 | 120814 | $250.00 | U.S., Trade show video |
| 4/5/07 | 122822 | $325.00 | U.S., May 2007 Issue of "Stanford Magazine" with a circulation of 100,000 |

(Ex. 6.) As for Image 4, some of the more telling licensing fees are as follows:

| Date | Invoice No. | License Fee | Use |
|---|---|---|---|
| 11/21/01 | 098760 | $140.00 | U.S., English language, interior editorial in children's book "Orphan Diseases" |

| Date | Invoice No. | License Fee | Use |
|---|---|---|---|
| 3/4/02 | 099932 | $412.50 | U.S. English language, cover of children's book "Orphan Diseases" |
| 5/6/02 | 100757 | $145.00 | North American, English language, interior editorial in book series titled "Earthworks" |
| 10/25/07 | 125651 | $245.00 | U.S., English language, interior editorial for November 2007 issue of "Bloomberg Magazine," with a circulation of 300,000 |
| 2/6/09 | 131878 | $225.00 | U.S., electronic rights for intranet training manual "E-Module for Sales Reps," for a 3 year usage |

(Ex. 7.)

Additional invoices for some of Leonard's <u>other</u> stem cell images that are not at issue in this lawsuit show that his licensing fees for all sorts of uses, including books, internet and/or videos typically never exceed a few hundred dollars, sometimes for worldwide usage of his images and/or licenses that that go on for many, many years. (Ex. 8.) These invoices also show that Leonard's licensing fees are customarily consonant with the licensing fees quoted to Stemtech. (Exs. 1, 8.)

2. **STANDARD APPLICABLE TO MOTIONS TO EXCLUDE EXPERT TESTIMONY**

Under the Federal Rules of Evidence, "it is the role of the trial judge to act as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable. *Kannankeril v. Terminex Intl., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008); also *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Rule 702 governs the admissibility of expert testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, Rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. *Kannankeril*, 128 F.3d at 806; *Pineda*, 520 F.3d at 244.

With respect to the second requirement, courts interpreting this element have concluded that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Ibid.* To be "reliable," the proffered expert testimony must be based on the "methods and procedures of science," rather than on "subjective belief or unsupported speculation." *Kannankeril*, 128 F.3d at 806. To determine whether the expert's particular opinion is based on valid reasoning and reliable methodology, several nonexclusive factors are considered, including: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Id.* at 806-807; *Pineda*, 520 F.3d at 247-248; *Daubert*, 509 U.S. at 593-595. The overarching purpose of the

inquiry required by Rule 702 "is the...validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594-595.

3. **SEDLIK'S CALCULATIONS OF LEONARD'S "ACTUAL" DAMAGES ARE BASED UPON INVALID REASONING AND UNRELIABLE METHODOLOGY THAT ARE ENTIRELY REMOVED FROM THE FACTS OF THE CASE**

In both his Preliminary Report and Supplemental Report, Sedlik purports to calculate Leonard's "actual" damages resulting from Stemtech's alleged infringement of Images 3 and 4. (Ex. 3, pp. 26-28; Ex. 4, pp. 13-14.) As noted above, in doing so Sedlik admits that "each photographer sets his/her own fees," (Ex. 3, p. 26; Ex. 4, p. 13), but then utterly disregards the licensing fees Leonard has charged his clients over the past 15 years for Images 3 and 4, or the fees quoted to Stemtech in the instant case. (Ex. 3, pp. 26-28; Ex. 4, pp. 13-14; also Exs. 1, 5-8.) Instead, Sedlik calculates Leonard's "actual" damages using only "comparative stock photography license fee quotes from several stock photography agencies." (Ex. 3, p. 26; Ex. 4, p. 13.) The purportedly "comparable" licensing fees Sedlik utilizes are in no way comparable. To the contrary, they greatly exceed the fees Leonard customarily charges his clients, including Stemtech itself, *often times by **thousands** of dollars*. (Compare Ex. 3, pp. 26-28 and Ex. 4, pp. 13-14 with Exs. 1, 6-8.)

