# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANDREW PAUL LEONARD, ) | |
| ) | |
| Plaintiff, ) | C.A. No. 08-67 LPS-CJB |
| ) | Consolidated |
| v. ) | |
| ) | |
| STEMTECH HEALTH SCIENCES, INC. ) | |
| and JOHN DOES 1-100, Inclusive, ) | |
| ) | |
| Defendants. ) | |

### PLAINTIFF ANDREW LEONARD'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT STEMTECH HEALTH SCIENCES, INC.'S MOTION TO EXCLUDE JEFF SEDLIK'S OPINIONS

JAMES S. GREEN, ESQ. (DE0481)
JARED T. GREEN, ESQ. (DE5179)
SEITZ, VAN OGTROP & GREEN, P.A
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE 19899
(302) 888-0600
    Attorneys for Plaintiff

OF COUNSEL:

Jan I. Berlage, Esq.
Gohn, Hankey & Stichel, LLP
201 N. Charles Street, Suite 2101
Baltimore, MD 21201
(410) 752-9300

Dated: June 7, 2013

I.  **NATURE AND STAGE OF PROCEEDINGS**

Plaintiff Andrew Paul Leonard ("Plaintiff" and/or "Leonard") has filed two separate actions against Defendant Stemtech International, Inc., formerly known as Stemtech Health Sciences, Inc. ("Defendant" and/or "Stemtech"), for copyright infringement by Stemtech and for contributory and vicarious infringement by Stemtech's distributors. The two actions are Andrew Paul Leonard v. Stemtech Health Sciences, Inc. and Does 1-100, Inclusive, C.A. No. 1:08-cv-00067-LPS-CJB ("Leonard I") and Andrew Paul Leonard d/b/a APL Microscopic v. Stemtech International, Inc., C.A. No. 1:12-cv-00086-LPS ("Leonard II"). The two cases have been consolidated under the Leonard I caption.

On September 19, 2011, Leonard produced and served on Stemtech the Preliminary Expert Report and Disclosure of Professor Jeff Sedlik ("Sedlik Report" [Appendix Ex. 1][1]). On March 22, 2013, Leonard produced and served on Stemtech the Supplemental Report and Disclosure of Professor Jeff Sedlik ("Sedlik Supplemental Report" [App. Ex. 2]). On May 24, 2013, Stemtech filed a Motion to Exclude Jeff Sedlik's Opinions (the "Motion"), a Memorandum of Points and Authorities[2] in Support of the Motion, and the Declaration of one of Stemtech's lawyers, Christine Arnold.

This is Leonard's Memorandum of Points and Authorities in Opposition to Stemtech's Motion.

---

[1] Documents referenced herein are contained in the Appendix to this Memorandum referenced hereinafter as "App. Ex. ___."
[2] Although Stemtech titles its supporting paper a Memorandum of Points and Authorities, it is really in the form of a brief, but without the required parts of a brief. Pursuant to Local Rule 7.1.2, Plaintiff will follow Defendant's form.

## II. PERTINENT FACTS

Leonard is a professional photographer who creates microscopic images using an electron microscope. He is the creator and owner of Scanning Electron Microscopy of Human Bone Marrow Stem Cells Images 3 and 4, which were created in 1993 and registered with the U.S. Copyright Office in December 2007. (Leonard Dep. 50-51, Exs. 2 and 3 [App. Ex. 3])

Leonard used a stock photography company in New York, Photo Researchers, Inc., to license his photographs, but also retained the right to license his images directly. Because of the scientific nature of Leonard's stem cell images, many of the licensees were medical, scientific, and educational institutions or individuals who utilized the photos for editorial or educational purposes. A review of Exhibits 6, 7, and 8 to the Declaration of Christine Arnold filed in Support of Stemtech's Motion shows that many, if not all, of the invoices Stemtech relies upon in support of its Motion were for editorial or educational uses.[3] License fees for such uses are considerably less than fees for commercial use. Compare, e.g. invoice no. 149501 to Discover Magazine dated 1/11/2000 for editorial use of a Leonard image in one issue of the magazine ($150.00) and invoice no. 122822 to Stanford University dated 4/5/07 for use in Stanford Magazine ($325.00) with invoice no. 120814 to Stinson Brand Innovations, Inc. for the commercial use by Baxter in a single trade show ($2,400.00) and invoice no. 124267 of Maritius Images dated 7/12/2007 (one image $2,608.44).[4] Mr. Gerard, the Science Source Director at Photo Researchers, testified that the price for a photo use is dependent upon the type and scope of what the client is going to do with it. (Gerard Dep. 31 [App. Ex. 4]) There are various Photo

---

[3] Many of the attachments to the Arnold Declaration are "sales reports" from other photo licensing companies, not license invoices.

