IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANDREW PAUL LEONARD,<br><br>Plaintiff,<br><br>v.<br><br>STEMTECH HEALTH SCIENCES,<br>INC. and DOES 1-100, Inclusive,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No: 08-067-LPS-CJB<br>) Consolidated<br>)<br>)<br>)<br>) |

**DEFENDANT STEMTECH HEALTH SCIENCES, INC.'S**
**REPLY IN SUPPORT OF MOTION TO EXCLUDE JEFF SEDLIK'S OPINIONS**

1. **Introduction**

In his Opposition, Plaintiff Andrew Paul Leonard either completely ignores or only superficially addresses many of Stemtech's meritorious arguments, presumably because he has no colorable argument to dispute them. Instead, what Leonard devotes the majority of his Opposition to is explaining how qualified Sedlik is for calculating the "third grade math" at issue in his actual damages calculations and trying to support Sedlik's severely inflated and unreliable licensing fee numbers by presenting a slanted and misleading summary of Leonard's own purported licensing fees which, coincidentally, do not even factor into Sedlik's opinions. Even Leonard's own arguments, however, support the exclusion of Sedlik's opinions and, therefore, Stemtech's Motion should be granted.

2. **Sedlik's Actual Damages Calculations That Disregard Leonard's Own Licensing Fees Are Based Upon Invalid Reasoning and Unreliable Methodology**

In calculating Leonard's actual damages, Sedlik utterly disregards the licensing fees Leonard has charged his clients over the past 15 years for Images 3 and 4, as well as the fees specifically quoted to Stemtech in the instant case. (Ex. 3, pp. 26-28; Ex. 4, pp. 13-14; also Exs.

1

1, 5-8.[1]) Instead, Sedlik calculates Leonard's actual damages using only "comparative stock photography license fee quotes from several stock photography agencies," most of which come from Getty Images who, according to Leonard, is "the largest image licensing firm in the world." (Ex. 3, p. 26; Ex. 4, p. 13; Opposition, p. 11.) These stock photography licensing fees, however, are not comparable to the fees charged by Leonard and have no connection to the facts or evidence in this case as they are more than five (5) to twenty (20) times higher than what Leonard charged Stemtech in this matter or what he regularly charges other clients and are often times ***thousands*** of dollars higher than Leonard's customary fee. (Compare Ex. 3, pp. 26-28 and Ex 4, pp. 13-14 with Exs. 1, 6-8.) Thus, in violation of Federal Rule of Evidence 702 and applicable case law, Sedlik's actual damages calculations are not based upon sufficient facts or data and are unreliable, misleading and invalid. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 593-595 (1993); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243-244 (3d Cir. 2008); *Kannankeril v. Terminex Intl., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *Burke v. Transam Trucking, Inc.*, 617 F.Supp.2d 327, 330-332 (M.D. Pa. 2009); Fed. R. Evid. 702.

In response, Leonard makes two claims: (1) that disregarding Leonard's own licensing fees and using only stock photography fees to calculate Leonard's actual damages is appropriate because such damages are measured by fair market value, (Opposition, pp. 13-15); and (2) that Stemtech failed to include fees charged by Photo Researchers for commercial uses of Leonard's Images 3 and 4, including "post-usage payments" Leonard received *in litigation settlements*,[2] and hand-picked only some of Leonard's smaller licensing fees in making its arguments. (Opposition, pp. 2-6, 10-11.) Leonard misses the mark on both arguments.

---

[1] All exhibits referenced herein are attached to the Compendium of Exhibits that was filed with Stemtech's moving papers unless otherwise stated.
[2] Leonard's position that Stemtech should consider the post-infringment litigation settlements Leonard obtained for the alleged unlicensed use of his images in calculating his "actual damages" is absurd and contrary to law. *Jarvis v. K-2 Corp.*, 486 F.3d 526, 534, fn. 9 (9th Cir. 2007).

