IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANDREW PAUL LEONARD,     )
         )
       Plaintiff,    )
         )
     v.       )    Civil Action No. 08-67-LPS-CJB
         )    Consolidated
STEMTECH HEALTH SCIENCES,    )
INC., et al.,        )
         )
       Defendants.   )

## REPORT AND RECOMMENDATION

In this consolidated action, Plaintiff Andrew Paul Leonard ("Plaintiff" or "Leonard")

brought suit against Defendant Stemtech Health Sciences, Inc./Stemtech International, Inc.

(collectively, "Stemtech" or "Defendant") and John Does 1-100 for copyright infringement in

violation of the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*, and the common law, relating to

certain photographic images created by Plaintiff. Pending before the Court is Stemtech's motion

for summary judgment ("Motion") on Plaintiff's claim for copyright infringement and for

statutory damages, attorney's fees and profits, as set out in Plaintiff's Complaint filed on January

27, 2012 (the "*Leonard II* Complaint") in the lawsuit entitled *Andrew Paul Leonard, d/b/a APL*

*Microscopic v. Stemtech International, Inc.*, Civil Action No. 12-86-LPS-CJB ("*Leonard II*").[1]

(D.I. 176) For the reasons that follow, I recommend that Defendant's Motion be GRANTED.

---

[1] *Leonard II* is the second copyright infringement action that Plaintiff has filed in
this Court. *Leonard II* has been consolidated with the first lawsuit that Plaintiff filed on February
1, 2008 against Stemtech Health Sciences, Inc. and John Does 1-100, Inclusive, entitled *Andrew
Paul Leonard v. Stemtech Health Sciences, Inc. and John Does 1-100, Inclusive*, Civil Action
No. 08-67-LPS-CJB ("*Leonard I*"). (*Leonard II*, D.I. 25 at 26) Unless otherwise noted, citations
to docket numbers are to documents that have been filed in the *Leonard I* action.

## I.   BACKGROUND[2]

### A.   Factual Background and Procedural History

#### 1.   Plaintiff and His Images

Plaintiff is the owner and operator of APL Microscopic, a sole proprietorship that he began in 1990. (D.I. 183, ex. 1 at 26; *Leonard II*, D.I. 1 at ¶ 4)  A professional photographer, Plaintiff specializes in creating images of microscopic subject matter, using a scanning electron microscope ("SEM") as his camera. (*Leonard II*, D.I. 1 at ¶ 6)  The SEM produces only grayscale (or black and white) images that Plaintiff subsequently enhances by digitally adding colors and effects. (*Id.*)  The images that are the subject of this consolidated action are photographs of human bone marrow stem cells that Plaintiff created, at various times before 2002, using an SEM. (D.I. 76 at ¶ 10; D.I. 183, ex. 2 at ¶¶ 2-3)  Each of the images was first published between 1999 and 2002; Image 3, the subject of this Motion, was first published on January 1, 2000 in *Discover* magazine. (D.I. 76, ex. B at APL 00119; D.I. 176, ex. 7 at APL 00129)  Image 3 is entitled "Scanning Electron Microscopy of Bone Marrow Stem Cells." (*Leonard II*, D.I. 1 at ¶ 7)  All of the images referenced above, including Image 3, were registered with the United States Copyright Office on December 20, 2007. (D.I. 183, ex. 2 at ¶ 4; *Leonard II*, D.I. 1 at ¶ 7)

#### 2.   Defendant Stemtech and its Business Model

---

[2]      In this section, the Court will assume familiarity with the facts and procedural history detailed in its prior opinions in this consolidated action, *Leonard v. Stemtech Health Scis., Inc.*, Civil Action No. 08-67-LPS-CJB, 2011 WL 6046701 (D. Del. Dec. 5, 2011) and *Leonard v. Stemtech Int'l, Inc.*, Civ. Action No. 12-86-LPS-CJB, 2012 WL 3655512 (D. Del. Aug. 24, 2012). To the extent that certain facts are particularly relevant to the issues raised by the instant Motion, the Court will include them in this section.

Defendant Stemtech is a direct sales company that markets and sells nutrition supplements on its own and through independent distributors. (D.I. 6 at ¶ 13; D.I. 176 at 2; D.I. 183, ex. 10 at 93)[3] Stemtech was formed on October 11, 2005, when it filed its Certificate of Incorporation in Delaware under the name "Stemtech HealthSciences, Inc." (D.I. 176, ex. 11) Four years later, on October 12, 2009, Stemtech changed its name to Stemtech International, Inc. as it began to expand internationally. (*Id.*) The company's primary product, StemEnhance, is marketed as "a breakthrough, natural botanical extract that supports wellness by helping your body maintain healthy stem cell physiology" and "the first product on the market from the latest phytoceutical product category called 'stem cell enhancers.'" (D.I. 111 at DEFSUPP4000054)

Stemtech sells its products through a vast network of independent distributors. (D.I. 78 at ¶¶ 12-13; D.I. 183, ex. 10 at 131) For example, as of January 2011, a little over one hundred thousand individuals or entities had signed up to be Stemtech independent distributors; 30,000 to 40,000 of those were active distributors, having ordered inventory from Stemtech within the previous six months. (D.I. 183, ex. 10 at 131-32) Stemtech develops marketing materials and internet sites for its own use and for the use of its distributors in promoting and selling Stemtech products. (D.I. 78 at ¶ 29) Initially, Stemtech's independent distributors were permitted to create their own websites to sell Stemtech's products, but because some distributors were impermissibly using copyrighted material on such websites, Stemtech changed its policy in approximately November 2009. (D.I. 183, ex. 13 at 141) Stemtech's new policy mandated that its independent distributors "use the Marketing Materials and support materials produced by

---

[3]     Defendant filed the Motion and a Memorandum of Points and Authorities in support of the Motion together as D.I. 176. Unless otherwise noted, page citations to D.I. 176 are to pages in Defendant's memorandum.

