## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANDREW PAUL LEONARD, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    C.A. No. 08-67-LPS (Consolidated) |
| | : |
| STEMTECH HEALTH SCIENCES, | : |
| INC., et al., | : |
| | : |
| Defendants. | : |

## MEMORANDUM ORDER

Pending before the Court are four post-trial motions, one of which was filed by Plaintiff

Andrew Paul Leonard ("Plaintiff" or "Leonard") and the remaining of which were filed by

Defendant Stemtech Health Sciences, Inc. ("Defendant" or "Stemtech").

## BACKGROUND

The factual background and procedural history of this case leading up to the filing of the

pending motions are detailed in the Court's prior opinions. For present purposes, the following

background will suffice.

Plaintiff Leonard brought suit against Defendant Stemtech Health Sciences, Inc. – which

later changed its name to Stemtech International, Inc. ("Stemtech" or "Defendant") – as well as

John Does 1-100, for copyright infringement, in violation of the Copyright Act of 1976, 17

U.S.C. § 101, *et seq.*, and the common law, relating to certain photographic images created by

Plaintiff. On October 11, 2013, following a four-day trial, the jury returned a verdict finding

Stemtech liable for direct, vicarious, and contributory copyright infringement with respect to two

of Leonard's copyrighted images: Images 3 and 4. (D.I. 229, 230) The jury awarded Plaintiff

actual damages of $1.6 million. (*Id.*)

At the end of the trial, the Court directed the parties to meet and confer and submit a form of judgment order. (*See* D.I. 240 at 248) On October 17, 2013, Plaintiff's counsel advised the Court that the parties were unable to reach agreement upon the form of judgment. (D.I. 231) The next day, the parties submitted a total of three competing forms of order, which differed primarily in respect to whether to incorporate an award of prejudgment interest. (D.I. 232, 233) On October 22, 2013, the Court denied Plaintiff's request for entry of either of its proposed forms of judgment, without prejudice to Plaintiff's ability to renew its request for an award of prejudgment interest, following the filing of a motion and full briefing. (D.I. 235)

On November 8, 2013, Plaintiff filed a Motion for an Award of Prejudgment Interest on the jury's monetary award. (D.I. 241) Defendant opposed the motion and briefing on it was completed on December 5, 2013. (D.I. 242, 243, 244) On July 8, 2014, the Court issued a Memorandum Order denying Plaintiff's request for prejudgment interest[1] and ordering the parties, again, to file a proposed form of judgment. (D.I. 247) This time the parties were able to agree (D.I. 248) and, on July 18, 2014, the Court entered judgment in favor of Plaintiff and against Defendant (D.I. 249).

Thereafter, the parties filed additional motions. On July 31, 2014, Defendant filed a Motion For Attorney Fees (D.I. 250) as well as a Motion For Costs (D.I. 251). On August 14, 2014, Defendant filed a Motion For a New Trial or Remittitur. (D.I 258) Finally, on November

---

[1]Exercising its discretion, the Court explained that it was "unpersuaded by Plaintiff's contention that such an award 'is necessary to fully compensate Plaintiff for misappropriation of his property and to avoid unjust enrichment to Defendant.'" (D.I. 247 at 3) (quoting D.I. 242 at 2)

4, 2014, Plaintiff filed a Motion For Costs and Attorney Fees. (D.I. 264) Briefing on the various motions was completed on November 24, 2014.

## STEMTECH'S MOTION FOR NEW TRIAL OR REMITTITUR

Stemtech has asked the Court to grant it a new trial, unless, in the alternative, Leonard agrees to remittitur of the judgment from $1,600,000 to just $1,804. (D.I. 258 at 18-19) Below the Court evaluates each of the multiple grounds Stemtech asserts as the bases for its requested relief.

### Legal Standards

Stemtech moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a), which provides in pertinent part:

> A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

New trials are commonly granted in the following situations: (1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence exists that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *See Zarow–Smith v. N.J. Transit Rail Operations*, 953 F.Supp. 581, 584 (D.N.J. 1997). The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (reviewing district court's grant or denial of new trial motion under

3

"abuse of discretion" standard).

Where the ground for a new trial is that the jury's verdict was against the great weight of the evidence – which is the principal, but not exclusive, basis on which Stemtech moves – the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury. *See Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993).

Although the standard for grant of a new trial is less rigorous than the standard for grant of judgment as a matter of law – in that the court need not view the evidence in the light most favorable to the verdict winner – a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352–53 (3d Cir. 1991).

## Vicarious Infringement

Stemtech first seeks a new trial on Leonard's claim for vicarious copyright infringement. In order to prevail on his claim for vicarious infringement, Leonard had to prove: (1) direct infringement by a third party, (2) Stemtech's right and ability to supervise the infringing conduct by a third party, and (3) Stemtech's obvious and direct financial benefit from the third party's direct infringement. *See Perfect 10 Inc. v. Amazon, Inc.*, 508 F.3d 1146, 1179 (9th Cir. 2007); *see also* Jury Instr. (D.I. 227) at #22. Although Stemtech challenges Leonard's showing on each of these elements, the Court finds that the record supports the jury's verdict, which is not against the clear weight of the evidence.