For example, as discussed above, Leonard quoted Stemtech a $300.00 licensing fee to use Image 4 on Stemtech's website for a one year period. (Ex. 1.) In addition, the Photo Researchers' invoices for Image 4 show that Leonard licensed Image 4 for web usage at the following rates to other clients: (1) $75.00 on August 1, 2008 (Invoice No. 129578); and (2) $225.00 on February 6, 2009 for a three year period (Invoice No. 131878). (Ex. 7.) Moreover,

Photo Researchers' invoices that relate to other stem cell images of Leonard that are not at issue in this case show that he licensed one of his stem cell images for web use for a mere $165.00 on September 29, 2003 (Invoice No. 106758). (Ex. 8.) Entirely ignoring Leonard's own licensing fees, Sedlik opines that the applicable licensing fee for calculating Leonard's "actual" damages based upon Stemtech's purported infringement of Images 3 and 4 on its website range from $1,530.00 for use "up to ¼ page" up to $1,640.00 for use "up to 1 full page." (Ex. 3, Ex. F thereto; Ex. 4, Ex. E thereto.) Such numbers are more than five (5) times what Leonard quoted Stemtech for use of Image 4 on its website, and more than six (6) to twenty (20) times what Leonard charged other clients. (Ex. 1, Exs. 7, 8.) Sedlik's other licensing fees are just as inflated and detached from the actual evidence in this case. (Compare Ex. 3, Ex. F thereto and Ex. 4, Ex. E thereto with Exs. 1 and 6-8.) Thus, in violation of Rule 702, Sedlik's "actual" damages calculations are not based upon sufficient facts or data and certainly are not based upon the facts of this case. Fed. R. Evid. 702.

Moreover, the methodology Sedlik utilizes to arrive at his applicable licensing fees is convoluted and unreliable. In particular, to obtain his applicable licensing fees, Sedlik takes all of the severely inflated, irrelevant and inapposite stock photography agency fees that he hand-picked for a particular "type" of usage, i.e., streaming web video, marketing materials, etc., and averages them. (Ex. 3, pp. 26-28 and Exs. F-K thereto; Ex. 4, pp. 13-14 and Exs. D-F thereto.) In arriving at this average, Sedlik inexplicably excludes Leonard's own licensing fees from the equation and, therefore, the licensing fees Sedlik uses to calculate Leonard's "actual" damages have no connection whatsoever to the fees Leonard actually charges or the evidence in this case. (Ex. 3, pp. 26-28 and Exs. F-K thereto; Ex. 4, pp. 13-14 and Exs. D-F thereto; also Exs. 1, 6-8.) Then, to make matters worse, Sedlik "adjusts" this average which, according to Sedlik represents

the 2011 rate, down to the alleged 2006 market rates by "referencing pricing data obtained by [his] firm in that time period." (Ex. 3, pp. 26-27.) These "adjustments" are, once again, based <u>exclusively</u> upon the fees charged by one outside stock photography agency, Getty Images, and do not take into account the fees Leonard himself received in or about 2006 for his images. (Ex. 3, pp. 26-28 and Exs. L-N thereto.) Finally, the images Sedlik uses to calculate these "adjustments" are not even remotely similar to the images at issue in this case. (Ex. 3, pp. 26-28 and Exs. L-N thereto.) To the contrary, the images Sedlik uses for his "adjustments" are not scientific images, stem cell images or microscopic images; instead, they are portrait and/or landscape images entitled "Woman in Swimming Pool at Night, Portrait" and "English Garden, Munich, Germany. A View of the English Garden in Munich." (Ex. 3, Ex. L thereto.)

From these faulty and unreliable licensing fee numbers, Sedlik then multiples them by what he determines to be the number of Stemtech violations and the duration of the violations. (Ex. 3, pp. 26-28; Ex. 4, pp. 13-14.) In making this final calculation, Sedlik also decides whether Stemtech's purported infringement should be governed by a licensing fee for an image up to ¼ page, up to ½ page or up to a full page. (Ex. 3, pp. 26-28 and Exs. E and F thereto; Ex. 4, pp. 13-14 and Ex. E thereto.) Sedlik's decisions, however, are contrary to the law and/or the evidence. For example, in making his calculations, Sedlik finds a violation any and every time one of Leonard's images is found on a website, in a video or in some sort of marketing material, regardless of whether that material is even Stemtech's material and regardless of the fact that the same work is purportedly infringed via the identical media. (Ex. 3, pp. 26-28 and Exhibits C-F; Ex. 4, pp. 13-14 and Ex. C-E thereto.) In particular, each time the <u>identical</u> e-book, or PowerPoint presentation or website is identified, Sedlik counts it as a separate and distinct infringement even though it is well-established that "[a] single infringer of a single work is liable

for a single amount..., no matter how many acts of infringement are involved in the action and regardless of whether the acts were separate, isolated, or occurred in a related series." *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143, fn. 11, 144 (5th Cir. 1992). Sedlik's computation of Leonard's "actual" damages in this way is analogous to him finding a separate and distinct infringement in a situation where an image is infringed upon by placing it in a magazine or a video and then counting *every single copy of that magazine or video as a separate infringement.* Such a computation is contrary to law.