[4] All of these invoices appear in Exhibit 6 to Christine Arnold's Declaration. The latter two invoices are for image 4 (See Affidavit of Andrew P. Leonard) infra. Presumably, because they are high dollar commercial uses, Stemtech does not reference them in its Memorandum.

2

Researchers' Invoices for Leonard's Stem Cell Images for commercial uses. They range from $550.00 for a one time print ad with a circulation of 5,000, up to $4,000 for a one year use for unlimited power point presentations and trade shows. (Leonard Aff. ¶6, Ex. B [App. Ex. 5])

In May 2006, Mr. Leonard received a call from Al Crane on behalf of Stemtech. (Leonard Dep. 71 [App. Ex. 3]) Mr. Crane was inquiring about a license to use Leonard image 4 for a Stemtech in-house publication, "Healthspan." Mr. Leonard asked him to outline the parameters of Stemtech's desired usage and get back to him. (Id. at 72) Mr. Crane contacted Leonard and told him that Stemtech was interested in using the image in a brochure going to distributors with a publication of 10,000 – 20,000. After discussions on sizes and usages, Leonard sent Mr. Crane confirmation of license terms which was accepted on June 1, 2006. (Id. at 73, Exs. 5 and 6) Leonard sent an invoice for the defined usage. (Id. Exs. 8 and 9; See also Sedlik Report at 7-9 [App. Ex. 1]). Mr. Crane then told Leonard that Stemtech did not want web usage, so Leonard reduced the invoiced price by $300.00. (Leonard Dep. 73, Ex. 7 [App. Ex. 3]) As agreed, the original invoice was $1,250.00, later reduced to $950.00. However, Stemtech paid only $500.00, leaving an unpaid balance of $450.00. (Id. at 84-85)

Although Stemtech declined a license for web usage of Leonard's image and never sought a license to reproduce his image on DVDs, in May 2006 it had already begun production of tens of thousands of DVDs containing Leonard's images 3 and 4. (See Terborg Media invoices [App. Ex. 6]) Stemtech then provided user access to the DVDs on its website. The DVDs were sold by Stemtech to its Distributors, and Leonard's images were, in turn, posted on Distributors' websites. All of Stemtech's and its Distributor's uses of Leonard's images were to sell its nutritional supplements and other products, especially StemEnhance, as well as its business opportunities, and not for educational or editorial purposes.

Professor Jeff Sedlik is a professional photographer and educator who serves as the Chief Advisor on Licensing and Copyright for the Advertising Photographers of America. (Sedlik Report at 2-6 [App. Ex. 1]) Professor Sedlik is the President and CEO of the PLUS Coalition which propagates and maintains universal standards for use by licensees and licensors in transactions involving photography and illustration. He authored the chapter on Photography Licensing of "Professional Business Practices in Photography" published by the American Society of Media Photographers. He serves on the Photography Industry Advisory Council for Adobe Systems advising Adobe on matters related to professional photography, including licensing. He is a Professor of Photography at the Art Center College of Design in Pasadena, California where he teaches advanced courses on legal, business, and technical issues related to photography and advertising with an emphasis on licensing issues. He has often been qualified and testified as an expert witness in litigation involving photography. (Id.)