With respect to the appropriate measure of a copyright plaintiff's actual damages, Leonard is correct that such damages are evaluated based upon the fair market value. As courts have repeatedly held, however, what this means is that "in situations where the infringer could have bargained with the copyright owner to purchase the right to use the work, actual damages are 'what a willing buyer would have been reasonably required to pay to a willing seller *for plaintiffs' work.*'" *Jarvis*, 486 F.3d at 533, quoting *Frank Music Corp. v. Metro-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985); *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002); also *MGE UPS Systems, Inc. v. GE Consumer & Industrial, Inc.*, 622 F.3d 361, 367, fn. 2 (5th Cir. 2010); *Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc.*, 335 F.Supp.2d 466, 468 (S.D.N.Y. 2004). [Emphasis added.] Thus, in calculating a copyright plaintiff's actual damages, courts have consistently utilized that plaintiff's own licensing fees, as opposed to randomly selected licensing fees charged by other photographers or stock photography agencies for other photographers' images, to calculate his or her actual damages. E.g., *Jarvis*, 486 F.3d at 533-535; *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004); *Curtis v. General Dynamics Corp.*, 1990 U.S. Dist. LEXIS 17333, *28-29 (W.D. Wa. 1990); *Bishop v. Wick*, 1988 U.S. Dist. LEXIS 19372, *14-15 (N.D. Ill. 1988); *Szekely v. Eagle Lion Films, Inc.*, 242 F.2d 266, 268-269 (2d Cir. 1957). In fact, in one case similar to the instant case, the court discounted an expert's opinions on a plaintiff's actual damages in part because he "relied almost exclusively on the Getty website for his figures." *Jarvis*, 486 F.3d at 534.

This measurement of a plaintiff's actual damages makes perfect sense in light of the purpose of such damages which, according to Black's Law Dictionary, are defined as follows:

> Compensation for actual injuries or loss. Chappell v. City of Springfield, Mo., 423 S.W.2d 810, 814. Term used to denote the type of damage award as well as the nature of injury for which recovery is allowed; thus, actual damages flowing from injury in fact are to be distinguished from damages which are nominal,

exemplary or punitive. *Rasor v. Retail Credit Co.*, 87 Wash.2d 516, 554 P.2d 1041, 1049. "Actual damages" are synonymous with compensatory damages. *Weider v. Hoffman*, D.C.Pa., 238 F.Supp. 437, 445. *See also* Damages.

\*\*\*

Real, substantial and just damages, or the amount awarded to a complainant in compensation for his actual and real loss or injury, as opposed on the one hand to "nominal" damages, and on the other to "exemplary" or "punitive" damages. Synonymous with "compensatory damages" and with "general damages."

BLACK'S LAW DICTIONARY 35, 390 (6th ed. 1990); also *Birdsall v. Coolidge*, 93 U.S. 64, 64 (1876) [compensatory damages are synonymous with actual damages]; *Solivan v. Valley Housing Development Corp.*, 2009 U.S. Dist. LEXIS 104355, \*23 (E.D. Pa. 2009) [same]. Compensatory damages, in turn, are:

[S]uch as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury. Damages awarded to a person as compensation, indemnity, or restitution for harm sustained by him. The rationale behind compensatory damages is to restore the injured party to the position he or she was in prior to the injury. *Northwestern Nat. Cas. Co. v. McNulty*, C.A.Fla., 307 F.2d 432, 434. Equivalent of *Actual damages, above*.

BLACK'S LAW DICTIONARY 390. According to the Third Circuit, "[t]he purpose of compensatory damages is 'to make the plaintiff whole,'" not give him a windfall. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 216 F.3d 338, 347 (3d Cir. 2000); also *Jarvis*, 486 F.3d at 535.

Despite this authority, Sedlik ignores the fees Leonard quoted Stemtech for use of his image, as well as the fees Leonard has charged clients over the past 15 years, and, instead, utilizes only stock photography fees from Getty and three other places for other photographers' images to calculate Leonard's actual damages. (Ex. 3, pp. 26-28; Ex. 4, pp. 13-14; also Exs. 1, 5-8.) He presumably does this since Photo Researchers' invoices show that Leonard has been quite unsuccessful in licensing his images over the past 15 years and has only made $5,914.19 and $6,109.66, respectively, for the licensing of Images 3 and 4 from 1997 through March 12,

4

2013. (Exs. 6, 7). More tellingly, these invoices show that the licensing fee Leonard has routinely charged for Images 3 and 4 range from $16.54-$425.00 and $10.77-$800.00, respectively, numbers that are **significantly** lower than the self-serving stock photography fees Sedlik hand-picked. (Compare Ex. 3, pp. 26-28 and Ex. 4, pp. 13-14 with Exs. 1, 6, 7) By omitting Leonard's own fees from the equation and using only substantially higher stock photography fees for <u>other</u> photographers to calculate Leonard's purported actual damages, Sedlik seeks to obtain a hefty windfall for Leonard, which contravenes the purpose of actual damages. *Birdsall*, 93 U.S. at 64; *Solivan*, 2009 U.S. Dist. LEXIS 104355 at *23; *Calhoun*, 216 F.3d at 347; *Jarvis*, 486 F.3d at 535; BLACK'S LAW DICTIONARY 35, 390.