3

[Stemtech]" in marketing Stemtech's products to customers. (D.I. 108, ex. B. at ST-00090)  In

setting out the policy, Stemtech's Business Development System Training Manual ("Training

Manual") explains that the underlying rationale is "simple": "to ensure that each aspect of

[Stemtech] . . . complies with the vast and complex legal requirements of Federal, Provincial and

State laws." (*Id.*)

      In conjunction with the new policy, Stemtech's independent distributors were no longer

permitted to create their own websites, but instead must use Stemtech's official replicated

templates if they wish to utilize an internet website to sell Stemtech products. (D.I. 76 at ¶ 29;

D.I. 108, ex. B. at ST-00091; D.I. 183, ex. 15 at 48)  When independent distributors make the

choice to use a website to sell Stemtech products, Stemtech provides them with a personalized

URL, but the content of the distributor's websites is nearly identical to that of Stemtech's official

website. (D.I. 176, Declaration of George Tashjian In Support of Motion for Summary Judgment

("Declaration of Tashjian") at ¶ 3)  The only personalized content on the distributor's website

that a distributor may affirmatively add is his name(s), phone number, e-mail address, a

"headshot" photograph, and a short story about himself. (*Id.*; D.I. 183, ex. 13 at 107; *id.*, ex. 14

at 21-22; *id.*, ex. 16 at 58)  This personalized information appears on each page of a distributor's

website, including sub-domains of that website that are accessed when a viewer clicks on a link

on the website. (Declaration of Tashijian at ¶ 3)  Stemtech owns the domain and sub-domains of

the independent distributors' websites, and through its website's application service provider,

Exigo, hosts these websites on its internet server. (D.I. 183, ex. 17 at 27-36; *see also* D.I. 182 at

11)  Stemtech's main domain name is www.stemtechbiz.com. (*Id.* at 27)

      **3.**    ***Leonard I***

On February 1, 2008, Plaintiff commenced his first action in this Court, *Leonard I*. (D.I. 1) In that Complaint (the "First Complaint"), Plaintiff asserted a claim of copyright infringement against Stemtech regarding Image 4 and Image 5, two of his bone marrow stem cell images. (*Id.*) In the First Complaint, Plaintiff alleged that Defendant, without authorization, infringed his copyright by "using, copying, and displaying" the Images on its internet websites, in publications, and in video presentations, and by "ma[king] the Images available to its sales and distribution network for their use, copying and distribution" from "[a]t least as early as June 2006" through January 2008. (*Id.*)

On July 16, 2010, Plaintiff filed his First Amended Complaint ("Amended Complaint") in *Leonard I*. (D.I. 76) The Amended Complaint contained 38 counts, this time alleging that Stemtech was guilty of infringing Plaintiff's copyright as to not only Images 4 and 5, but also to two other images: Images 2 and 3.[4] (*Id.* at ¶¶ 10-11; D.I. 101, ex. H) The Amended Complaint alleged two counts of direct copyright infringement against Stemtech due to Stemtech's "using, copying, and displaying" these images "on its Internet websites, in publications, and in video presentations without authorization" and otherwise making the Images available to its distributors via certain websites. (D.I. 76 at ¶¶ 17-18, 23-24) The Amended Complaint also alleged 36 counts of contributory or vicarious copyright infringement against Defendant, linked to the alleged display of certain of the Images on websites of various distributors of Defendant's products. (*Id.* at ¶¶ 28-208) In various filings associated with *Leonard I*, Plaintiff alleged that

---

[4]     Images 2 and 5 are no longer at issue in this action. The District Court has entered summary judgment in favor of Defendant on liability with respect to Image 2, and Plaintiff has confirmed that he is no longer asserting any infringement with respect to Image 5. (D.I. 137 at 28; D.I. 149 at 49; D.I. 155)

Stemtech's and its independent distributors' infringement of Images 3 and 4 commenced before

he registered the Images with the United States Copyright Office on December 20, 2007. (D.I.

108 at 5, 7; D.I. 109 at ¶¶ 6-8; D.I. 176, ex. 3, 4)

   *Leonard I* was referred to the Court by Judge Leonard P. Stark on August 31, 2011 to

hear and resolve all pretrial matters, including the resolution of case dispositive motions. (D.I.

131) On December 5, 2011, the Court issued a Report and Recommendation recommending that

the District Court enter summary judgement in Defendant's favor, precluding Plaintiff from,

*inter alia*, electing to receive statutory damages and attorney's fees or from collecting damages in

the form of Defendant's profits with regard to any alleged infringement of Images 3 and 4.

*Leonard v. Stemtech Health Scis., Inc.*, Civ. Action No. 08-067-LPS-CJB, 2011 WL 6046701, at

*24 (D. Del. Dec. 5, 2011). The District Court adopted the Report and Recommendation on

March 28, 2012. (D.I. 155) Plaintiff's claims for actual damages and for a permanent injunction

regarding the alleged infringement of Images 3 and 4 asserted in *Leonard I* remain pending.