Stemtech contends that Leonard failed to prove direct infringement by any Stemtech distributor. (D.I. 258 at 6) Citing broadly to a 107-page swath of trial transcript, Defendant

4

argues that Leonard did not testify specifically about each instance of purported direct infringement and did not include in his testimony for each infringement the detail that the unauthorized reproduction of his images occurred on a platform that was owned or operated by a Stemtech distributor. (*Id.*) Stemtech further suggests that Photo Researchers, a firm with which Leonard contracted to license some images, may have authorized some or all of these uses of Leonard's images. (*Id.*)

The Court agrees with Leonard that the record contains sufficient evidence from which a reasonable jury could find that Stemtech's distributors directly infringed Leonard's copyrights. The jury could reasonably have credited all of the following evidence: (1) testimony by Leonard that he had valid copyrights for the images involved (*see* D.I. 261 at 15 (citing D.I. 237 at 138-50; D.I. 238 at 38-45); (2) testimony regarding the unauthorized use of the copyrighted images (D.I. 261 at 15-16; D.I. 238 at 79, 85-86, 90, 98, 100); and (3) testimony regarding the unauthorized use of the images by Stemtech distributors in association with Stemtech marketing material and internet links to Stemtech (D.I. 256 at 16; D.I. 238 at 57211-16521 1; PX 51-143). While the jury was not compelled to credit all of this evidence, it was free to do so, leaving the finding of direct infringement not against the clear weight of the evidence.[2]

In this regard, it is also noteworthy that at trial, Stemtech told the jury that it agreed that some amount of infringement of Leonard's copyrighted images did occur. In closing argument,

_____

[2]With respect to whether Photo Researchers, or any other agent of Leonard's, licensed Stemtech or its distributors to use Leonard's images, it appears that Stemtech is attempting to shift the burden to Leonard to disprove an unproven defense. (*See* D.I. 263 at 1) ("Leonard did not prove that PR and its agents did not authorize any distributors' use of his images. Thus, Leonard failed to prove direct infringement by a single distributor.") On the evidence presented, the jury was free to find that Stemtech's distributors directly infringed Leonard's copyrights.

5

Defendant (through counsel) admitted that some of its distributors did copy Plaintiff's Images 3 and 4 without permission. (*See* D.I. 240 at 169, 184-85)

Stemtech also challenges Leonard's showing with respect to the second element of vicarious infringement, that Stemtech had the right and ability to supervise any infringing conduct of its distributors. Stemtech analogizes its relationship with its distributors with that between Google and operators of third-party websites, which were found to be outside the control of Google for purposes of vicarious infringement in *Perfect 10*, 508 F.3d at 1173. Again, the Court agrees with Leonard that there was sufficient evidence in the record from which a reasonable jury could have found that Stemtech had the right and ability to stop the infringing activities of its distributors. Brian Noar, Stemtech's compliance officer, and George Antarr, a Stemtech vice president, testified that Stemtech had multiple means of communicating with its distributors, as well as means to influence the distributors to limit or stop their infringing uses of Leonard's images, including requiring them to "stay within our [Stemtech's] policies and procedures" by withholding from non-compliant distributors money and access to essential back office tools. (D.I. 239 at 251-53, 291-94, 300-04, 309) The contractual and financial relationship between the defendant and the third parties in *Perfect 10* was more limited in scope than the relationship the jury could reasonably have found existed between Stemtech and its distributors. It would have been reasonable to find that the threat of termination of distributorship provided sufficient leverage for Stemtech to rein in an errant distributor whenever Stemtech chose to do so, particularly given the undisputed evidence the jury heard of Stemtech succeeding in stopping the unauthorized behavior of certain distributors. (*See* D.I. 258 Ex. 2,

6

286-87)[3]

Stemtech further contends that Leonard failed to establish any obvious and direct benefit to Stemtech from its distributors' infringement, citing the absence of evidence that distributors' use of the images attracted customers or new distributors to Stemtech. (D.I. 258 at 9) However, the jury heard the testimony of Stemtech's Noar, who explained that use of Leonard's images in Stemtech's marketing materials assisted in the recruitment of new distributors, and the more distributors there are the more product that will be sold, and, therefore, the more revenue that will be generated. (D.I. 239 at 249-50) Another Stemtech witness, Antarr, testified to the importance of using pictures (and not just words) in marketing materials, to show what a stem cell looks like. (*See id.* at 41-42)

In sum, Stemtech has failed to persuade the Court that permitting the jury's verdict of vicarious infringement to stand would result in a miscarriage of justice, shocks the conscience, or cries out to be overturned.

## Contributory Infringement

Stemtech next seeks a new trial on Leonard's claim for contributory copyright infringement. In order to prevail on his claim for contributory infringement, Leonard had to prove: (1) direct infringement by a third party; (2) Stemtech's knowlege that the third party was directly infringing; and (3) material contribution. *See Parker v. Google Inc.*, 242 Fed. Appx.

---

[3]While the jury would have been free to draw the reasonable inference from this evidence that Stemtech was unaware of further infringing uses of Leonard's images by its distributors – for if Stemtech were aware, it surely would have taken steps to stop such infringement, just as it stopped other distributors' infringing uses – the jury was likewise free to infer from this evidence that Stemtech *could* stop other infringing uses but failed to do so. The evidence presented at trial supported each of these competing conclusions. In such a circumstance, it is for the jury to find the facts.

7

833, 837 (3d Cir, 2007); *see also* Jury Instr. #24. Although Stemtech challenges Leonard's showing on each of these elements, the Court finds that the record supports the jury's verdict, which is not against the clear weight of the evidence.

With respect to the first element, direct infringement by Stemtech's distributors, the analysis here is no different that that already set out above with respect to the same element of Leonard's vicarious infringement claim.

Turning next to Stemtech's contention that Leonard failed to prove it had knowledge that its distributors were infringing, the jury heard from Leonard that he, himself, provided Stemtech notice of such infringing activity by its distributors. (*See* D.I. 237 at 19; D.I. 240 at 168) As discussed above, there was also evidence that Stemtech stopped certain infringing activities of its distributors, activities of which it was undisputed Stemtech had knowledge. A reasonable jury could have found from this evidence that Stemtech also came to have knowledge of additional infringing activities (and for whatever reason chose not to stop them).