One of the most egregious abuses of this methodology is found in Sedlik's Supplemental Report in *Leonard II* which, again, involves two of Stemtech's independent distributors utilizing Leonard's Image 3 as their "headshot." (Ex. 2.) Although Stemtech denies that these uses constitute any infringement at all on its part, if they are an infringement they are, at most, two infringements. (Ex. 2.) Sedlik, however, finds there to be **56 separate infringements** because he opines that every time a link on the independent distributors' website is clicked and the user is taken to a sub-domain of the distributors' website, on which the distributors' "headshot" populates, such as the "contact us" page or the "home page," that constitutes a new infringement. (Ex. 4, pp. 13-14 and Exs. C and D thereto.) Thus, under Sedlik's reasoning, licensing Leonard's Image 3 for use on one of the independent distributors' websites or Stemtech's website, would cost tens, if not hundreds, of thousands of dollars because that licensing fee would be multiplied by the number of sub-domains that could be opened on each particular website. (Ex. 4, pp. 13-14 and Exs. C and D thereto.)

Finally, Sedlik's determination of the applicable licensing fee, i.e., whether the one for up to ½ page or up to a full page, etc., should apply and the duration of Stemtech's purported infringement are wholly speculative and not at all supported by the facts. As just two examples,

Sedlik opines that what he deems "License #R1" for "Usage #s U18, U23, U36 and U58" and "License #R15" for "Usage #s U42, U43 and U46" in his Preliminary Report all demand a licensing fee of "up to 1 full page" and not "up to ½ page" even though the image does not take more than one-half of the page. (Ex. 3, pp. 26-28 and Exs. D-F thereto.) And, as for Sedlik's selected duration of infringement, there is absolutely nothing in his report that supports the number of years he uses to calculate each infringement. (Ex. 3, pp. 26-28 and Exs. C-F thereto.)

Based upon the foregoing, Sedlik's methodology for calculating Leonard's "actual" damages is fatally flawed, wholly unreliable and completely detached from the evidence and law in this case. It entirely ignores Leonard's own history of licensing fees he has charged or received for the subject images or other similar images and, instead, utilizes inflated licensing fees of large outside stock photography agencies that charge over five (5) times for their images what Leonard himself charges. As such, Sedlik's methodology and his resulting selective application of that methodology to the facts of this case are both irrelevant and unreliable and must be excluded. *Daubert*, 509 U.S. at 592-597; Fed. R. Evid. 702. As a result, Sedlik must be precluded from testifying at trial about Leonard's "actual" damages and all information in his expert reports that relate to that topic must be stricken.

4. **SEDLIK IS NOT QUALIFIED TO OPINE ON LEONARD'S "ACTUAL" DAMAGES**

Not only is Sedlik's methodology unreliable, but Sedlik is not qualified to calculate or opine upon Leonard's actual damages. As discussed above, to be admissible, expert testimony must be proffered by a witness who is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; also *Kannankeril*, 128 F.3d at 806; *Pineda*, 520 F.3d at 244. Although Sedlik has experience in the photography industry, he is not an accountant or any other financial expert capable of or qualified to calculate Leonard's lost licensing fees or

adjusted licensing rates as he has attempted to do, as evidenced by the convoluted and unreliable nature of his methodology and resulting opinions. (Ex. 3, pp. 2-4, 26-28.) Consequently, Sedlik should be precluded from offering testimony on Leonard's "actual" damages and all information in his expert reports that relate to that topic must be stricken.

6. **CONCLUSION**

Based upon the foregoing, Stemtech respectfully requests that this Court preclude Sedlik from offering testimony on Leonard's "actual" damages and that it strike all information in his expert reports that relate to that topic.

DATED: May 24, 2013
CASARINO CHRISTMAN SHALK
RANSON & DOSS, P.A.

By: /s/ Stephen P. Casarino
Stephen P. Casarino (DE0174)
405 North King Street, Suite 300
P.O. Box 1276
Wilmington, DE 19899-1276
Telephone: (302) 594-4500
Email: scasarino@casarino.com

*Attorneys for Stemtech HealthSciences, Inc. and Stemtech International, Inc.*

*Associated Counsel:*

Kathleen Mary Kushi Carter
Christine R. Arnold
HOLLINS LAW
2601 Main Street, Penthouse Suite 1300
Irvine, California 92614-4239
Telephone: (714) 558-9119