Professor Sedlik was retained by Plaintiff in these consolidated cases and prepared the two reports referenced above and in Defendant's Motion. Professor Sedlik has opined on licensing fees he believes are appropriate for Leonard's images as well as the total of those fees, or Leonard's "actual damages." As shown in Sedlik Report Exhibit "F," the calculated license fees for different uses by Stemtech or its distributors adjusted to 2006 dollars range from $1,277.10 per year to $2,569.46 per year. These fees were based upon Professor Sedlik's exhaustive survey and analysis of license fees charged by stock photography agencies for similar images and uses. (Id. Exs. "G"-"P") They are similar to the license fees charged by Photo Researchers for commercial use of Leonard's images 3 and 4, which Stemtech has studiously avoided in its Motion and Memorandum. Some of the commercial uses of Leonard's stem cell images licensed by Photo Researchers include:

| **Photo Researchers Invoice** | Image | Fee | Usage |
|---|---|---|---|
| 080522 | 1 | $1,325.00 | One time, non-exclusive use on brochure cover with a run of 5,000 |
| 105586 | 4 | $1,800.00 | One time, non-exclusive use, four insertions in "Blood" magazine, 15,000 circulation, on web, and 3 trade show panels at one trade show |
| 113189 | 4 | $650.00 | One time, one year, non-exclusive use on cover of up to 2,500 brochures |
| 120814 | 4 | $2,400.00 | One time, non-exclusive use 13 trade show panels and trade show video |
| 121564 | 2, 4 | $1,095.00 | One time, non-exclusive use on website for 2 years |
| 124267 | 4 | $2,608.44 | Not specified |
| 124381 | 4 | $4,000.00 | One year, non-exclusive use reproduction rights for Power Point presentations and trade show graphics |
| 125902 | 4 | $800.00 | One time, non-exclusive use for up to 5,000 brochures |
| 127314 | 4 | $550.00 | One time, non-exclusive rights in an ad appearing in an event program guide of 5,000 copies |
| 126938 | 4 | $1,195.00 | One year, one time, non-exclusive use in trade ad (up to 125,000 circulation) and on web |
| 128380 | 4 | $745.00 | One time, non-exclusive use on cover of bulletin up to 25,000 copies |
| 134118 | 4 | $1,1650.00 | One year, one time non-exclusive for up to 100,000 print and online ads |
| Average Fee: $1,568.02 ||||

Professor Sedlik points out other significant licensing fees received by Leonard for commercial uses of his images, ranging from $7,000.00 for a 1 year license to $25,000 for a 2 year license. (Id. at 17) Additionally, Leonard has received amounts ranging from $1,600.00 to $30,000.00 for unlicensed uses of his image number 4. (See Plaintiff's Supplemental Answers to

Defendant's Fourth Set of Interrogatories, Leonard Affidavit ¶7, Ex. C. [App. Ex. 5]) If these fees were included in a calculation of Leonard's license fees for his images, they would dwarf the comparables used by Professor Sedlik. As all witnesses, including Professor Sedlik, have opined that license fees for photographs are largely dependent, not only on the quality and uniqueness of the photograph, but the type and scope of use.

Stemtech's Motion is based upon a false premise and hand-picked facts. The premise of Stemtech's Daubert Motion is that Professor Sedlik's calculation of lost license fees is severely inflated and unreliable (Defendant's Memorandum at 4) because it is based upon stock photography license fees "which are not even remotely similar to the fees regularly charged by Leonard." (Id.) Stemtech supports its false premise by hand picking fees received by Leonard for uses which are completely dissimilar to Stemtech's usage (which is on a scale immensely larger than any prior use of Leonard's images), and, are virtually all editorial or educational uses which fees are much lower than commercial fees. Moreover, Stemtech ignores the substantial fees Leonard received from Photo Researchers for commercial use, for negotiated licenses (Sedlik Report at 17 [App. Ex. 1], and in post-usage payments. (Leonard Affidavit [App. Ex. 5])

One thing is clear; there is no prior or subsequent use of Leonard's images which approaches the scale of Stemtech's use. Stemtech has used Leonard's images on tens of thousands of DVDs which it has sold to its distributors for a profit. [App. Ex. 6] And, they have used his images extensively on numerous websites promoting Stemtech products. Stemtech's and its distributors' unauthorized uses have now spanned eight years.

## III.  ARGUMENT

### A.  *The Daubert Standard of Admissibility.*

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court laid out a general framework for the application of Rule 702, which, as the Court noted, "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." Id. at 589. The Court's basic holding in Daubert is that Rule 702 requires the trial court to act as a gatekeeper and screen expert testimony that does not satisfy the threshold requirements of "evidentiary reliability" and "relevance" to the issues. Id. at 589-591. The Court's decision in Daubert also provides specific guidance to the trial court to perform its gatekeeping role. The trial court must determine, at the outset, "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592. Daubert was based solely on "scientific evidence." The Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) expanded the holding of Daubert to include all proposed experts. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that

7

reasoning or methodology properly can be applied to the facts in issue." Id. at 592-593. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Id. at 591. "The inquiry envisioned by Rule 702 is … a flexible one. The focus must be solely on principles and methodology." Id. at 594-595.