Leonard claims, however, that Stemtech's summary of his fees is incomplete and that Stemtech failed to include invoices reflecting commercial licenses for Images 3 or 4 when evaluating Leonard's licensing fees.[3] (Opposition, pp. 2-6, 10-11.) To the contrary, Stemtech included **every single invoice** produced by Photo Researchers that includes any of the photograph numbers its Person Most Knowledgeable, Stephen Gerard, identified as referencing Images 3 or 4 in those invoices, numbers to which the parties stipulated.[4] (Exs. 5-7; Arnold Decl., ¶ 4.) Despite this fact, Leonard claims that Stemtech omitted 11 commercial invoices for Image 4 in its calculations which, along with another commercial license for an unidentified image that is not at issue in this case, Leonard uses to arrive at an average commercial fee for his images of $1,568.02. (Opposition, p. 5.) Leonard's claim and corresponding calculation is not

---

[3] Leonard also claims that he has charged from $7,000 for a 1 year license to $25,000 for a 2 year license for the use of some undisclosed images. (Opposition, p. 5.) Quite tellingly, despite the fact that Stemtech has requested all documents reflecting any licensing fees charged or obtained by Leonard for the licensing of his images, Leonard has failed to produce any documents reflecting such fees and Photo Researchers has not produced any such documents in response to Stemtech's subpoenas. (Declaration of Christine R. Arnold ["Arnold Decl."], ¶ 3.)

[4] According to Stephen Gerard and the parties' stipulation, the photograph numbers listed on Photo Researchers' invoices that correspond with Leonard's Image 3 are 3G4557, 3H3364, 3L5663, 3L5664, 3L5665 and 3M0354, while the photograph numbers listed on Photo Researchers' invoices that correspond with Leonard's Image 4 are BE9950, 3U6689, 3D6755, 3U6686, 3U6687, 3U6688, 3U6691, 3U7124, 3U7135, 3U7137, 3U7139, 3U7140, 3U7141, 3U7142, 3U7144, 3U9334, 3U9335, 3U9336 and 3U9337. (Ex. 5.)

only disingenuous and misleading, but contrary to Mr. Gerard's representations and the parties' stipulation as to the photograph numbers on Photo Researchers' invoices that correspond with Images 3 and 4. (Compare Opposition, p. 5 and Ex. 5 to Leonard's Appendix, Ex. B thereto ["Leonard Ex. B"], with Ex. 5.)

In particular, not a single one of the commercial invoices that Leonard uses to calculate his average commercial fee involves Image 4. (Compare Ex. 5 to Leonard Ex. B.) Moreover, many of the fees at issue in Leonard's hand-selected invoices are for multiple images and/or uses that are not comparable to the uses or license fees at issue in this case. For example, the $625.00 in Invoice No. 105586 is for the use of Leonard's image on up to ¼ of a page of three (3) separate trade show panels. Similarly, the $4,000.00 fee in Invoice No. 124381 is for the <u>unlimited</u> use of Leonard's image in PowerPoint presentations and trade show graphics. Finally, the $1,650.00 fee in Invoice No. 134118 is for use of Leonard's image in an <u>unspecified</u> number of trade print and online ads, where <u>each ad</u> has a circulation of 100,000. (Leonard Ex. B.)