### 4.   *Leonard II*

   Soon after the Court issued the Report and Recommendation in *Leonard I*, Plaintiff

commenced *Leonard II* against Stemtech. (*Leonard II*, D.I. 1) The *Leonard II* Complaint asserts

one count of copyright infringement under 17 U.S.C. § 101 against Defendant, with respect to

Image 3 only. (*Id.* at ¶¶ 12-15) As a result of such infringement, Plaintiff asserts that he is

entitled to recover actual damages, additional profits, or, in the alternative, an award of statutory

damages pursuant to 17 U.S.C. § 504(a). (*Id.* at ¶ 16) He further asserts that he is entitled to

recover enhanced damages for willful infringement pursuant to 17 U.S.C. § 504(c)(2), and costs

and attorney's fees pursuant to 17 U.S.C. § 505. (*Id.* at ¶¶ 17-18)

On February 17, 2012, Defendant filed a Motion to Dismiss the *Leonard II* action on the grounds that it is duplicative of *Leonard I*. (D.I. 6)  On April 6, 2012, *Leonard II* was referred to the Court by Judge Stark to hear and resolve all pretrial matters, including the resolution of case dispositive motions.  On August 24, 2012, the Court issued a Report and Recommendation that recommended denial of Defendant's Motion to Dismiss. *Leonard v. Stemtech Int'l, Inc.*, Civ. Action No. 12-86-LPS-CJB, 2012 WL 3655512, at \*10 (D. Del. Aug. 24, 2012).  The Court also ordered the consolidation of *Leonard I* and *Leonard II*. *Id.* at \*11-12.  The District Court adopted the Report and Recommendation on September 28, 2012. (*Leonard II*, D.I. 26)

At issue in *Leonard II* is the use of Image 3 by two of Stemtech's independent distributors, Joe Cinocca and David Velasco, who posted Image 3 as their "headshot" on their personalized websites. (*Leonard II*, D.I. 1 at ¶ 8; D.I. 176, ex. 2; *id.*, Declaration of Tashjian at ¶¶ 4-5)  Plaintiff alleges that this infringement occurred on January 16, 2012, when "Stemtech published three web pages containing Image #3 on [D]efendant Stemtech's official website." (*Leonard II*, D.I. 1 at ¶ 8)

Stemtech cites to a Declaration from its Director of Global Information Technology, which states that Stemtech did not post Image 3 on either Mr. Cinocca's or Mr. Velasco's respective websites. (Declaration of Tashjian at ¶ 6)  According to that Declaration, the distributors' use of Image 3 as a "headshot" was also not "a part of the content Stemtech created for or posted on its replicated website." (*Id.*)[5]

---

[5]     Although the *Leonard II* Complaint further asserts that Defendant distributed Image 3 without a license "through DVDs, and possibly file sharing web-based applications, such as Exigo[,]" (*Leonard II*, D.I. 1 at ¶¶ 9-10), the Complaint does not specify when this alleged distribution is said to have occurred.  Further, in its answering brief regarding the instant motion, the only reference that Plaintiff makes to Defendant's alleged infringement of Image 3 through

## B.    The Instant Motion

On May 24, 2013, Defendant filed the instant Motion. (D.I. 176)  Briefing on the Motion

was completed on June 27, 2013.  (D.I. 189)  A pretrial conference is scheduled in the

consolidated case for September 23, 2013, and trial is to begin on October 8, 2013.  (D.I. 191)

## II.    STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a

genuine issue of material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 585 n.10 (1986).  If the moving party has demonstrated the absence of a genuine

dispute of material fact, the nonmovant must then "come forward with specific facts showing

that there is a genuine issue for trial."  *Id.* at 587 (internal quotation marks omitted).  If the

nonmoving party fails to make a sufficient showing on an essential element of its case with

respect to which it has the burden of proof, the moving party is entitled to judgment as a matter

of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court

will "draw all reasonable inferences in favor of the nonmoving party, and it may not make

---

the marketing of DVDs comes when Plaintiff is summarizing the infringement claims at issue in
*Leonard I.*  (D.I. 182 at ¶¶ 23, 29-33)  When it comes to the allegations of infringement in the
*Leonard II* Complaint, Plaintiff's answering brief does not discuss allegations of infringement
through the use of DVDs or file-sharing web-based applications.  (*Id.* at ¶ 46)  Nor does Plaintiff
cite the existence of any facts relating to such allegations as a basis for denial of the instant
motion.  Rather, Plaintiff focuses exclusively on the independent distributors' use of Image 3 on
their personalized websites as comprising "Stemtech's [n]ew [i]nfringements[.]"  (*Id.* at 13, 15-
17)  (Indeed, the entirety of both parties' arguments in their briefs relate only to that type of
usage.)  Accordingly, the Court understands that the only facts of alleged infringement relating to
the Complaint in *Leonard II* that are in existence in the record are those regarding Mr. Cinocca's
or Mr. Velasco's use of Image 3 as their headshots on their respective personalized websites.

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.   DISCUSSION

In its Motion, Defendant seeks summary judgment on Plaintiff's claim for direct copyright infringement of Image 3. (D.I. 176 at 10-11) For the reasons discussed below, the Court recommends that summary judgment be granted in favor of Defendant with respect to Plaintiff's claim.

## A.     Direct Copyright Infringement

Under the Copyright Act, 17 U.S.C. § 101 *et seq.* ("the Act"), to prevail on a claim for direct copyright infringement, the plaintiff must prove that: (1) he owned the copyrighted work; and (2) the copyrighted work was copied by the defendant. *Kunkel v. Jasin*, 420 F. App'x 198, 199 (3d Cir. 2011); *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 667 (3d Cir. 1990); *Leonard*, 2011 WL 6046701, at *5.