The record also supports a finding that Stemtech materially contributed to its distributors' infringement by knowingly taking steps that were substantially certain to result in direct infringement by those distributors. *See Perfect 10*, 508 F.3d at 1170-71. The jury heard evidence from which it could have found that Stemtech wanted to use Leonard's images in its marketing materials, used those images in the marketing materials it distributed to its distributors, and it required its distributors to use these marketing materials, all in an effort to drive larger sales and obtain further revenues. (*See* D.I. 261 at 18-19) (citing evidence)

In sum, Stemtech has failed to persuade the Court that permitting the jury's verdict of vicarious infringement to stand would result in a miscarriage of justice, shocks the conscience, or

8

cries out to be overturned.

**Damages**

Stemtech asserts that the jury's damage award is excessive, based on the wrong standard, and that Plaintiff's expert, Jeffrey Sedlik, expressed an opinion on damages that was speculative and unsupported by the evidence. (D.I. 258 at 12-19) Specifically, Defendant claims that Leonard's actual damages should have been based on amounts Leonard received from licensing or the amounts used in negotiations between Leonard and Stemtech. (*Id.* at 14) Stemtech also attacks Sedlik's use of multipliers in opining on the estimated value of lost licenses, describing the multipliers as punitive and, therefore, improperly used in calculating actual damages. (*See id.* at 15-16; Ex. 2 at 169-76) In Defendant's estimation, Leonard's actual damages cannot exceed $1,804. (D.I. 258 at 18-19)

To warrant a new trial on the grounds of excessive damages, the Court must find that the jury's award (1) is grossly excessive, shocking, or monstrous; (2) is clearly not supported by the evidence; (3) results in a plain injustice; (4) is based on speculation or guesswork; or (5) is the product of passion or prejudice. *See Garrison v. Mollers N. Am., Inc.*, 820 F.Supp. 814, 822 (D.Del. 1993); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996); *Eich v. Bd. of Regents for Central Mo. State Univ.*, 350 F.3d 752, 762-763 (8th Cir. 2003). While the $1.6 million damages figure returned by the jury is excessive and surprising, the Court concludes it is not *grossly* excessive, *shocking*, or *monstrous*, or a *plain injustice*.

In denying prejudgment interest, the Court held: "The jury's $1.6 million verdict more than fully compensates Plaintiff for the misappropriated value of his property. As Plaintiff's expert witness, Professor Jeff Sedlick, testified at trial, $1.6 far exceeds the aggregate value

9

Plaintiff 'received for all of [his] 92 previous licenses Photo Researchers obtained over a 15-year time period for the use of the Leonard's Image 3 or 4 . . . .'" (D.I. 247 at 4) (quoting D.I. 243 at 15) There the Court further summarized some of the pertinent damages-related evidence:

> The evidence presented at trial showed that from November 1997 through December 2012, Plaintiff (through Photo Researchers) earned a total of no more than $16,000 for licensing of the two images at issue at trial. (*See* D.I. 243 at 2-3, 12) (citing evidence of total fees earned by Leonard for all licenses to Images 3 and 4) The average fees he earned for commercial use of the images during that period were under $400 per image. (*See id.* at 3) (citing evidence) Thus, the license amount implied by the jury's verdict is an average of approximately $17,000 more per infringing use than Leonard's average commercial license fee actually obtained by Photo Researchers. (D.I. 243 at 15)
>
> Additionally, the undisputed evidence presented at trial was that Leonard offered Stemtech yearly licenses to the use of Images 3 and 4 (including usage on the internet) for amounts measured in the hundreds of dollars, not thousands or millions of dollars. Also, as Defendant points out, "there was no evidence at trial, let alone a finding, that Stemtech's conduct was intentional or willful[.]" (D.I. 243 at 14) Nor did Plaintiff prove that any of the infringement drove Defendant's sales or caused anyone to sign up as a distributor for Stemtech.

(D.I. 247 at 4)

All of the foregoing indicates that another reasonable jury *could have* decided that Leonard's actual damages were one or two orders of magnitude lower than what the actual reasonable jury that heard the evidence decided. The $1.6 million awarded can be accurately characterized as excessive. But that is not an adequate basis for granting the relief sought by Stemtech. For, as the Court also stated in denying Plaintiff's motion for prejudgment interest, "none of this means the jury's verdict was *unreasonable*." (D.I. 247 at 4) (emphasis added)

More importantly, none of it – or anything else Defendant has argued – qualifies the jury's actual damages figure as something that here justifies a new trial.

The $1.6 million actual damages figure is not "*clearly* not supported by the evidence," particularly when one realizes that Stemtech chose to present *no damages expert* at trial. Plaintiff's expert, Professor Sedlik, opined that an appropriate lump sum base licensing fee was $215,767.65, and then further opined that scarcity and exclusivity multipliers should be applied, resulting in a damages amount of $1,456,431.71 to $2,966,805.33. (D.I. ___ at 161, 163-66, 173-76)[4] Defendant's damages expert . . . did not exist. There was no competing expert testimony for the jury to assess as it determined an appropriate figure for actual damages. Hence, as Leonard correctly emphasizes, "the amount the jury awarded falls squarely within the range of damages that the *only* expert in this case, Professor Jeff Sedlik, testified would be reasonable." (D.I. 261 at 1) (emphasis added)[5]

Other evidence could have been found by the jury to corroborate the reasonableness of Sedlik's opinions. For example, the jury heard evidence that Leonard had demanded $700,000 for alleged infringement on several websites and for a license to use his images with his impression. (*See* DX878, 879, 973, 1020, 1024) Similarly, defense counsel mentioned in

---

[4]Leonard agrees that use of a multiplier would be punitive and inappropriate in calculating the fair market value of a license, but he takes the view that Sedlik's application of multipliers was properly based on the scarcity and exclusivity of the images involved. (D.I. 261 at 25-26) The jury was free to credit Sedlik's testimony as to the bases for his multipliers (*see* D.I. 239 at 164, 172-77), particularly in the absence of any competing expert testimony.