The Third Circuit has established that Rule 702, as interpreted by Daubert and its progeny, includes three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit. Burke v. TranSam Trucking, Inc., 617 F. Supp. 2d. 327, 330-331 (M.D. Pa. 2009) (citing United States v. Mathis, 264 F.3d 321, 335 (3d. Cir. 2001)); Elcock v. Kmart Corp. 233 F.3d 734, 741 (3d. Cir. 2000). "The proponent of the expert testimony bears the burden of establishing the reliability and admissibility of the expert's testimony by a preponderance of the evidence." Id. at 331; see also Daubert 509 U.S. at 593 n.10; In re TMI Litig., 193 F.3d 613, 663 (3d. Cir. 1999) Rule 702 embodies a liberal policy of admissibility. Pineda v. Ford Motor Co., 529 F.3d 237, 243 (3d. Cir. 2008); In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 857 (3d. Cir. 1990).

First, the proffered witness must be qualified as an expert, meaning that the witness possesses some specialized expertise. Feit v. Great-West Life and Annuity Ins. Co., 460 F. Supp. 2d. 632, 636 (D. N. J. 2006). This requirement has been given liberal interpretation and a broad range of knowledge, skills, and training may qualify an expert. In re TMI Litig., 193 F.3d at 664.

Second, the testimony needs to be reliable. "This requirement has been interpreted to mean that an expert's opinion must be based on the 'method and procedures' rather than a 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." Burke, 617 F. Supp. 2d at 331; (citing In re TMI Litig., 193 F.3d at 664). "The focus is

not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusion." Id. (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d at 746.). "A sufficient factual foundation must accompany an expert's testimony before it can be submitted to a jury." Elcock, 233 F.3d at 754 (citing Gumbs v. International Harvester, Inc., 718 F.2d 88, 93 (3d. Cir. 1983)).

In evaluating whether a particular scientific methodology is reliable, the precursor for admitting expert testimony based on that methodology, a district court should consider:

    1)    whether a method consists of a testable hypothesis;

    2)    whether a method has been subject to peer review;

    3)    known or potential rate of error;

    4)    existence and maintenance of standards controlling technique's operation;

    5)    whether a method is generally accepted;

    6)    relationship of technique to methods which have been established to be reliable;

    7)    qualifications of expert witnesses testifying based on methodology; and,

    8)    non-judicial use to which method has been put. F.R.E. 702; Elcock, 233 F.3d at 734 (citing Kumho Tire Co., Ltd. v. Carmichael, 256 U.S. 137 (1999)).

This is not an exhaustive list of factors, and each factor need not be applied in every case. Eclock, 233 F.3d at 734.

Third, the expert's testimony must "fit," meaning that it must "be relevant for the purposes of the case and must assist the trier of fact." Calhoun v. Yamaha Motor Corp. U.S.A., 350 F.3d 316, 321 (3d. Cir. 2003) (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d. Cir.

9

2003)). The most important consideration in evaluating admissibility under Rule 702 is helpfulness to the trier of fact. Id.

### B. *Professor Sedlik's Opinions Meet the Standard for Admissibility.*

Professor Sedlik is an expert in the area of photography licensing. He teaches the subject and has written the guide to image licensing for the American Society of Media Photographers. He has testified as an expert in this field on many occasions. Indeed, Stemtech does not seriously challenge Professor Sedlik's qualifications and Stemtech offers no expert opinion of its own to contradict Professor Sedlik's methodology, conclusions, or qualifications.