More important, even disregarding the above inconsistencies and assuming that Leonard's selected invoices actually involve Images 3 or 4, Leonard's calculation of his average commercial fee based upon <u>only</u> these twelve (12) invoices is unreliable, erroneous and misleading. This is so because Leonard does not evaluate each <u>individual</u> licensing fee to arrive at his average. Instead, he conveniently omits smaller fees and lumps all favorable fees in one invoice together so his starting license fees are larger and there are fewer licenses by which to divide the total to arrive at the average, thereby artificially inflating his resulting average. (Compare Opposition, p. 5 with Leonard Ex. B.) For example, Invoice No. 105586 that Leonard claims has a $1,800.00 fee actually includes three (3) separate fees that range from $550.00 to $625.00. (Leonard Ex. B.) Similarly, Invoice No. 120814 that Leonard claims has a $2,400.00

6

fee also has three (3) separate fees ranging from $250.00 to $1,900.00. (Leonard Ex. B.) Finally, for Invoice No. 124267, Leonard chooses only the highest fee of $2,608.44 and leaves out the remaining five (5) fees that range from $57.06 to $1,141.19.[5] (Leonard Ex. B.) Had Leonard averaged the fees properly and included each separate fee set forth in his hand-selected invoices, his average commercial fee drops from the $1,568.02 he proffers to $856.45, a difference of $711.57 per license.[6] (Leonard Ex. B.)

Thus, even Leonard's own incomplete and self-serving commercial invoices lead to a much, much smaller average licensing fee than those calculated by Sedlik. Specifically, as just noted, when just Leonard's twelve (12) invoices are properly averaged, his average commercial fee totals $856.45, while Sedlik's averages range from $1,277.10 to $2,569.46, ***$420.65 to $1,713.01 more per license than Leonard's own favorable hand-picked invoices.*** (Ex. 3, Ex. F thereto; Ex. 4, Ex. D thereto.) Consequently, Leonard's own biased arguments and invoices, which Sedlik improperly disregards in arriving at his opinions on Leonard's actual damages, support the exclusion of Sedlik's opinions. Therefore, because Sedlik's opinions on Leonard's purported actual damages are contrary to law and based upon unreliable methodology and invalid reasoning, he must be precluded from testifying about such damages.

3.  **Leonard Failed to Address Other Deficiencies in Sedlik's Unreliable and Invalid Damages Calculations That Were Specifically Raised by Stemtech**

In its Motion, Stemtech also challenged Sedlik's opinions on the following grounds: (1) that the images Sedlik utilizes to adjust his averages down to 2006 rates are not comparable; (2) that the number and duration of violations Sedlik uses to calculate Leonard's actual damages are

---

[5] One of the fees Leonard inexplicably excludes is the dismal $57.06 fee for Image 3, one of the images actually at issue in this case. (Opposition, p. 5; Leonard Ex. B; Ex. 5.)

[6] When this average, which covers the licensing of images not at issue in this case, is considered in conjunction with Photo Researchers' invoices for Images 3 and 4, which are at issue in this case, the average fee charged by Leonard to license his images drops to $332.43. (Leonard Ex. B; Exs. 6, 7.)

7

wholly speculative and/or contrary to law; and (3) that fees selected by Sedlik for specific purported infringements are contrary to the evidence. For whatever reason, Leonard either fails to address these arguments or only superficially addresses them, presumably because he has no cogent arguments to the contrary.

With respect to Stemtech's first challenge, in adjusting his averages down to 2006 rates, Sedlik again fails to consider Leonard's own fees and, instead, bases his adjustments exclusively upon Getty's fees. (Ex. 3, pp. 26-28 and Exs. L-N thereto.) Moreover, the images Sedlik uses for his adjustments are portrait or landscape images, not stem cell images or microscopic images. (Ex. 3, Ex. L thereto.) Leonard's only response to these challenges is that "Getty is the largest image licensing firm in the world, and the downward adjustment favors Stemtech." (Opposition, p. 11.) Leonard fails, however, to explain how the use of Getty's images favors Stemtech and, based upon the case law cited above, some of which discounted an expert's actual damages calculations because he "relied almost exclusively on the Getty website for his figures," this response is without merit and does not address Sedlik's unreliable and invalid methodology, which excludes all consideration of Leonard's own fees. *Jarvis*, 486 F.3d at 533-535; also, e.g., *Mackie*, 296 F.3d at 917; *MGE UPS Systems*, 622 F.3d at 367, fn 2; *Stehrenberger*, 335 F.Supp.2d at 468; *Polar Bear*, 384 F.3d at 709; *Curtis*, 1990 U.S. Dist. LEXIS 17333 at *28-29; *Bishop*, 1988 U.S. Dist. LEXIS 19372 at *14-15; *Szekely*, 242 F.2d at 268-269. Leonard also fails to address the fact that the images Sedlik utilizes for his adjustments are images of an entirely different genre than those at issue in this case.