Here, the parties dispute whether Plaintiff can establish the second element of his direct infringement claim. Stemtech contends that Plaintiff cannot establish that it—Stemtech—copied Image 3, for a simple reason: it was not Stemtech who caused Image 3 to be copied, but rather two of its independent distributors, Mr. Cinocca and Mr. Velasco, who posted the image as their "headshot" on their respective personalized webpages. (D.I. 176 at 10-11) In response, Plaintiff argues that Stemtech is guilty of direct infringement because Image 3 appears on internet domains that Stemtech "owns, controls, hosts, and directly profits from[,]" and so "it does not matter whether it or one of its agents posted" Image 3. (D.I. 182 at 15)

It is well-settled that to prove direct infringement, a plaintiff must establish—in addition to the two elements set out above—volitional conduct on the part of the defendant that causes the infringement. *See Parker v. Google, Inc.*, 242 F. App'x 833, 836 (3d Cir. 2007) (citing cases); *Coach, Inc. v. Sunfastic Tanning Resort*, Civil Action No. 10-1626, 2011 WL 5447972, at *7

(E.D. Pa. Nov. 10, 2011); *see also Cartoon Network, LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d

121, 131 (2d Cir. 2008); *Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 1791557, at *2

(N.D. Ill. May 10, 2011) (citing cases). Indeed, as the United States Court of Appeals for the

Second Circuit has emphasized, "volitional conduct is an important element of direct liability"

and must, at a minimum, amount to "'actual infringing conduct with a nexus sufficiently close

and causal to the illegal copying that one could conclude that the [owner of the instrumentality

producing the copied work] trespassed on the exclusive domain of the copyright owner.'"

*Cartoon Network*, 536 F.3d at 130-31 (quoting *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544,

550 (4th Cir. 2004)).

There are at least two reasons that courts have cited in stressing that a finding of direct

copyright infringement requires deliberate, direct action or participation on the part of the

defendant (i.e., volitional conduct). First, courts point to the language of the Act itself, which, as

the United States Supreme Court has stated, "does not expressly render anyone liable for

infringement committed by another." *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417,

434 (1984); *see also Cartoon Network*, 536 F.3d at 133; *Playboy Enters., Inc. v. Russ

Hardenburgh, Inc.*, 982 F. Supp. 503, 512 (N.D. Ohio 1997). Second, in the absence of

volitional conduct on the part of a party, it is more appropriate for a plaintiff to utilize doctrines

other than direct infringement, such as contributory infringement or vicarious infringement,

which allow for "the imposition of liability for copyright infringements on certain parties who

have not themselves engaged in the infringing activity." *Sony*, 464 U.S. at 435.[6]

---

[6]     *See also Cartoon Network*, 536 F.3d at 132-33 (in refusing to find defendant
directly liable in the absence of volitional conduct on its part, noting that the *Sony* Court
"deem[ed] it 'just' to impose liability on a party in a 'position to control' the infringing uses of

11

The issue of whether a defendant's actions were sufficient to warrant a finding of direct infringement is considered in a case cited by both parties, *Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory*, 689 F.3d 29 (1st Cir. 2012) ("*Monastery*"). Plaintiff cites to the case in support of the proposition that because Stemtech "owns, controls, hosts, and directly profits from the websites at issue," it is guilty of direct infringement regardless of "whether it or one of its agents posted the infringing Image." (D.I. 182 at 15) Defendant responds that *Monastery* is distinguishable from the instant facts, (D.I. 189 at 4), and the Court agrees.

In *Monastery*, the United States Court of Appeals for the First Circuit considered an appeal by the defendant, Archbishop Gregory (the "Archbishop"), from a grant of summary judgment on the plaintiff's direct infringement claim. *Monastery*, 689 F.3d at 38-39. The Monastery, an Eastern Orthodox monastic order, was engaged in the practice of translating religious texts from their original Greek into English (the "Works"). *Id.* at 35-36. These translations became in demand amongst parishes, due to an increasing need for English versions of the texts for use in religious services conducted in English. *Id.* at 36. The Monastery's practice was to grant these requests on a limited basis. *Id.* The Archbishop was a member of the Monastery until the late 1970s, when he moved west and formed his own monastery. *Id.* The Archbishop also then created a website devoted to the Orthodox faith (the "Website"), over which he had authority and ownership. *Id.* at 37. Father Peter, a priest monk and member of the

---

another, but as a contributory, not direct, infringer") (citation omitted); *Hardenburgh, Inc.*, 982 F. Supp. at 513 ("There would be no reason to bifurcate copyright liability into the separate categories of direct and contributory if any remote causal connection to copyright infringement could be analyzed under theories of direct infringement.").

Archbishop's new monastery, helped to build, design, and program the Website. *Id.* at 36-37. In 2005 and in August 2007, postings of certain of the Monastery's copyrighted Works were put on the Website. *Id.* at 37. The Archbishop relied on Father Peter to perform such postings. *Id.* The Monastery filed suit against the Archbishop and his publisher, but that suit was dismissed after the parties reached a settlement agreement in which the Archbishop agreed to refrain from posting certain of the Monastery's Works. *Id.* In spite of that agreement, however, one Work remained posted on the Website, and additional Works were subsequently posted to the Website. *Id.* As a result, the Monastery commenced a second lawsuit against the Archbishop alleging, *inter alia*, copyright infringement of the Works. *Id.*