[5]In addition to not calling its own expert, Defendant also chose to advocate a position on damages that, in light of all the evidence, the jury might reasonably have concluded was as unsupportable as Defendant contends Plaintiff's figure is: just $784, or possibly as much as $1804. (*See* D.I. 240 at 200, 203)

11

argument that Leonard had made a demand of $300,000 for the use of a single image. *(See* D.I. 240 at 175) Defendant did not object to admission of evidence of these demands. While these large dollar figures are not evidence of actual agreements between a willing buyer and a willing seller, they are at least somewhat probative of fair value (as some indication of the value Leonard has placed on his property) and may have, in the context of the entire record, caused the jury reasonably to view Professor Sedlik's figures not unreasonable. *(See also generally* D.I. 239 at 68-69) (Gerard, whose company represented Leonard in licensing efforts, testifying that his images were popular for editorial and commercial use)

Plaintiff's licensing agent, Mr. Gerard, provided additional bases from which a jury could reasonably find that use of Leonard's images was very valuable. Gerard testified that Leonard's images were "very popular," in part because "for many, many years, they were the only ones [of their kind] that I could get and the only ones that I could make available to my clients." (D.I. 239 at 48, 49) The images were also "beautiful." *(Id.* at 50) As a result, Gerard testified, Leonard "made a significant amount of money" and "the per-image popularity . . . was a lot higher for Andy's material, just because of the subject matter." *(Id.* at 48, 49) Gerard further explained how he licensed one of Leonard's images to Time, Inc. for a cover photo on Time Magazine, which he described as the "Holy Grail . . . having that up there with your credit is very, very significant." *(Id.* at 53-54)

Finally, while Stemtech devotes a great deal of attention to arguing that Leonard's damages case is based on nothing more than speculation or guesswork, the Court already rejected these contentions when it denied Stemtech's *Daubert* motion to exclude the testimony of Professor Sedlik. Stemtech particularly emphasizes that "Leonard's own licensing fees should

12

have been used to calculate his actual damages." (D.I. 258 at 13) Of course, Stemtech was free to retain an expert who could have expressed this very opinion and calculated Leonard's actual damages based on his own licensing history – but that is not the trial strategy Stemtech chose to pursue. Importantly, Stemtech has done nothing to overcome the thorough, persuasive analysis articulated by Judge Burke in his Memorandum Order denying Stemtech's *Daubert* motion seeking to exclude Professor Sedlik's testimony. (D.I. 203)

There, Magistrate Judge Burke wrote:

> Plaintiff retained Professor Sedlik, a professional photographer and educator, as an expert in this action, to offer opinions regarding, inter alia, "licensing issues [and] applicable damages." (D.I. 177, ex. 3 at 1 & ex. A) Professor Sedlik issued a Preliminary Expert Report (hereinafter "Preliminary Report") in which he purported to calculate Plaintiffs actual damages resulting from the infringement at issue in Leonard I, and opined that Plaintiff is entitled to actual damages in the amount of at least $215,767.65. (*Id.* at 26-29) Professor Sedlik explained this figure represents "a reasonable estimate of licensing fees applicable to the" alleged infringements at issue. (*Id.* at 26) To arrive at this figure, Professor Sedlik obtained "comparative stock photography license fee quotes from several stock photography agencies." (*Id.*) Professor Sedlik then calculated a total fee based on these quotes and on several other factors, including his personal knowledge and experience in the field. (*Id.* at 26-27)
>
> . . .
>
> Actual damages for copyright infringement are governed by 17 U.S.C. § 504(b), which states that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement[.]" The purpose of actual damages is to assess damages from the point of view of the copyright owner and "compensate the [copyright] owner for any harm he suffered by reason of the infringer's illegal act." *On Davis v. Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001); *see also Am. Bd. of Internal Med. v. Von Muller*, Civil Action No. 10-CV-2680, 2012 WL 2740852, at *4 (E.D. Pa. July 9, 2012).

13

. . .

"[F]inding the fair market value of a reasonable license fee may involve some uncertainty," and such uncertainty "is not sufficient reason to refuse to consider this as an eligible measure of actual damages." *On Davis*, 246 F.3d at 166. Indeed, "when courts are confronted with imprecision in calculating damages, they 'should err on the side of guaranteeing the plaintiff a full recovery.'" *Id.* at 164 (quoting *Sygma Photo News, Inc. v. High Soc'y Magazine*, 778 F.2d 89, 95 (2d Cir. 1985)).

. . .

Here, Professor Sedlik's curriculum vitae makes clear that he has extensive experience in the area of photography licensing. (Preliminary Report, ex. A) For instance, Professor Sedlik is the current President and CEO of the PLUS Coalition, which is the international photography industry licensing metadata standards body. (*Id.* at 1, 6) He operates a company dedicated to licensing his own photographic images for various usages, and has served on advisory boards in which he was consulted on issues including stock photography licensing. (*Id.* at 1) Professor Sedlik has written articles on licensing that have been published in various photography publications and has taught classes on the subject. (*Id.* at 4, 7)

. . .

In purporting to calculate Plaintiff's actual damages, Professor Sidlik did not incorporate the licensing fees that Plaintiff himself has previously charged clients for the Images, instead relying on license fee quotes that he obtained from several stock photography agencies. (Preliminary Report at 26-29) . . . In making his calculations, Professor Sedlik claims that he also relied on his "personal knowledge and experience in image licensing." (*Id.* at 27) To ensure that the licensing fees corresponded with the relevant time frame, Professor Sedlik adjusted the fees to 2006 market rates by referencing pricing data that his firm had obtained during that year. (*Id.* at 26-27 & exs. L, M, N)

. . .