Professor Sedlik's calculation of fees consists of a reasonable and testable hypothesis. To arrive at a reasonable estimate of licensing fees applicable to Stemtech's infringing usages, he obtained comparative stock photography license fee quotes from several stock photography agencies. He calculated total fees based on the information available, including the number of uses of each image, the media in which the images were produced, the reproduction quantity, size, and placement of reproduction and period of use. He adjusted the fees to 2006 market rates by referencing pricing data obtained during that time period. He also relied upon his considerable personal knowledge and experience in image licensing. (Sedlik Report at 26-27 [App. Ex. 1])

Tellingly, Stemtech has not produced any expert to question either Professor Sedlik's methodology, his application of his methodology, or his conclusions. Instead, it relies upon its own biased selection of licensing fees charged by Leonard for non-comparable uses, eliminates most commercial usage fees charged by Photo Researchers, and ignores the vast scope of its own infringement. In this last regard, the fee quoted by Leonard to Stemtech is quite revealing. The quote was for $1,250 for a one year non-exclusive use of a 2.5" x 3" image and a 1" image in

10

10,000-20,000 copies of Healthspan Magazine, and a one year use of the same image on its website. [App. Ex. 5] These are relatively minor usages as negotiated by Stemtech, but are nowhere near what Stemtech actually has done with images 3 and 4 (one of which, 3, was not even part of the limited license which was requested and granted).

Contrary to what Stemtech argues, if Professor Sedlik had utilized fees actually charged by Leonard for significant uses, his damage calculation would have been far higher than he calculated by utilizing the comparative market rates. For example, the $4,000.00 fee charged to Baxter, as shown in Photo Researchers invoice no. 124381 (which was for one year of usage in Power Point presentations and trade show graphics), would have more than doubled his damage calculation. Professor Sedlik's methodology is not only reasonable, but it is fair and equitable to Stemtech, because it is market tested and verifiable. Thus, contrary to Stemtech's argument (Memorandum at 10), it is based upon sufficient facts and data. Although Stemtech denounces the stock photography agency fees that Professor Sedlik used as "severely inflated, irrelevant, and inapposite" (Id.), it does not support that critique with any expert testimony.

Stemtech criticizes the downward adjustments Professor Sedlik makes to account for 2006 dollars because he relied upon Getty Images. (Stemtech Memorandum at 11) However, Getty is the largest image licensing firm in the world, and the downward adjustment favors Stemtech. Stemtech also criticizes Professor Sedlik's calculation of damages based upon the number of known infringements by Stemtech. Id. However, Professor Sedlik expressly states that his calculations will be revised upon receipt of new information concerning infringement and/or damages. (Sedlik Report at 27, 31 [App. Ex. 1]) Of course, the ultimate decision on infringement and damages will be made by the trier of fact.

Stemtech totally misconstrues Sedlik's Supplemental Report regarding Stemtech's infringement in Leonard II. (Stemtech Memorandum at 12) Professor Sedlik's damage calculations apply a single usage fee to each website, not to each copy of Leonard's image, and he never used the term "headshot."

As to sizes and durations of infringing uses, Professor Sedlik expressly states that either or both would be appropriately adjusted based upon receipt of information from Stemtech documenting actual scope of infringement. However, since Stemtech has not, to the present, acknowledged any unauthorized use of Leonard's images, this information has not been forthcoming.

Professor Sedlik and his opinions more than satisfy the Third Circuit's <u>Daubert</u> criteria. First, he is well-qualified to opine on photography copyright matters, in general, and photography copyright licensing, specifically. He is a well-known professional photographer who has licensed his own works. He has experience in microscopy as he testified in his deposition. He has written about licensing copyrighted photographic works, he teaches licensing, and he has been qualified and testified as an expert in this area on many occasions.

Second, the method utilized by Professor Sedlik is not based upon a subjective belief or speculation, but is based upon methods and procedures that can be tested and verified. The license fees charged by the various stock photography agencies can be accessed and reviewed by Stemtech – or any expert they may have consulted. While they (and the trier of fact) may disagree with Professor Sedlik's conclusions derived from that data, the methodology itself is sound and testable.

Third, Professor Sedlik's testimony "fits," i.e. it is relevant and will help the trier of fact on the issue of actual damages. As this Court has ruled, a motion to exclude evidence is

committed to the sound discretion of the Court, and Rule 702 embodies a liberal policy of admissibility. B. Braun Melsungen AG v. Teramo Med. Corp., 749 F. Supp. 2d 210 (D. Del. 2010).

### C. *Leonard's Actual Damages are to be Measured by Fair Market Value.*

Except for cases regarding the Daubert standard, Stemtech's entire argument is premised on only one case, Mason v. Montgomery Data, Inc., 967 F.2d 135 (5th Cir. 1992)(Stemtech Memorandum at 12) which involved statutory damages, not actual damages, and, is of no assistance in resolving the instant Motion.