With respect to Stemtech's arguments that Sedlik's selection of the licensing fee to be charged based upon the size of the image purportedly infringed and the number and duration of violations are wholly speculative and/or contrary to the law or the evidence, Leonard fails to

8

address these. In fact, all Leonard states in response to Stemtech's argument as to the improper and inflated number of infringements utilized by Sedlik is that "Sedlik expressly states that his calculations will be revised upon receipt of new information concerning infringement and/or damages." (Opposition, p. 11.) A similar response is provided for Stemtech's contentions regarding the size and duration of the infringements, namely that "[a]s to sizes and durations of infringing uses, Professor Sedlik expressly states that either or both would be appropriately adjusted based upon receipt of information from Stemtech documenting actual scope of infringement" but that such information has "not been forthcoming" from Stemtech since it has not acknowledged any unauthorized use of Leonard's images to date. (Opposition, p. 12.)

Such responses, however, do not address the very real deficiencies in Sedlik's methodology since there is no information that he needs that he does not already have or that he cannot obtain from Leonard or his own research. For example, Sedlik has copies of marketing materials and screenshots of purported infringements by Stemtech and/or its distributors that, at least according to Leonard's additions to these screenshots, show the websites the images were purportedly on and the size of the image allegedly infringed, as well as the screenshot's date. (Ex. 3, pp. 19-23 and Ex. D thereto; Ex. 4, Ex. H thereto.) Thus, Sedlik has all of the information he needs and yet, his opinions are still contrary to the evidence and the law and are wholly speculative.[7] Consequently, for the reasons more fully addressed in Stemtech's moving papers, these deficiencies render Sedlik's methodology and opinions unreliable and invalid.

4. **Since Leonard Concedes That His Actual Damages Calculations are Within the Common Knowledge of the Average Juror, Sedlik Should be Precluded from Testifying to Them**

In its Motion, Stemtech argued that Sedlik is not qualified to opine on Leonard's actual

---

[7] As just one example, Sedlik uses a higher licensing fee for "up to 1 full page" for certain infringements where the image does not even take up ½ of the page. (Ex. 3, pp. 26-28 and Exs. D-F thereto; see Motion, pp. 12-13.)

damages as evidenced by the convoluted and unreliable nature of his methodology that makes an easy calculation complex and unnecessarily difficult. Fed. R. Evid. 702; also *Kannankeril*, 128 F.3d at 806; *Pineda*, 520 F.3d at 244. Leonard counters that Sedlik's actual damages calculations are "third grade math." (Opposition, p. 14.) If that is the case, no expert testimony is required and none should be permitted since expert testimony is allowed to "assist the trier of fact in understanding complex transactions that lie outside 'the common knowledge of the average juror.'" *U.S. v. Chaffo*, 452 Fed.Appx. 154, 158 (3d Cir. 2011). Here, however, as even Leonard concedes, determining Leonard's actual damages is merely "third grade math" and requires only evidence of Leonard's licensing fee and multiplying that fee by the number of violations, something any average juror can do on his own. Therefore, because expert testimony is unnecessary, Sedlik should be precluded from testifying about Leonard's actual damages.

5. **Conclusion**

For all of the foregoing reasons and those set forth in Stemtech's moving papers, Stemtech respectfully requests that this Court grant its Motion and preclude Sedlik from offering testimony on Leonard's actual damages and that it strike all information in his expert reports that relate to that topic.

DATED: June 24, 2013

CASARINO CHRISTMAN SHALK
RANSOM & DOSS, P.A.

*Associated Counsel:*

Kathleen Mary Kushi Carter
Christine R. Arnold
HOLLINS LAW
2601 Main Street, Penthouse Suite 1300
Irvine, California 92614-4239
Telephone: (714) 558-9119

By: /s/ Stephen P. Casarino
Stephen P. Casarino (DE0174)
405 North King Street, Suite 300
P.O. Box 1276
Wilmington, DE 19899-1276
Telephone: (302) 594-4500
Email: scasarino@casarino.com

*Attorneys for Stemtech HealthSciences, Inc. and Stemtech International, Inc.*