On appeal, the Archbishop argued that he should not be held liable on the Monastery's direct infringement claim because he "was not the specific individual responsible for uploading" the Works at issue onto the Website. *Id.* at 54. The First Circuit rejected the Archbishop's position, finding that the Archbishop had indeed engaged in volitional acts sufficient to establish direct liability—acts that "ensure[d] that copies of the Works were available on [the Archbishop's] server and posted to his Website." *Id.* at 55-56. In that regard, the First Circuit noted that the Archbishop was the owner of the Website, and that he had admitted to bearing "responsibility for and [] authority over the content that appears on the [w]ebsite." *Id.* at 56 (internal quotation marks omitted). Further, the First Circuit pointed to the Archbishop's concession that, while he himself did not physically place content on the Website—Father Peter did—he was responsible for selecting the content of the Website. *Id.* In other words, if the Archbishop wanted something to be posted to the Website, he directed Father Peter to upload those contents. *Id.* Finally, the *Monastery* Court stressed that the Archbishop knew that Father

Peter was uploading religious services to the Website and "expressly authorized" Father Peter to do so. *Id.*

On these compelling facts, the *Monastery* Court concluded that the Archbishop was liable for direct infringement for two primary reasons. First, the Court explained that "agency principles may apply in the copyright context," and accordingly "a principal (here, the Archbishop) may be held liable for the authorized acts of its agent (here, Father Peter)." *Id.* at 56. The *Monastery* Court held that this was such a case, because the *"record confirm[ed]* that the Archbishop held authority and control over the Website, and that *he knew of and assented to* Father Peter's postings of religious texts to the site." *Id.* (emphasis added). Further, such postings "clearly fell within [Father Peter's] actual authority[,]" in that they fell within the ambit of the Archbishop's goal with respect to the website (that of sharing information about the Orthodox Christian religion with internet users). *Id.* at 57. Second, and relatedly, the *Monastery* Court found that even though the Archbishop did not *physically* post the Works to his Website, his participation in the infringement was significant enough to warrant a finding of direct liability because he "repeatedly confirmed his responsibility for and control over the Website, as well as his express authorization to Father Peter to engage in acts that would violate the Monastery's display right" in the Works. *Id.*

There are key differences between the nature of the factual record in *Monastery*, and that presently before the Court. Here, unlike in *Monastery*, Plaintiff has failed to point the Court to facts of record that establish volitional acts on the part of Stemtech with respect to the alleged misuse of Image 3. Plaintiff does not deny that it was the independent distributors who posted Image 3 as the headshot on their respective websites, but rather argues that the fact that Stemtech

14

"owns, controls, hosts, and directly profits" from those websites imposes upon it liability for direct infringement. (D.I. 182 at 2, 14-15)  However, while the Archbishop owned the Website at issue in *Monastery*, he also did much more than that: he instructed Father Peter as to the contents that were posted on the Website—that is, he *expressly* authorized Father Peter to infringe the Works; he told him to do it. *Monastery*, 689 F.3d at 56-57.  That direct connection to the infringement of the Works was enough to render the Archbishop guilty of direct infringement.[7]

Just as in *Monastery*, in other cases where courts have found a party guilty of direct infringement—despite the fact that another individual actually posted the infringing material—there was significant evidence of the party's volitional conduct (i.e., their actual engagement in or direct causation of the infringing acts) relative to the copying at issue. *See, e.g., Capital Records, LLC v. ReDigi Inc.*, No. 12 Civ. 95 (RJS), 2013 WL 1286134, at *12

---

[7]     As noted above, the *Monastery* Court also found that the facts could establish the Archbishop's liability for direct infringement on the basis of an agency relationship between the Archbishop and the person who posted the infringing works (Father Peter).  A number of courts have applied agency principles in the context of copyright law to *secondary* liability for infringement, not direct liability.  Indeed, vicarious infringement derived from agency principles. *See Sony Discos, Inc. v. E.J.C. Family P'ship*, Civil Action No. H-02-3729, 2010 WL 1270342, at *3 (S.D. Tex. Mar. 31, 2010) ("Starting in 1963, courts began to borrow the idea of vicarious liability from agency law and apply it to copyright enforcement."); *Adobe Sys. Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1049 (C.D. Cal. 2001) ("Vicarious copyright liability is an outgrowth of the common law doctrine of respondeat superior, which holds the employer liable for the acts of its agents.") (internal quotation marks and citation omitted).  *Monastery* is the sole case to which Plaintiff cited for the proposition that a principal can be directly liable for direct copyright infringement based upon the acts of its agents.  (D.I. 182 at 15)  Nevertheless, even if agency principles could be used to hold a defendant liable for direct infringement based on the conduct of his agent, here, Plaintiff puts forward no facts in support of its bald assertion that Mr. Cinocca and Mr. Velasco were Stemtech's "agents[,]" (*id.*), that Stemtech knew they were posting Image 3 on their websites and ratified that conduct, or that the distributors posted Image 3 within the scope of their actual or apparent authority as agents.

15

(S.D.N.Y. Mar. 30, 2013) (noting that the *Cartoon Network* Court had "allowed that a case may exist where one's contribution to the creation of an infringing copy [is] so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy" and finding this to be that case, as defendant's "founders built [an automated] service where *only* copyrighted work could be sold"); *Hardenburgh, Inc.*, 982 F. Supp. at 513 (finding defendant bulletin board service directly liable with respect to the unauthorized copying of adult photographs from plaintiff's magazine that appeared on the bulletin board, even though the files were uploaded by defendant's subscribers, where defendant was an "active participant" in the copying by "actively encourag[ing] their subscribers to upload" the images and viewing and moving the images so that they would be available for copying).