. . . [T]he caselaw is also clear that actual damages may be

calculated in different ways. (D.I. 179 at 13) . . . . None of the
cases to which Defendant cites stand for the proposition that an
expert calculating actual damages *must* rely on the plaintiff's past
licensing fees, or that a failure to do so automatically renders an
expert's methodology unreliable, and the Court has not located any
such case.

. . .

. . . It may well be true that Professor Sedlik's apparent
choice not to utilize Plaintiff's own previous licensing fees for
Images 3 and 4 (or for other of Plaintiff's images) in calculating
actual damages should affect the weight that the factfinder affords
his testimony; it is certainly a decision that provides fodder for
vigorous cross-examination. . . . However, because the type of
analysis utilized by Professor Sedlik has been expressly accepted
by courts in copyright infringement cases, the Court cannot
conclude that such a methodology – calculating Plaintiffs estimated
actual damages in reliance on quotes from four stock photography
agencies for various usages of similar images – is unreliable.

(D.I. 203 at 3-4, 7-12) (internal footnotes omitted)

Accordingly, the Court concludes that the damages awarded by the jury do not provide a

basis for granting Stemtech a new trial.

**Alleged Misconduct**

Stemtech next insists that Leonard, his attorney, and his expert witness all committed

various acts of misconduct at trial, resulting in such unfair prejudice to Stemtech's case as to

warrant a new trial. (*See* D.I. 258 at 19-20) Having presided at the trial, the Court is firmly of

the view that none of the purported misconduct (to the extent it even occurred) unfairly

influenced the verdict.

For example, Stemtech claims that Leonard and his lawyer improperly referred to the

financial disparity between the parties on multiple occasions, pointing out that Stemtech was an

15

"international, multinational or global corporation." (*Id.* at 20-22) But it was obvious – and

impossible for the jury not to learn – that Plaintiff is an individual and Defendant is a

corporation. As there is a financial disparity between most individuals and most corporations,

this fact, too, was essentially impossible for the jury not to know. Additionally, "International" is

part of Stemtech International's name, so, again, it was unavoidable for the jury to hear this fact.

(*See, e.g.*, D.I. 220 at 2 (advising jury pool as early as *voir dire* that "Defendant Stemtech . . . was

previously known as Stemtech Health Sciences, Inc. and is now known as Stemtech

International, Inc.")[6] As importantly, Defendant did not attempt at trial to prevent the jury from

learning any of these things. (*See* D.I. 261 at 10; D.I. 258 Exs. 9, 10, 11, 12, 13)

Stemtech also faults Plaintiff's counsel for suggesting during closing argument that

Stemtech views its misuse of Plaintiff's copyrighted images as analogous to a parking violation,

in an effort to encourage the jury to apply an improper damages standard. (*See* D.I. 258 at 23-24;

*see also* D.I. 240 at 220-21, 224) What Defendant is referring to is a portion of Plaintiff's

rebuttal argument, during which counsel made an analogy between Stemtech's damages theory

and a person who fails to put money in a parking meter and then responds to the resulting parking

ticket by offering to pay the meter amount rather than a larger fine. (*See* D.I. 240 at 220-21)

There was nothing objectionable about this fair response to defense counsel's closing argument –

nor was any objection made to it. Moreover, even if counsel's comment was improper,

considered in the context of all the damages evidence before the jury, the Court is confident that

---

[6]Similarly, in the preliminary instructions, the Court told the jury: "The parties in this
case are the Plaintiff, Andrew Paul Leonard, and the Defendant, Stemtech International, Inc., a
company formerly known as Stemtech Health Sciences, Inc., and which will often be simply
referred to as 'Stemtech.'" (D.I. 218 at 1; *see also* D.I. 227 at Instr. No. 15 (same))

the comment did not unfairly influence the verdict.

Stemtech further contends that Plaintiff's use of the word "pyramid" to describe Stemtech's business organization was deliberately intended to "appeal to the jury's passion and prejudice." (D.I. 258 at 22-23) But witnesses associated with both parties referred to the structure of Defendant's business as consistent with a pyramid, in that there is Stemtech at the top, and below it are top level distributors, and those distributors help recruit other distributors, and so on. (*See* D.I. 239 at 258-59 (Stemtech's Noar explaining Stemtech organizational structure, including responding to contention it is "pyramid" by denying it is *illegal* pyramid) Neither Plaintiff nor anyone associated with him improperly inflamed passions by testifying or arguing that Stemtech is an illegal "pyramid scheme" that makes money by drawing in more distributors, as opposed to aiming to sell product.

These conclusions become all the more evident when Defendant's current complaints are put in the proper context of the full trial. In his *opening statement*, Plaintiff's counsel referred to Stemtech both as a "multinational corporation" and as having a "pyramid" structure. (D.I. 237 at 105-06) There was *no objection* during or after Plaintiff's opening, or at any time thereafter. Consequently, it was entirely reasonable for Plaintiff (and the Court) to conclude that Defendant had no concerns about Plaintiff's use of these terms. Instead, defense counsel's strategy appears to have been to confront Plaintiff's characterizations directly, and argue that Plaintiff was trying to distract the jury from Plaintiff's lack of evidence. For instance, rather than contend that the organizational structure of her client was irrelevant, Defendant's counsel took the time to describe it as she thought most favorable, telling the jury: "Stemtech is a direct sales company, what is known as a direct sales company. And the more commonly known direct sales

17

companies are companies like Amway and Mary Kay." (D.I. 237 at 114) In her closing, defense

counsel argued:

> "You also heard a number of times both Mr. Berlage and Mr.
> Leonard referred to Stemtech as a pyramid company? Why do
> you think they did that? They did that because they need to
> get you not to like Stemtech, to have a bad taste in your mouth
> about Stemtech, because that's the way they're going to win
> their case, because they can't meet their burden under the law,
> and they haven't met their burden under the law, so their best
> chance is to get you not to like Stemtech."