Stemtech cites no authority whatsoever to attack Professor Sedlik's calculation and use of a reasonable license fee based upon fees charged by stock photography agencies for similar works. In fact, such "fair market value" is precisely the standard the law prescribes. Davis v. Gap, Inc., 246 F.3d 152 (2d Cir. 2001). In Davis, the court held that the measure of "actual damages" under 17 U.S.C. §504(b):

> [I]s not what the owner would have charged for use of the protected material, but rather what is the fair market value. In order to make out his claim that he has suffered actual damage because of the infringer's failure to pay the fee, the owner must show that the thing taken had a fair market value.

Id.

The Davis court went on to Rule:

> Many copyright owners are represented by agents who have established rates that are regularly paid by licensees. In such cases, establishing the fair market value of the license fee of which the owner was deprived is no more speculative than determining the damages in the case of a stolen cargo of lumber or potatoes. Given our long-held view that in assessing copyright damages "courts must necessarily engage in some degree of speculation," [citation omitted] some difficulty in quantifying the damages attributable to infringement should not bar recovery. See 4 Nimmer § 14.02 A, at 14-12 ("Uncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual

> damages are attributable to the infringement."); II Paul Goldstein, Copyright § 12.1.1, at 12:6 (2d ed. 2000) ("Once the copyright owner shows a connection between infringement and damage, uncertainty about the amount of damages will not bar an award."); Szekely, 242 F.2d at 269 (where "legal injury is certain… we should not allow difficulty in ascertaining precisely the value of the right destroyed, which difficulty arises largely from the destruction, to enable the infringer to escape without compensating the owner of the right"). Id. at 167.

The Davis court went on to conclude that the owner's actual damages may include the reasonable license fee that a willing buyer and a willing seller would have agreed for the use taken by the infringer. Numerous Circuit and District courts have articulated the same standards as Davis. Id. at 168-69. See also, Am. Bd. of Internal Med. v. Von Muller (ED PA 2012) 2012 U.S. Dist. LEXIS 94436 and cases cited therein. Stemtech has cited no contrary authority.

Thus, Professor Sedlik's methodology of calculating and applying a reasonable license fee to Stemtech's unauthorized use of Leonard's images is not only factually sound, but legally approved as well. In fact, Professor Sedlik's starting point for his actual damage analysis is that "actual damages are determined in part by the fees a willing buyer would have reasonably been required to pay at the time of the infringement" citing Sid & Marty Knofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157 (9th Cir. 1977); and Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505 (9th Cir. 1985). (Sedlik Report at 26 [App. Ex. 1])

Stemtech's argument that an accountant is necessary to opine on "actual damages," like its other arguments, is unsupported by any authority, and should be rejected for that reason alone. Nevertheless, as demonstrated above, Professor Sedlik is highly qualified to testify about license fees for photographic images, and that is what he has done. Furthermore, with due respect to Professor Sedlik and the accounting profession, the final financial calculation is third grade math: multiplying a reasonable license fee by the number of infringements found by the fact finder. (See Sedlik Report chart at 28 [App. Ex. 1])

Professor Sedlik's Reports and Opinions meet and surpass the <u>Daubert</u> test, and the Court should exercise its discretion as gatekeeper to allow Professor Sedlik to testify consistent with those Reports and Opinions.

## IV. CONCLUSION.

For the foregoing reasons, Stemtech's Motion to exclude the opinions of Professor Jeff Sedlik should be denied.

DATED: June 7, 2013

                                        SEITZ, VAN OGTROP & GREEN, P.A.

                                        /s/ James S. Green, Sr.
                                        JAMES S. GREEN, SR., ESQ. (DE0481)
                                        JARED T. GREEN, ESQ. (DE5179)
                                        222 Delaware Avenue, Suite 1500
                                        P. O. Box 68
                                        Wilmington, DE 19899
                                        (302) 888-0600
                                              *Attorneys for Plaintiff*

OF COUNSEL:

Jan I. Berlage, Esq.
Gohn, Hankey & Stichel, LLP
201 N. Charles Street, Suite 2101
Baltimore, MD 21201
(410) 752-9300