Even assuming that direct infringement liability can arise in those kinds of circumstances, in this case there is no evidence that Defendant engaged in that type of volitional conduct. In contrast, Defendant has put forward evidence indicating that it took no active role in relation to the copying of Image 3 on the websites at issue, and Plaintiff has pointed to nothing to compel a contrary conclusion. The uncontroverted evidence of record indicates that Image 3 was *not* a part of the contents of Stemtech's replicated website template, and that the independent distributors, Mr. Cinocca and Mr. Velasco, posted Image 3 to their respective websites in one of the few places that they themselves could control—the portion of the website that allowed for a "headshot." (Declaration of Tashjian at ¶¶ 3-6 & ex. 2; D.I. 183, ex. 13 at 107; *id.*, ex. 16 at 58)[8]

---

[8]     In fact, at times, Plaintiff appears to concede that this was a choice that the distributors themselves made. (*See* D.I. 182 at 16 (noting that "[Mr. Cinocca and Mr. Velasco] thought enough of the marketing value of . . . [Image 3] to chose [it] over any other photograph . . . including even a picture of themselves"); *id.* at 17 ("StemTech directly profited from the direct infringement of the distributor's websites . . . ."))

Indeed, in November 2009, Stemtech changed its policy as to the permissible content on the websites of its independent distributors—severely limiting the ability of distributors to post any content at all—because some distributors had been impermissibly using copyrighted images. (D.I. 183, ex. 13 at 141-42)  And here, Stemtech has presented evidence that none of its employees had any role in the posting of Image 3 to these websites, and that at the time the Image was posted, it was not a part of the content Stemtech created for or posted on its own replicated website. (Declaration of Tashjian at ¶ 6)  Plaintiff cites nothing to the contrary.[9]

In fact, in his cursory argument with respect to direct infringement, Plaintiff does not explicitly state that Stemtech posted (nor authorized or encouraged the posting) of Image 3 by the independent distributors. (*See* D.I. 182)  Rather, Plaintiff argues that owning, hosting, and directly profiting from a website equates to direct liability for infringement, even in the absence of direct participation in causing the infringement to occur. (*Id.* at 15)[10]  While it may be true that Stemtech could have "end[ed] its distributors' infringement with literally a push of a button[,]" (*id.* at 13), that is of little significance in the direct infringement inquiry; what matters is whether it can be said that *volitional conduct* on the part of the defendant *caused* the

---

[9]     Indeed, in the 12-page "Statement of Facts" section of Plaintiff's answering brief, almost none of the facts Plaintiff lists relate to the particular alleged infringement referenced in the *Leonard II* Complaint; many relate to events occurring years before. (D.I. 182 at 2-14)  There is little mention in this section of Mr. Cinocca and Mr. Velasco, the nature of their relationship with Stemtech (beyond a reference to their status as distributors), their use of Image 3 or any other facts relating to the new allegations. (*Id.*)  More broadly, many of the factual allegations set out in this section are accompanied by no citation to the evidentiary record. (*Id.*)

[10]     While Plaintiff also listed the fact that Stemtech "controls" the websites at issue as one rendering Stemtech directly liable for the independent distributors' alleged infringement of Image 3, (D.I. 182 at 15), again, the uncontroverted evidence is that the content of one's headshot is one of the few elements of the distributors' personalized websites that Stemtech leaves to the distributor.

17

infringement. There is an absence of volitional conduct on the record here, which militates in favor of a grant of the motion for summary judgment on the direct infringement claim. *See, e.g., Perfect 10, Inc. v. Giganews, Inc.*, No. CV11-07098 AHM (SHx), 2013 WL 2109963, at *8 (C.D. Cal. Mar. 8, 2013) ("An allegation that Defendants control the content on their servers, without a good-faith allegation specifying how Defendants exercised that control to directly create copies, cannot alone create an inference that Defendants engaged in a volitional act directly causing infringement"); *Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923, 932 (N.D. Cal. 1996) (rejecting argument that individual who operated electronic bulletin board was guilty of direct infringement when the board's users uploaded infringing content to the system, in spite of facts that the individual operated the bulletin board and knew that infringing activity was occurring, where there was a lack of evidence that operator "directly caused" the infringement to occur).[11]

Therefore, because Plaintiff has failed to make out the second element of his direct infringement claim—that Stemtech copied Image 3—the Court recommends entry of summary judgment in Stemtech's favor as to this claim. *See Celotex*, 477 U.S. at 322 (moving party entitled to judgment as a matter of law if non-moving party fails to make out an essential element of its claim on which it bears the burden of proof).

### B.     Contributory and Vicarious Infringement

In the absence of volitional conduct on the part of a defendant that caused the copying to

---

[11]      *Cf. Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1033 (9th Cir. 2013) (noting that ownership of a machine that reproduces infringing material is not relevant to the liability inquiry, as "copyright liability depends on one's *purposeful involvement* in the process of reproducing copyrighted material, not the precise nature of that involvement") (emphasis added).

occur, an infringement claim against that defendant may be brought under a secondary liability

theory. *See, e.g.*, *Cartoon Network*, 536 F.3d at 132 (noting that "[m]ost of the facts found

dispositive by the district court—e.g., [defendant's] continuing relationship with its []

customers"—who actually uploaded the infringing content—and "[defendant's] control over

recordable content . . . seem to [the Court] more relevant to the question of contributory liability"

than to direct infringement"); *Shell v. Henderson*, Civil Action No. 09-cv-00309-MSK-KMT,

2013 WL 2394935, at *8 (D. Colo. May 31, 2013) ("Claims that an individual failed to take

action to halt another's copyright infringement are cognizable only as contributory or vicarious

infringement claims; a claim of direct copyright infringement may be brought only against the

person who specifically makes and publishes the infringing material."); *see also Sega Enters.*,

948 F. Supp. at 932.

     Although the Copyright Act itself does not provide for the secondary liability of

defendants—i.e., liability for the infringement of third-parties under a contributory or vicarious

liability theory—such claims have emerged from the common law and are well-established. *See*

*MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). In *Grokster*, the United States

Supreme Court described the different types of secondary liability claims, noting that: "[o]ne

infringes contributorily by intentionally inducing or encouraging direct infringement . . . and

infringes vicariously by profiting from direct infringement while declining to exercise a right to

stop or limit it[.]" *Id.* (internal citations omitted).