(D.I. 240 at 207) Defense counsel was free to pursue this strategy – but, having done so (and it

evidently having failed), Defendant cannot now persuasively complain that it received an unfair

trial.

Stemtech makes additional criticisms of Leonard and his attorney, but he fails to make

any persuasive showing that any of them – individually, or collectively – could have unfairly

influenced the verdict. Having sat through trial, and having seen that the fleeting references to

which Defendant cites were not prominent features of the trial, the Court concludes that there is

no "reasonable probability" that the jury's verdict was influenced by what Defendant

characterizes as improper conduct by Plaintiff and his litigation team. *See generally Fineman*,

774 F. Supp. at 269-70. The Court will not grant Defendant relief on this basis.[7]

## Purported Evidentiary Errors

As a final basis for obtaining a new trial, Stemtech identifies what it believes are a host of

---

[7]The Court has reviewed the authorities relied on by Defendant and finds they do not
justify a different outcome. Instead, they confirm that the type of advocacy the Court witnesses
from Plaintiff's counsel was within the broad range of what is acceptable under the law. *See, e.g*,
*Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) ("[W]e wish to emphasize that we do not
expect advocacy to be devoid of passion.").

18

erroneous, prejudicial evidentiary rulings. Stemtech contends that the Court wrongly "affected the trial's outcome by improperly admitting evidence that: (1) exaggerated the alleged infringements potentially attributable to Stemtech; (2) supported a legally improper and inflated damages award; and/or (3) was intended to inflame the jury or cast Stemtech in a bad light." (D.I. 258 at 25-26) Stemtech supports its contention with a table summarizing items of "Improper Evidence," listing no fewer than 94 exhibits and portions of testimony of six trial witnesses.

The Court finds that Stemtech's criticisms do not provide a meritorious basis for ordering a new trial. All of the evidence of which Stemtech now complains was admitted either over Stemtech's objection (and in such cases Stemtech has failed to provide any persuasive basis for the Court to reconsider its earlier decision) or in the absence of any such objection (and in such cases the Court perceives no basis to provide relief at this late date).

As the Third Circuit has explained – in a case relied on by Stemtech (*see* D.I. 258 at 25) – it is possible for evidentiary rulings to support a new trial (if a court is later persuaded it made a mistake), but not if "it is highly probable that the error did not affect the outcome of the case." *Goodman v. Pa. Turnpike Comm.*, 293 F.3d 655, 667 (3d Cir. 2002). Here, it is highly probable that the purported errors highlighted by Defendant did *not* affect the outcome of the trial. *See also* Fed. R. Civ. Proc. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

Once again, the Court finds no basis for granting Stemtech a new trial.

**Remittitur**

Finally, Stemtech contends that as an alternative to a new trial, "Leonard could agree to remit a portion of the verdict in excess of the amount supportable by the evidence." (D.I. 258 at 18) (citing *Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir. 1983)) The only amount of damages Stemtech agrees may be justified is $1,804, for direct infringement. (*See* D.I. 258 at 18) Thus, according to Stemtech, "unless Leonard agrees to remit $1,598,196 of the jury's excessive verdict, a new trial must be ordered." (*Id.* at 18-29)

For all of the reasons already described, particularly in connection with analyzing Stemtech's contention that the damages award justifies a new trial (see above), the Court disagrees with Stemtech. Leonard has, of course, not agreed to the remittitur proposed by Stemtech, and the Court will not compel Leonard to so agree. Instead, for all the reasons already given, the Court will deny Stemtech's motion for a new trial.

## STEMTECH'S MOTION FOR ATTORNEY FEES

Stemtech seeks to recover $96,686.59 attorney fees it incurred in defending itself in what has been referred to as *Leonard II*, the second, related case brought by Leonard against Stemtech. (D.I. 250 at 11) *See Andrew Paul Leonard d/b/a APL Microscope v. Stemtech International, Inc.*, C.A. No. 12-86-LPS-CJB (D. Del.). *Leonard II* was filed on January 27, 2012, less than two months after Magistrate Judge Burke issued a Report and Recommendation (D.I. 149) ("Report II") recommending that the Court grant Stemtech's motion for summary judgment in the original *Leonard I* case, "which had the effect of knocking out Leonard's claims for statutory damages, attorney fees and profits, leaving only his nominal actual damages [claims]." (D.I. 250

20

at 5)[8]  On March 28, 2012, the undersigned Judge adopted Judge Burke's Report II. (D.I. 155)

Ultimately, *Leonard II* was resolved when the undersigned Judge adopted Judge Burke's

September 19, 2013 Report and Recommendation (D.I. 198) ("Report III") and granted

Stemtech's motion for summary judgment (D.I. 217).

There is no question that Stemtech is the prevailing party in *Leonard II*. (*See, e.g.*, C.A.

No. 12-86-LPS-CJB D.I. 27) ("In *Leonard II*, Plaintiff Andrew Paul Leonard, d/b/a APL

Microscope take nothing, the action be dismissed on the merits and Defendant Stemtech

International, Inc. recover taxable costs incurred therein from Plaintiff Andrew Paul Leonard,

d/b/a APL Microscope . . . ."))