     The Third Circuit further discussed these claims in *Parker v. Google, Inc.*, 242 F. App'x

833, 837 (3d Cir. 2007), where it stated that as to a claim of contributory infringement, a plaintiff

must allege:

> (1) [D]irect copyright infringement of a third-party; (2) knowledge
> by the defendant that the third-party was directly infringing; and
> (3) material contribution to the infringement.

*Id.* at 837. *Parker* also explained that to set out a claim of vicarious infringement, a plaintiff

must allege:

> [T]hat the defendant 'has the right and ability to supervise the
> infringing activity and also has a direct financial interest in such
> activities.'

*Id.* (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d

Cir. 1971)). Although the lines between these two types of secondary liability claims are not

always clear, "in general, contributory liability is based on the defendant's failure to stop its own

actions which facilitate third-party infringement, while vicarious liability is based on the

defendant's failure to cause a third-party to stop its directly infringing activities." *Perfect 10,*

*Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007).

 As an alternative to his argument that there is sufficient evidence of direct infringement,

Plaintiff also asserts that Stemtech is guilty of contributory infringement and vicarious

infringement with respect to its independent distributors' infringement of Image 3. In that

regard, he asserts that in its opening brief, Stemtech "simply avoids the issue of contributory and

vicarious infringement." (D.I. 182 at 2, 15-17)

 Plaintiff is correct that Stemtech's opening brief in support of its Motion did not address

secondary liability claims, but, as Stemtech points out in its reply brief, this was for good reason:

"Leonard does not even allege such causes of action in his Complaint" in *Leonard II*. (D.I. 189

at 4)

 Plaintiff's Complaint in *Leonard II* makes this deficiency clear. In that pleading, Plaintiff

exclusively identifies Stemtech as the allegedly infringing party.[12]  None of the nineteen

averments that make up the Complaint expressly mention any independent distributors, nor

otherwise pin responsibility for infringement on anyone other than Stemtech itself.  It is well-

settled that in order to state a cause of action for contributory infringement or vicarious

infringement, a plaintiff must identify another party who was responsible for the direct

infringement (to which the defendant contributed in some way).  *See Levine v. Landy*, 832 F.

Supp. 2d 176, 185-86 (N.D.N.Y. 2011) (plaintiff sufficiently alleged contributory copyright

infringement where, *inter alia*, the averments "identif[ied] non-parties responsible for" direct

infringement); *Miller v. Facebook, Inc.*, No. C. 10-00264 WHA, 2010 WL 1292708, at *3 (N.D.

Cal. Mar. 31, 2010) (noting that, to sufficiently allege contributory or vicarious infringement,

"[a]s a threshold matter, [] plaintiff must first establish that there has been direct copyright

infringement by a third party"); *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc*, 591 F.

Supp. 2d 1098, 1104 (N.D. Cal. 2008) ("All theories of secondary liability for copyright . . .

infringement require some underlying direct infringement by a third party.").

    In addition to failing to identify any third-party direct infringer, the one "Claim For

Relief" set out in the Complaint fails to reference other elements of a contributory or vicarious

---

[12]    (*See, e.g., Leonard II*, D.I. 1 ¶ 8 ("On January 16, 2012, Stemtech published three web pages containing Image #3 on defendant Stemtech's official website. . . ."); *id*. at ¶ 10 ("[Stemtech] did not obtain a license for use of photograph Image 3 and failed to give proper attribution or notice of the true ownership rights in the copyrighted work."); *id*. at ¶ 13 ("[Stemtech] knew or should have known that Image 3 was protected by copyright and, that when procured by Stemtech, it was published with willful disregard for Mr. Leonard's rights[.]"); *id*. at ¶ 14 ("The foreseeable result of [Stemtech's] wrongful conduct has been to deprive the Plaintiff, Mr. Leonard, of the enjoyment of his exclusive rights in and to the copyrighted work."); *id*. at ¶ 15 ("[Stemtech] has willfully infringed and has wrongfully profited from the unlicensed use of Image 3."))

infringement claim. There is no reference to Defendant making a "material contribution to the infringement" of a third party (as with a contributory infringement claim) or to the Defendant's "right and ability to supervise" infringing activity of a third party and any "direct financial interest" it had in such activities (as with a vicarious infringement claim). Instead, the allegations in the "Claim for Relief" track the requirements of a direct infringement claim, making reference to the Plaintiff's ownership of a copyrighted work, and Stemtech's alleged "wrongful conduct" in "publish[ing]" that work. (*Leonard II*, D.I. 1 at ¶¶ 12-15)[13]

Thus, Plaintiff has clearly failed to state causes of action for contributory or vicarious infringement, and for this reason his arguments with respect to these theories of liability on summary judgment fail. *See, e.g.*, Fed. R. Civ. P. 56(a) (motions for summary judgment are based on parties' claims and defenses); *Jones v. N.Y.C. Bd. of Educ.*, No. 09 Civ. 4815, 2012 WL 1116906, at *9 (S.D.N.Y. Apr. 2, 2012) (refusing to consider new claims raised on summary judgment, as "because this is the first time the [p]laintiff has asserted these claims, it is tantamount to an amendment of the Amended Complaint which at this stage is not permissible"); *Villasenor v. Sears, Roebuck & Co.*, No. CV 09-9147 PSG (FMOx), 2011 WL 165374, at *11 (C.D. Cal. Jan. 18, 2011) (same).