It is also clear that the Copyright Act provides, in pertinent part, that a "court in its

discretion may allow the recovery of full costs by or against any party" and, further, that "the

court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17

U.S.C. § 505.  In exercising such discretion, a court usually evaluates four factors: (1)

frivolousness, (2) motivation, (3) objective unreasonableness (both in the factual and legal

---

[8]A summary of Stemtech's position is as follows:

> *Leonard II* was based upon a claim that Stemtech
> ***directly*** infringed upon Leonard's Image 3 by
> placing that image as the "headshot" on two of its
> independent distributors' replicated websites.  Yet
> ***years before filing Leonard II***, Leonard and his
> counsel had ***actual knowledge*** that Stemtech's
> independent distributors controlled their "headshot"
> photograph. . . .  Based upon the foregoing, *Leonard
> II* was factually objectively unreasonable, thereby
> supporting an award of fees to Stemtech.

(D.I. 250 at 9) (emphasis in original although modified in form for consisistency)

components of the case), and (4) the need in particular circumstances to advance considerations

of compensation and deterrence. *See Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 155-56 (3d

Cir. 1986). Having undertaken this evaluation, the Court has determined that the appropriate

exercise of its discretion is to deny Stemtech's motion.

The Court is not persuaded by Stemtech that *Leonard II* was an "objectively unreasonable

and frivolous lawsuit that was filed in bad faith." (D.I. 250 at 8) Despite evidence Leonard

obtained in *Leonard I* – which, by the time he filed *Leonard II*, included evidence that

"headshots" on distributors' websites were placed on those websites by distributors' themselves,

and not by Stemtech – Leonard has reason to believe Stemtech was engaged in ongoing and new

infringement, that was not the subject of *Leonard I*. He had a non-sanctionable, non-frivolous

basis to file *Leonard II*.

Stemtech's characterization of *Leonard II* as being motivated by bad faith, with a purpose

of harassment, and being objectively unreasonable, is contradicted by the objective facts that the

Court denied Stemtech's motion to dismiss and motion for sanctions filed in *Leonard II*. (*See*

C.A. No. 12-86-LPS-CJB D.I. 25, 26)[9] In his Report III, which was adopted by the Court

(without objection from Stemtech), Judge Burke found all of the following:

- "the filing of *Leonard II* was not an end-run around
  a prior denial of Plaintiff's attempt to amend the
  complaint in *Leonard I*"

- "in light of the late stage of the proceedings in
  *Leonard I* as of January 2012, it is understandable
  why – if Plaintiff truly felt that Defendant was
  engaging in new, wrongful activity in that month –

---

[9]Stemtech did not object to Judge Burke's recommendation that these motions both be
denied.

22

> Plaintiff chose to file a new lawsuit, instead of seeking leave to further supplement the Amended Complaint in *Leonard I*"
>
> - "I cannot clearly find that the filing of the instant case was simply a bad faith attempt to re-litigate issues that have been decided [against Leonard] in *Leonard I*"
>
> - "the actions of Plaintiff and his counsel here were objectively reasonable"
>
> - "the Court has found that the filing of *Leonard II* did not amount to the promotion of improperly duplicative litigation"

(*Id.* 25 at 17, 20-21, 25)

In light of these facts, there is no basis for the relief now sought by Stemtech. The Court will exercise its discretion to deny Stemtech's motion.

## STEMTECH'S MOTION FOR COSTS

Stemtech seeks $6,255.30 as taxable costs for being the prevailing party in *Leonard II*. (D.I. 251) Leonard has posed objections to the request. (D.I. 257)

Pursuant to D. Del. LR 54.1, the proper procedure is to file a bill of costs, to be reviewed by the Clerk of Court, rather than a motion seeking judicial review. Thereafter, a party opposing the Clerk's determination may file a motion for review of that decision. *See* Fed. R. Civ. Proc. 54(d).

Accordingly, the Court will deny Stemtech's motion for costs without prejudice to its right to file a bill of costs.

## LEONARD'S MOTION FOR COSTS AND ATTORNEY FEES

Leonard seeks to recover from Stemtech the fees and costs associated with taking the

deposition of Stemtech's IT Director, George Tashjian, which Leonard contends was necessitated "[b]ecause Stemtech denied [certain] Requests for Admission [Requests]," at which, in Leonard's view, Tashjian "readily admitted that Stemtech's denials to the Requests were wrong." (D.I. 264 at 1) Leonard explains that "the issue involving these requests was an important part of Plaintiff's proof, namely, that Stemtech owned certain internet domains and provided its registered distributors with websites with sub-domains." (*Id.* at 2) Stemtech denied these Requests – even though what Leonard asserted was true – and did so without consulting Tashjian. (*See id.*) Leonard learned these latter facts only at Tashjian's deposition. Leonard seeks to recover $2,275 in attorney fees as well as the $773.30 it paid for the transcript of Tashjian's deposition. (*See id.*)

Federal Rule of Civil Procedure 37(c)(2) provides:

> If a party fails to admit what is requested under Rule 36 [governing Requests for Admission] and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless:
>
> (A)    the request was held objectionable under Rule 36(a);
>
> (B)    the admission sought was of no substantial importance;
>
> (C)    the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or
>
> (D)    there was other good reason for the failure to admit.