---

[13] Another aspect of the *Leonard II* Complaint that underscores its allegation of a direct infringement claim (and not a contributory and/or vicarious infringement claim) is Plaintiff's statements that the action is being brought pursuant to "17 U.S.C. § 101" (the Act). (*Leonard II*, D.I. 1 at ¶1 and 3) The Act does not expressly provide for these types of secondary infringement claims, which have developed from the common law. In contrast, Plaintiff's Amended Complaint in *Leonard I*, which purported to allege several claims specifically entitled "Contributory Copyright Infringement" and "Vicarious Copyright Infringement[,]" stated that the action arose under both the Act and "the common law[.]" (D.I. 76 at ¶¶ 1, 28-208) The secondary liability claims in the Amended Complaint in *Leonard I* also included language tracking the elements of such claims, as compared to the Claim for Relief in the *Leonard II* Complaint, which does not. (*Id.*; *Leonard II*, D.I. 1 at ¶¶ 12-19)

Even assuming that Plaintiff *had* sufficiently alleged causes of action for contributory infringement and vicarious infringement against Stemtech in his Complaint, Plaintiff has not put forth sufficient evidence to withstand summary judgment as to those claims. For instance, as to contributory infringement, Plaintiff's argument is that the fact that "Stemtech owned, controlled and maintained [the personalized websites of the independent distributors'] as well as directly profited from them . . . . is more than enough to support [Plaintiff's] claim of contributory infringement[.]" (D.I. 182 at 16) Even if all of this is true, a finding of contributory infringement requires a showing that the defendant had "knowledge" that the third party was directly infringing—a showing that Plaintiff does not even attempt to make. Plaintiff has pointed to no evidence of record establishing that Stemtech knew that the independent distributors had uploaded Image 3 as their headshot on their respective websites—indeed, to no evidence at all about the relationship of Defendant and these two distributors. *See, e.g., Morgan v. Hawthorne Homes, Inc.*, Civil Action No. 04–1809, 2009 WL 1010476, at *23 (W.D. Pa. Apr. 14, 2009) (granting motion for summary judgment to defendant where there was "no genuine issue of material fact that [defendant] had no knowledge of the fact that the alleged actual infringement was occurring").

And as to vicarious infringement, Plaintiff argues, for instance, that Stemtech is guilty because it "directly profited from the direct infringement of the distributor's websites, and [it] declined to stop that infringement." (*Id.* at 17) Again, here, as the party with the burden of proof, it is Plaintiff's responsibility to come forward and point the Court to "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (internal quotation marks omitted). Plaintiff does not do so in his brief; he simply asserts that

StemTech has committed vicarious infringement, without any clear citation to any fact of record in support of a showing as to the elements of that claim. (D.I. 182 at 17); *see Gonzalez v. Thomas Built Buses, Inc.*, No. 3:09cv2271, 2013 WL 1181590, at *4 (M.D. Pa. Mar. 21, 2013) (noting that "a party who asserts that a fact is genuinely disputed at the summary judgment stage, must cite to specific portions of record, including depositions, affidavits or declarations, that support its position[,]" or to expert reports sworn to by the expert witness); *Petrucelli v. Bohringer*, No. CIV.A. 91-2098, 1994 WL 81999, at *4 (E.D. Pa. Mar. 10, 1994) (to defeat summary judgment, non-moving party may not rest upon "the vague and amorphous argument that the record somewhere contains facts sufficient to support its claims . . . nor by substituting conclusory allegations in a complaint with the conclusory allegations of an affidavit or even expert report") (citations omitted).

### C.    Conclusion

Therefore, because Plaintiff has not established that Defendant Stemtech copied Image 3, a requisite element of a direct copyright infringement claim, the Court recommends that summary judgment be granted in favor of Stemtech with respect to this claim.  Further, the Court holds that Plaintiff's arguments that Stemtech is liable for contributory and vicarious infringement are improper, as Plaintiff has raised these causes of action for the first time in his brief in opposition to Defendant's Motion (and, alternatively, that even if they had previously been pled, Plaintiff could not withstand summary judgment as to those claims).

## IV.    CONCLUSION

For the reasons set forth above, I recommend that Defendant's Motion for Summary

24

Judgment be GRANTED in its entirety.[14]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1.  The failure of a party to object to legal conclusions may

result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*,

812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir.

2006).

The parties are directed to the Court's Standing Order In Non-Pro Se Matters For

Objections Filed Under Fed. R. Civ. P. 72(b), dated November 16, 2009, a copy of which is

available on the Court's website, http://www.ded.uscourts.gov/.


Dated:  September 19, 2013

_____

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[14]     In light of the Court's recommendation of the grant of summary judgment to
Defendant on liability grounds as to the conduct alleged in the *Leonard II* Complaint, the Court
need not address Defendant's additional request for summary judgment on Plaintiff's claims for
statutory damages, attorney's fees and Defendant's profits regarding that conduct.