Stemtech opposes the motion on several grounds. First, Stemtech contends "Leonard inexplicably and unreasonably waited" to file the motion until nearly two years after Stemtech

denied the Requests and approximately 20 months after Leonard believes he proves the denials were wrongly provided. (*See* D.I. 265 at 1) The Court disagrees with Stemtech, as it points to no firm deadline for filing a Rule 37(C)(2) motion, *see Chemical Eng'g Corp. v. Essef Indus. Inc.*, 795 F.2d 1565, 1574 (Fed. Cir. 1986) ("No Rule specifies the time during which a Rule 37(c) motion must be filed, and as explained in the advisory committee note to Rule 37(c), the Rule is intended to provide post-trial relief."); evaluating whether the admission sought was of substantial importance may, in some circumstances, require waiting until very late in a case to evaluate; and, under the particular circumstances here, Stemtech's litigation strategy – which appeared to include denying any infringement by its distributors and any control over its distributors' websites until admitting certain aspects of liability at trial, all rendered Leonard's delay not unreasonable. Even if such a "motion should normally be deemed waived if it is not made prior to trial," *Mercy v. County of Suffolk, New York*, 748 F.2d 52, 55-56 (2d Cir. 1984); *see also Popeil Bros., Inc. v. Schick Elec., Inc.*, 516 F.2d 772, 778 (7th Cir. 1975) ("We conclude that Rule 37(c) expenses and fees must be timely sought prior to judgment and appeal, and that if the judgment is silent in regard thereto, they are deemed waived or denied."), here, with two consolidated cases, with a magistrate judge handling all pretrial matters, with the lack of prejudice to Stemtech from Leonard's delay, and given Stemtech's overall litigation strategy, the Court concludes that Leonard's motion is not untimely.

Stemtech next argues that the Requests were "objectionable and, more importantly, they were of no substantial importance." (D.I. 265 at 1) Stemtech bases this argument on the fact that "not a single domain name that was at issue in the responses [to the Requests] was even mentioned at trial, let alone admitted as evidence;" nor was Tashjian a witness at trial. (*Id.*)

Stemtech unfairly undermines the importance of the evidence sought (and eventually obtained) by Leonard. The substantial importance of the domain evidence is demonstrated by its use by Leonard in defeating a Stemtech motion for summary judgment. (*See* D.I. 266 at 3) Less directly, the importance of the evidence is shown by the fact that Stemtech could not take certain positions at trial, knowing that Leonard could prove the contrary, thanks to the Tashjian deposition transcript, a purpose that could have been served equally as well by proper responses to the Requests. For instance, as Leonard explains, at trial Leonard could ask Noar – Stemtech's only witness at trial – "the questions that he did, knowing that he could pull Mr. Tashjian's transcript should Mr. Noar try and deny these facts" as to the relationship between Stemtech's conduct and its distributors' infringement. (D.I. 266 at 3) Stemtech also asserts that the Requests were objectionable as "vague and ambiguous, call[ing] for the premature disclosure of expert witness information and for a legal conclusion." (D.I. 265 at 6) These objections are unavailing, as the Requests plainly and properly seek admission of the facts that "Stemtech provides independent distributors websites with sub-domains of the official Stemtech owned domain." (D.I. 264 Ex. A at 4) Stemtech offers no explanation for why it would respond to such requests for factual evidence without even consulting the fact witness who could best answer them (i.e., Tashjian).

Stemtech's final contention has more merit. Stemtech persuasively debunks Leonard's assertion that Leonard took Tashjian's deposition *because* of Stemtech's denials of the Requests. As Stemtech points out, Leonard noticed Tashjian's deposition more than one month *before* Stemtech served its responses to the Requests and only two of 107 pages of Tashjian's deposition transcript relate to the issues raised in the Requests. (*See* D.I. 265 at 2) Leonard's briefing

contains nothing more than conclusory assertion that he took Tashjian's deposition *because* of Stemtech's denials, but this is plainly incorrect.

Ultimately, then, the Court is confronted with a situation in which neither side's position is entirely meritorious. Leonard is correct that Stemtech should have admitted the Requests and that the facts Leonard sought to confirm were of substantial importance. The timing of Leonard's motion, while not ideal, was not so delayed as to unfairly prejudice Stemtech, nor does it (given the nature of the issues raised) make it more difficult for the Court to resolve. However, Leonard has wholly failed to persuade the Court that it took Tashjian's deposition *because* of Stemtech's denials of the Requests, given the undisputed facts that Leonard noticed the deposition well before receiving Stemtech's responses and that only a small portion of the actual deposition was devoted to the issues involved in the Requests.

Under the circumstances, the Court can fathom no better resolution than to rule for each side in part. Thus, the Court will grant Leonard's motion, but reduce the amount he seeks to recover by 50%. This result is fair to both sides as it avoids the unfair outcome of awarding Leonard all of his fees and costs – when they were not all or even mostly necessitated as a result of Stemtech's improper conduct – and also avoids the unfair outcome of allowing Stemtech to escape unscathed despite its improper denials of the Requests.[10]

---

[10]Leonard filed what appears to be an identical motion in the related case, *Andrew Paul Leonard d/b/a APL Microscope v. Stemtech International, Inc.*, C.A. No. 12-86-LPS (*see* D.I. 28). By separate order, that motion will be denied as moot. Granting relief in both cases would amount to an improper double recovery, as the record shows Leonard incurred the fees and costs sought just once.

**CONCLUSION**

For the reasons stated above, IT IS HEREBY ORDERED that:

1.      Stemtech's Motion For a New Trial or Remittitur (D.I. 258) is DENIED.

2.      Stemtech's Motion For Attorney Fees (D.I. 250) is DENIED.

3.      Stemtech's Motion For Costs (D.I. 251) is DENIED WITHOUT PREJUDICE.

4.      Leonard's Motion For Costs And Attorney Fees Pursuant to Fed. R. Civ. Proc. 37(c)(2) (D.I. 264) is GRANTED to the extent that Stemtech SHALL PAY Leonard fifty percent (50%) of the costs and fees sought by Leonard.

5.      The Clerk of Court is directed to CLOSE this case.


August 13, 2015                         HON. LEONARD P. STARK
Wilmington, Delaware                    U.S. DISTRICT COURT JUDGE